# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
**SIMON BANKS,**                                      )
)
**Plaintiff**              )
)
**v.**                                                      )          **Civil Action No. 05-1514 (ESH)**
)          **Ellen Segal Huvelle, Judge**
**S. ELWOOD YORK, JR., ET AL.**              )
)
**Defendants**            )          **November 20, 2006**
_____)

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF' RULE 56(F) MOTION TO DENY DEFENDANT'S MOTION WITHOUT PREJUDICE, OR ALTERNATIVELY, FOR EXTENSION OF TIME IN WHICH TO COMPLETE DISCOVERY

Comes now Simon Banks, Plaintiff and submit Memorandum of Law In Support of Plaintiff's Rule 56(e) and (f) Motion to Stay and/or Deny Defendants District of Columbia, joint motions to dismiss and/or for summary judgment, and in support, cites the following:

### VIOLATION OF RIGHT TO EXTRADITION HEARING

Defendant District of Columbia Government, et al Motions to Dismiss the Plaintiff's Third Amended Complaint (joint motions to dismiss) to Dismiss the Plaintiff's Third Amended Complaint and/or for summary judgment, cites a myriad of excuses and reasons for the Plaintiff's overdetention, unlawful and false imprisonment and attaches a sham waiver, dated June 18, 2004, asserting falsely that the Plaintiff "having appeared with counsel in open Court on June 18, 2004, and having waive further proceedings

pursuant to law and indicated his desire to return voluntarily to the State of Virginia."
First the Plaintiff was not represented by any counsel. No counsel entered his appearance
and no counsel was appointed by the Court and the Plaintiff has not retained counsel.
Moreover, this pleading does not comport with the requirements of the District of
Columbia Extradition Act, the Uniform Criminal Extradition Act.

The District of Columbia Department of Corrections transfer of the Plaintiff to the
State of Virginia when and while the Plaintiff was serving a sentence imposed by the
District of Columbia Court of Appeals (Superior Court Judge Noel Kramer serving by
special designation), after the Plaintiff submitted protest on the record of the Virginia
detainer and Plaintiff's intent to challenge the constitutionality of the Virginia detainer,
On June 4, 2004, violated Plaintiff's Constitutional rights pursuant to the Interstate
Compact, the Interstate Agreement on Detainers, Pub. L. 91-538, § 1, Dec. 9, 1970, 84
Stat. 1397, as amended by Pub. L. 100-690, title VII, § 7059, Nov. 18, 1988, 102 Stat.
4403, to which the State is a party.

The totality of the circumstances will clearly show that the Plaintiff never waived
his rights to challenge the constitutionality of the detainer, and not with respect to the
rights accorded Plaintiff under Fed. R. Crim. P. 40(a). *Hagans v. United States,* 408 A.2d
965, 967 (D.C. 1979). See *United States v. Holmes,* 380 A.2d 598, 602 (D.C. 1977)(citing
*Schneckloth v. Bustamonte,* 412 U.S. 218 (1973).
By statutory enactment. *State ex re. Modie v. Hill,* 191 W.Va. 100, 102 (1994). As the
federal government is a party to the IAD, it constitute federal law, subject to federal
construction. *Somerlot, 209 W.Va. at 128 (quoting Carchman v. Nash,* 473 U.S. 716, 719,
105 S.Ct. 3401 (1985). ([t]he Agreement is a congressionally sanctioned interstate

compact within the Compact Clause, U.S. Const. Art. 1, § 10, cl.3, and thus is a federal

law subject to federal construction."); see also, *New York v. Hill,* 528 U.S. 110, 111, 120

S.Ct. 659 (2000).  When the Plaintiff was transferred his right to bring a habeas corpus

petition on the ground that he is in custody in violation of the Constitution or laws or

treaties of the United States." 28 U.S.C. § 2254 (a) (1996).  The Plaintiff can show

prejudice arising from the violation. *Wainwright v. Sykes,* 433 U.S. 72 (1977); *Maggard*

*v. Gammon,* 197 F.Supp.2d 1321, 1330-31 (D.Kan. 2002).  The Plaintiff can show that

any constructive waiver conclusively-self-servingly construed by the District of

Columbia Government, was not voluntary.  *New York v. Hill,* 528 U.S. 110, 114, 120

S.Ct. 359 (2000).

   *Harden v. Pataki,* 320 F.3d 1289, 1294-1302 (11th Cir. 2003), held that a state

prisoner's § 1983 claim seeking damages and declaratory relief for the alleged violation

of his federally protected extradition rights is not barred by ***Heck); French v. Adams**

*County Det. Ctr.,*** 379 F.3d 1158, 1160 (10th Cir. 2004) (same).

## DISTRICT OF COLUMBIA PATTERN AND PRACTICE OF OVER-DETAINING INMATES

   Defendant District of Columbia has resumed since at least approximately January

1, 2006 the practice of holding inmates in the DC Jail[1] or CTF or halfway house for

periods of time from 1 day to several months after judicial officers (judges and

magistrates of the District of Columbia Superior Court and the District of Columbia

District Court) ordered them released. The District has participated in a pattern and

practice of releasing persons on dates beyond their release dates through May, 2006,

---

[1] The Department of Corrections houses inmates in the DC Jail or CTF or halfway
houses.  Generally, depending on context, the use of the term DC Jail in this motion
includes all three facilities

pursuant to a custom, pattern and practice that deprived persons of Constitutional rights. See Plaintiff' Exhibits' ## 1-14, 16-22, 37-42 **(affidavits of persons overdetained)** set forth in Plaintiff's Exhibits in Support of Plaintiff's Rule 56(e) motion.

See also, Plaintiff's list of Exhibits listed in the Plaintiff's Motion for Judicial notice (listing persons overdetained through May, 2006, and Plaintiff's Second Set of Exhibits in Support of Plaintiff's Rule 56(e) Motion.

Plaintiff' Exhibit #38 (affidavit of Jeffrey Owens, overdetained 96 days). The District of Columbia Department of Corrections (sometimes "DOC") has also resumed since approximately January 1, 2006 the practice of subjecting court returns ordered released at their court appearances (and who are not subject to any other cases on which they are being detained, holds or warrants) to suspicionless strip searches after a judicial officer has ordered them released. Plaintiff' Exhibits ## 1-14 and 16-18, 37-42.

## APPLICABLE LAW

1.  Rule 56(f) motions are granted in this circuit as a matter of course where, as here, a party files a motion for summary judgment before entry of a scheduling order.

    Rule 56(f) motions are granted in this Circuit as a matter of course as long as the moving party has been pursuing discovery diligently, *Berkeley v. Home Ins. Co.*, 68 F.3d 1409 (D.C. Cir. 1995), especially where discovery is ongoing, *Bynum v. District of Columbia,* 215 F.R.D. 1,2(D.D.C. 2003)(any motion for summary judgment is case premature until close of discovery process); *Cobell v. Babbitt*, 30 F. Supp. 2d 24, 28-29 (D.D.C. 1998) (summary judgment motion premature when filed before close of discovery under scheduling order) (subsequent history but no

adverse treatment on this point), or has not even commenced, *Loughlin v. United States*, 230 F. Supp. 2d 26, 51 (D.D.C. 2002) (premature to grant summary judgment where non-movant has not yet conducted discovery).  Dismissing a summary judgment without prejudice is especially appropriate where, as here, the case is factually complex and the defendant filed its summary judgment motion before a scheduling order has even been entered.  *Bynum*, 215 **F.R.D**. at 2 (decision by summary judgment disfavored when additional development of facts might illuminate issues of law requiring decision); *Loughlin*, 230 F. Supp. 2d at 51.

In this case, the Courts has not even entered a Scheduling Order. Therefore, summary judgment would be premature because plaintiff has established that the Plaintiff cannot at this time present essential facts needed to justify their position in this case, but the Plaintiff will be able to present such facts after discovery.  *Cobell*, 30 F. Supp 2d at 28-29.

Moreover, denial without prejudice or a continuance is especially appropriate where, as here, the discovery plaintiff needs to oppose the joint motions is within the exclusive possession of the moving party.  *Carmona v. Toledo*, 215 F.3d 124, 133-134 (1st Cir. 2000) (entry of summary judgment for defendants police supervisors reversed because plaintiff could not respond to motion because defendants did not respond to discovery, and information plaintiff needed was in possession of defendants).  Plaintiff has a right to conduct an investigation into the factual basis of **the District of Columbia Government conclusions**.  Fed. R. Civ. P. 56(f).  Otherwise, defendants could end every case

before it began by as here, filing a motion to dismiss and/or for summary judgment based upon conclusory arguments, before discovery began. *Edmond v. Consumer Protection Division Office of Attorney General of Maryland*, 934 F.2d 1304 (4th Cir. 1991) (defendants cannot offer affidavits in support of summary judgment motion and then invoke 5th Amendment privilege to avoid depositions and other discovery).

Plaintiff will make evidentiary objections when Plaintiff respond to the motion on the merits or in a separate motion to strike the affidavit.

2.    **Plaintiff cannot respond to challenges to the lengths of his overdetention until Plaintiff can obtain discovery**

Plaintiff cannot respond to challenges to the length of his overdetentions until Plaintiff can obtain discovery on plaintiff's institutional file.

Thus far, Plaintiff has been able to obtain documents needed to analyze the District's contentions regarding the length of overdetentions of plaintiff. The Plaintiff has requested a copy of his institutional file a couple of weeks ago and has of yet received a copy.. Plaintiff also need discovery to establish the Monell claims pled in the Second Amended Complaints.

3.    Plaintiff's legal theory is that (1) the Plaintiff was overdetained; (2) the District has a custom of overdetaining persons incarcerated by the District; and (3) and the District is deliberately indifferent to the overdetentions because the District maintains a release system "that simply delays all releases until the system with the resources it chooses …is ready to make releases." See *Berry v. Baca*, 379 f.3d at 768; (4) that the

Plaintiff pled the sufficient facts in support of this theory in his Third amended complaint.xx

    Under Fed. R. Civ. P.8.  *Atchinson v. District of Columbia*, 73 f.3d 418, 423 (D.C. Cir. 1996)(plaintiff satisfies Rule 8 in § 1983 *Monell* claims by alleging (i) failure to train (ii) and unusually serious instance of misconduct that on its face raises doubts about its training policies); *Miller v. Caldera,* 138 f. Supp. 2d 10, 12 (D.D.C. 2001) ("A complaint …need not allege all that a plaintiff must eventually prove.") *citing Atchinson*, 73 f.3d at 421-22.

    Plaintiff previously submitted affidavits in support of  Plaintiff's Motion for Judicial Notice, and as set forth in Plaintiff's Rule 56(e) affidavit which plaintiff incorporate by reference here.  Plaintiff' Exhibits ## 1-14, 16-22 (affidavits of persons overdetained through May, 2006. (See overdetained affiants in *Barnes v. District of Columbia, et al. Plf's list.)* **Id.**

    The **affidavit of the Records Office administrator Paige Ireland** and affidavits submitted by Plaintiff establish that the District has tolerated for years a system that cannot reliably and promptly transmit release date on in custody defendants from the courtroom to the Records Office.  These affidavits are sufficient justify Plaintiff contention that the plaintiff was overdetained, and that in the District of Columbia there is a custom of overdetentions and the District is deliberately indifferent to it, and that discovery will produce "additional development of facts [which] might illuminate the issues of law requiring decision." *Bynum*, 215 F.R.D. at 2.

**DEFENDANTS'S MOTION TO DISMISS AND WHY IT IS FLAWED; MS. IRELAND'S AFFIDAVIT AND THE DISTRICT'S MOTION ESTABLISH THAT THE DISTRICT HAS NO FUNCTIONING INMATE MANAGEMENT SYSTEM**

**The District of Columbia's contention regarding the Plaintiff's overdetention, is that it is not their fault, it is the fault of somebody in the clerk's office of the District of Columbia Superior Court**, who placed various case numbers on the Plaintiff's records, and these case numbers confused the District of Columbia Department of Corrections Records Office employees whom were charged with calculating the Plaintiff's sentence into making an honest mistake. However, this contention is contradicted by the various notices that the Plaintiff gave to defendant York (Director, Department of Corrections) and Larry Corbitt )Acting Warden of the Central Detention Center (DC Jail) (predecessor of Defendant Clay whom has now been replaced by William J. Smith (Current Warden, CDC). **See Attachment #1** to this Motion, Plaintiff's Motion for Mandamus.[2]  The Plaintiff notified Warden Corbett in June 2005 that the DCDC incorrectly computed his date. **See Attachment #2**[3].  The Plaintiff informed Warden Smith that DCDC failed to credit time served and miscalculated Plaintiff's release date. **See Attachment #3**[4]**;**  On or about July 7,

---

[2] ***Banks v. Smith,* 1:04cv00903, Judge Royce Lamberth,** June 24, 2005, **"Plaintiff's Motion for Mandamus directing Larry Corbett, Acting Warden and Elwood York, Jr., Director of DC Department of Corrections for Time Served, Good Time Credit and Release Records of the DC Jail**.

[3] Plaintiff's facsimile to Larry Corbitt, Warden DC Jail, dated June 10, 2005, in part providing: "The release date set forth in your computer record is October 2, 2006. " **There has been no credit afforded for me for the time I spent in jail since April 8, 2004 to the present. "**

[4] Plaintiff's Memorandum of Points and Authorities in *Banks v. Smith*, dated June 24, 2005, provides, in part at ¶3**: " ..The procedure used by the DC Department of**

2005, the Plaintiff informed both defendant York and defendant Clay (via service upon Larry Corbett, Warden DCDC) that Defendant York and Corbett subjected the Plaintiff to an extra six months of confinement.  **See Attachment 4 (Original Complaint).**  At Page **12, ¶Z5** of the original complaint in the instant case, filed by the Plaintiff, on July 7, 2005, the Plaintiff provides, in part:  "***Defendant's York and Corbitt  incorrectly subjected the Plaintiff to an extra six months of confinement by setting Plaintiff's release date six months after expiration of the sentence.  In this case the Plaintiff was under a bench warrant and the detainer issued by Judge Noel Kramer in July 23, 2004 although Plaintiff was released to Virginia authority pursuant to a scheme and plan to subject Plaintiff to trial in the State of Virginia and to subject Plaintiff to an enhanced sentence.  The actions of defendant York and Corbett by failing to credit the Plaintiff with time incarcerated in the State of Virginia between July 23, 2004 through December 19, 2004 was intentional.***  A copy of this Complaint was mailed to Elwood York, Jr. and Larry Corbett, Acting Warden, DC Jail and further submitted by facsimile to Elwood York, Jr. and Larry Corbett, Acting Warden. DC Jail See Certificate of Service.  ***See also,*** Plaintiff's Motion for Temporary and Preliminary Injunctive Relief and Memorandum of Points and Authorities In Support of Temporary, Preliminary and Permanent Injunctive Relief, filed on July 7, 2005,  were served upon Defendants York and Corbett, via Facsimile.  **See Certificate of Service of the Same. [EMPHASIS ADDED],**

Notwithstanding the claims of Defendant District of Columbia Department of Corrections as set forth in "**The New District of Columbia Department of**

---

**Corrections and the DC Jail computing plaintiff's time served and good time credit, are violative of the Due Process Clause of the Fourteenth Amendment.** "

**Corrections Records Office Action Plan 2000 (August 21, 2000)** and Odie Washington, Director of Department of Corrections, letter of August 21, 2000, reporting significant improvements initiated within the DCDC," pursuant to the Show Cause Order of Honorable Royce C. Lamberth, United States District Court for the District of Columbia, "ordered that Patricia Britton-Jackson, Warden of the D.C. Jail, show cause why the defendant in the case of *United States v. Oscar Veal, Jr.,* Criminal No. 00-068 (RCL) should not be held in contempt, referencing at ¶ of Introduction, the Shaw Report, and the Department of Corrections adoption of the recommendations contained in the Shaw Report*,* the Plaintiff not only was overdetained some 40 plus days, but the overdetention of the Plaintiff would have gone unabated but for the Plaintiff's pro se Emergency Petition pursuant to D.C. Code §23-110, filed on April 12, 2006, and acted on April 26, 2006, ultimately causing the Plaintiff's release on August 28, 2006.  See attachment #4, Plaintiff's D.C. Code § 23-110 Emergency Motion.

### PRIOR NOTICE AND DELIBERATE INDIFFERENCE TO PLAINTIFF'S MEDICAL NEEDS AND THAT PLAINTIFF STOOD IN IMMINENT DANGER OF LOSING SEVEN TEETH

The defendants, their subordinates and assigns, were deliberately indifferent to Plaintiff's medical needs and had prior knowledge that the Plaintiff might suffer irreparable harm to seven of the Plaintiff's teeth, because of defendants' conduct and failure to take reasonable measures to protect the Plaintiff's teeth, thereby committing medical malpractice, negligent infliction of mental and emotional distress.

The Plaintiff further informed defendant York (Former Records Office Administrator by designation) of Plaintiff's dental dilemma on August 23, 2005, and

10

notwithstanding this prior notice defendant York was deliberately indifferent to the medical needs of the Plaintiff and the harm that the Plaintiff was exposed to.  **See Attachment #5**[5]**,  See also Attachments #6,**[6]  **See Attachment #6,**[7]  **See**

---

[5] Letter submitted to Elwood York, Jr. via facsimile,  August 23, 2005, Re: Request for Dental Appointment, referencing prior meeting about same with defendant Corbett (amended to defendant Clay) which provide: " ***Please be advised that this constitutes my precursor to civil litigation against the dentists at the DC Jail in their official and personal capacity pursuant to the requirements of the D.C. Code § 12-309, et seq., for failure to treat me, provide me with an appointment, although I have now submitted seventeen requests for dental appointments. Several months ago, specifically March 2005, the DC Corrections' Officers confiscated my crown protecting seven (7) teeth.  I reported this and subsequently met with Larry Corbett then Acting Warden, having been provided various assurances to no avail.  Subsequent to meeting with Larry Corbett, I have been subjected to retaliation and reprisal and my request for dental appointment has fallen on death ears.***"

1. [6] Plaintiff's Motion for Medical Furlough, dated July 24, 2004, served upon defendant Steven Smith, Warden, which in part provides, at ¶2 in part: **The plaintiff is in imminent danger of loss of seven to eight teeth resulting from exposure** of **(7) of plaintiff's teeth having been sawed down in February and March 2004 for purposes of installing a crown which provides for porcelain teeth coverings.** And at ¶4, it provides**: On February 12, 2005 Correctional Officers of the DC Jail effectuated a shakedown of the cells in the cellblock and seized and trashed plaintiff's temporary crown, leaving plaintiff's seven sawed down teeth vulnerable to chipping and breakage.**

[7] On November 3, 2005, Plaintiff submitted a letter to the Medical Director of the CTF (Central Treatment Facility – which is the same medical director for the DC Department of Corrections, providing in part:  **I wish to be seen at Sick Call because (Describe Problem) I have an Emergency Dental Problem – second chipping and breakage of tooth.  I am in continuous pain.**

**Attachment #8.** [8]  The Plaintiff further incorporate by reference, **the exhibits attached to Plaintiff's Motion to Supplement Plaintiff's Third Amended Complaint**, as if pleaded fully and completely herein..  These attachments shows a deliberate indifference and an egregious callous disregard for the rights of the Plaintiff.

### IN THE CASE OF CARL BARNES V DISTRICT OF COLUMBIA
### 1:006CV00315 (RCL)
### THE PLAINTIFFS' ALLEGE

(Plaintiff herein adopts the following contentions, conclusions and assessment of the facts asserted by the Plaintiffs in Carl Barnes v. District of Columbia Government, 1:006cv00315(RCL) as if pleaded fully and completely herein.)

**"Moreover, the District's analysis of Mr. Williams' overdention shows because the District calculates overdetentions from the time the Records Office receives release order until the time of release, rather than from the time the Superior Court judges issue release orders until the time of release, and the District believes the DOC rather than the government of the district of Columbia is the proper defendant; the District is using DC Code § 24-211.02 (b) (6) (Central Detention Facility may not between 10:00 pm and 7:00 am) to hide a release system "that simply delays all releases until the system, in its sweet time, and with the resources it chooses … is ready to make releases."  The District has no functioning inmate management system.  For example, as Ms. Ireland's affidavit shows, the District has no system for promptly and reliably**

---

[8] Letter dated February 7, 2005,  submitted to Larry Corbett, Warden via facsimile, which provide in part: **This is to inform you that your officers, during one of the two shake downs that occurred on Wednesday, February 9, 2005, removed and trashed my temporary crown which was sitting in a cup in a sanitary glove (see through).  As a consequence, all of my sawed-down teeth (seven) are exposed and I am suffering pain.  Moreover, my ability to eat cold, hot and non-soft foods is obstructed.**

communicating release decisions about in-custody defendants from the Superior court courtrooms where judges make the release decisions to the Records Office where staff process the release orders, so the District is unable to make prompt releases.

1. <u>District's motion for summary judgment</u>

The District's motion contends:

(1)     The named Plaintiff were not overdetained as long as Plaintiff claim in their second amended complaint (and, the District contends, Toney Malloy was not overdetained at all), District's motion at pages 5-6;

(2)     In any event, the named plaintiff's overdetentions do not rise to a constitutional violation, District's motion at 11;

(3)     the named Plaintiff' overdetentions were isolated events rather than caused by any policy or custom of the District, District's motion at 11.

2. Defendant's method of calculating overdetentions is flawed

The district's motion in large part is based on the contention that the named Plaintiff' lengths of overdetention (and in the case of Mr. Malloy, the fact of his overdetention) are overstated.  Motion at pages 5-6.  However, the District's method of calculating overdetentions is flawed.  The district contends that it is not responsible for overdetentions until the Records Office receives the release orders or other judicial paperwork ordering an inmate's release.  District's motion at page 5 and 6 and in footnote 1-6.  For example, on page 6 and in footnote 6 the District

Maurice Williams was overdetained for only 2 days because the Department of corrections did not receive the Superior Court release order (entered by a Superior Court judge on 2/8/06) until 3/1/06. But, the cases universally hold that overdetentions involving release orders (as opposed to releases after a period of confinement) are measured from the time the judge issues the release order and not from the time the jail receives the release order. *Jones v. Cochran*, 1994 U.S. Dist. LEXIS 20625 (S.D.Fla. 1994)(three hours); *Arline v. City of Jacksonville*, 359 f. Supp.2d 1300 at 8 (M.D.Fla. 2005) approximately two and a half hours); *Parilla v. Eslinger*, 2005 U.S. dist LEXIS 34747 (D. Fla. 2005)(approximately five hours after court ordered released and 14 hours after family paid bond); *Young v. City of Little Rock*, 249 f.3d 730 (8th cir. 2001) (1/2hour); *Levis v. O'Grady*, 853 F.2d 1366, 1370 (7th Cir. 1988); *Berry v. Baca*, 379 F.3d at 768.

This seems to be because the District seems to think that the defendant in the case is the Department of Corrections and not the District of Columbia.

3.    Plaintiff' overdetention definition follows the law and excludes persons overdetained by variable, daily factors not attributable to the collapse of the inmate management system

Overdetentions of in-custody defendants ordered released at court hearings in excess of a few hours are presumptively unreasonable, and must be justified by the defendant. This is especially true where there is a pervasive and persistent pattern of overdetentions, as here. District courts have held that post-release detentions of just a few hours are actionable under the fourth and fourteenth amendments. *Jones v. Cochran*, 1994 U.S. Dist. LEXIS 20625 (S.D. Fla. 1994) (three

14

hours); *Arline v. City of* Jacksonville, 359 f. Supp. 2d 1300 at 8 (M.D. Fla.2005)

(approximately two and a half hours); *Parilla v. Eslinger*, 2005 U.S. Dist. LEXIS

34747 (D. Fla. 2005) (approximately five hours after court ordered released and 14

hours after family paid bond).  Courts of Appeals have held that post-release

detentions ranging from ½ hour, *Young v. City of* Little Rock, 249 f.3d 730 (8th Cir.

2001), to 11 hours, *Lewis v. O'Grady*, 853 F.2d 1366, 1370 (7th Cir. 1988), to 29 hours,

*Berry v. Baca*, 379 f.3d at 768, are actionable.

      Generally, the reasonableness of an overdetention is based on the facts and

circumstances of the overdetention.  Therefore, Plaintiff overdetention class

definition accommodates the fact that the Constitution allows defendant some time

to perform the administrative functions incident to processing an inmate's release

from custody by excluding people held less than the time needed to perform

administrative processing-out functions[9] (about eight hours).  Thus, the

Overdetention Class definition does not treat someone as overdetained until

midnight of his Release Date and so the Overdetention Class definition sets an

overdetention "floor" of midnight of the Release Date.  This definition excludes

persons overdetained by variable, daily factors not attributable to the collapse of the

inmate management system (e.g. bus breakdowns, large numbers of court returns

that day).  Since persons whose overdetention is attributable two daily variables

such as bus schedules are excluded, the class definition leaves only persons whose

unconstitutional overdetention is attributable to the problems of the inmate

---

[9] The actual time defendant is allowed to process the release of someone ordered release is the crux of the overdetention claim.  The Atlanta Journal Constitution newspaper article attached as Plaintiff' Exhibit #43 says that most large metropolitan counties in Georgia make releases in 3 to 8 hours.  LA County makes releases in about 8 hours.

management system.  Thus, the class definition also obviates the need for

individualized inquires into the cause of overdetentions in individual cases.

4.    <u>Maurice Williams' Overdetention</u>

     Maurice Williams was overdetained in the DC Jail from 2/8/06 to

3/1/06District's Account Of Maurice Williams' Overdetention

     Ms. Ireland in her affidavit says the following about Mr. Williams:

     Maurice Williams.  This inmate was held on three charges.  He was
     sentenced on February 27, 2006 on two charges to time served, but DOC did
     not receive that release order until March 1, 2006.  that order indicated a
     release date of February 8, 2006.  Inmate Williams was released on March 1,
     2006.  True and correct copies of documents regarding inmate Williams are
     attached hereto as Exhibit "E" and made apart hereof.

     1.    "Analysis Of Maurice Williams' Overdetention (citing from Rule 56(f)

          Pleadings of *Carl Barnes, et al v. District of Columbia, Id.*

     "An Analysis of the publicly available records relating to Mr. Williams'

February 2006 detention indicates that Mr. Williams should have been released on

2/8/06, and that, he was held illegally in the DC Jail from 2/8/06 until 3/1/06.

Nothing in the copy of Mr. Williams' Department of corrections file provided by

counsel for the District to undersigned counsel affects this analysis.  The events

resulting from Mr. Williams arrest and incarceration on 2/2/06 in chronological

order and the documents establishing the chronology are:

"February 1, 2006 Background:  As of February 1, 206 Mr. Williams was on

probation[10] on tow case 04cmd6502 and 05cmd9764.

---

[10] The Honorable James E. Boasberg of the Superior Court had sentenced Mr. Williams to probation on
these case on 9/29/05 in a plea deal in which Mr. Williams had pled guilty to 04cmd6502 and 05cmd9764
and the government had dismissed04cmd5291.

"February 2, 2006 arrest, presentment and detention on traffic charge:  On 2/1/06 or 2/2/06 Mr. Williams was arrested and charged with several traffic offenses in case 06ctf2022.  A copy of the Superior Court docket sheet in case 06ctf2022 is attached as Plaintiff' Exhibit #34.  The docket sheet in 06ctf2022 (pages 4, 5, and 6 of Plaintiff # 34) shows that at presentment on 2/2/06 the presentment Court (Judge McCarthy) ordered Mr. Williams held on a "five day hold" because he was on probation in case 04cmd6502 and 05cmd9764 at the time of his arrest and presentment in 06ctf2022.  Pursuant to D.C. Code § 23-1322(a)(1)(C) the presentment judge must order an arrested person arrested while on probation held for at least 5 business days if the judge finds probable cause and must also direct the prosecuting attorney to notify the probation officer or sentencing court.  The docket sheet in 06ctf2022 (page 6 of Plaintiff' Exhibit # 34) shows Mr. Williams was due back in Superior Court on 2/8/06.  The presentment court also directed the prosecutor to notify Mr. Williams' probation officer of the traffic rearrest in 06ctf2022."

February 3, 2006 probation report recommending show cause in misdemeanor case: The probation officer in cases 04cmd6502 and 05cmd9764 filed a report dated 2/3/06 with the sentencing judge in cases 04cmd6502 and 05cmd9764 does not recommend incarceration. Id at page 5.

"February 8, 2006 five day hold dissolved; no detention order on any case; illegal detention begins; illegal strip search:  A five dayhold hearing was held pursuant to D.C. Doe § 23-1322 (d)(1) on 2/8/06.  Plaintiff' Exhibit #34, page 8.  the Court did not order [11] holds in either 04cmd6502 or 05cmd9764.  Moreover, the Court ordered

---

[11] It is clear from the docket sheets in 04cdmd6502 and 05cmd9764 that Mr. Williams was not ordered held in these cases because the docket sheets do not indicate any holds were ordered.

Mr. Williams released in 06ctf2022.  Plaintiff' Exhibit #34, page 9.  The docket sheet reads:  "Release Order – Jail sent on:  2/8/2006 18j:51:24."  The 2/8/06 release order in 06ctf2022 is at page 10 in Plaintiff' Exhibit #34.  At this point, the detention order holding Mr. Williams in 06ctf2022 – the only order holding Mr. Williams – was dissolved by the release order at page 10 in Plaintiff' Exhibit #34.  But, the Records Office did not process the release order in 06ctf2022.  In fact, the records Office continued to show Mr. Williams subject to a hold in 06ctf2022.

"February 14, 2006 show cause order issued:  On 2/14/06, Judge Boasberg issued a show-cause order in 05-9764 and a copy was mailed to Mr. Williams' address.  The Docket sheets for 04cmd6502 (Plaintiff' Exhibit # 32) and 05cmd9764 (Plaintiff' Exhibit # 33) show that no detention order for either of these two cases had been issued since the 2/2/06 re-arrest in 06ctf2022 or the 2/28/06 fivc day hold hearing. February 27, 2006 Mr. Williams sentenced to time-served on misdemeanor probation cases but not released; illegal detention continues; illegal strip search:  On 02/27/06 Judge Boasberg sentenced Mr. Williams to time-served and extended his probation on 04cmde6502 (Plaintiff's Exhibit #32, page 8) and 05cmd9764 (Plaintiff's Exhibit #33, page 3).  But, instead of being released, Mr. Williams was returned to DC Jail, and subjected to a strip search.

March 1, 2006 Mr. Williams finally released; illegal strip search"

5.      District is hiding its dysfunctional inmate management system behind DC Code § 24-211.02 (b) (6)

        "Additionally, the District of Columbia law embargoing releases from the "Central Detention Facility" between 10:00 pm and 7:00 am, DC Code § 24-211.02

**(b)(6), is not a defense to overdetentions, when the District stops processing releases between 10:00 mm and 7:00 am.  The district is hiding behind the statute to protect itself from liability for a release system "that simply delays all releases until the system, in its sweet time, and with the resources it chooses … is ready to make releases."  See *Berry v. Baca*, 379 F3d 764 768 (9th Cir. 2004).  The statute embargos releases at night, not the processing of releases at night.  But, the District does not continue processing releases overnight so that it is ready to make releases at 7:00 am.  Instead, the district halts all release activity, including the processing of releases, and not just opening the jailhouse doors during that time, so that rather than being able to make releases as soon as the black out time is over, it just starts processing releases at that time, so persons arriving at the jail too late to be released on the day the of their Release Dates must wait until the evening of the next day to get release.  See footnotes 3, 4 and 5, district had release orders for Plaintiff Barnes, Hawkins and Peterson on one day but did not make releases until the next day, because of release-embargo in DC Code § 24-211.02 (b)(6).  As applied, the statute is unconstitutional." *Id.***

6. **There is a pattern of overdetentions caused by lack of an effective inmate management systems that states a Monell claim under § 1983.**

    **Finally, the District contends that the overdetentions of the named Plaintiff are isolated incidents rather than result of a custom of overdetentions.  District's motion at 11.  But, Paige Ireland's affidavit does not asset facts in support of the District's contention.  The affidavit merely asserts that Mr. Peterson's overdetention was caused by a computer malfunction, page 2, and**

lists administrative tasks involved in making releases, page 8.  But, the mere existence of a single computer malfunction or the existence of administrative tasks that must be performed before releasing inmates does not establish the non-existence of a custom of overdetentions that is the moving force of the overdetentions.  What is important is the District response over time.  In fact, as described below, the district own affidavit contains facts establishing that he District maintains a release system "that simply delays all releases until the system, in its sweet time, and wit the resources is chooses … is ready to make releases, Berry v. Baca, 379 f.3d at 768,because there is a pattern of the DC Jail admitting inmates without court paperwork and of the Records Office of not receiving releases until days or weeks after judges issued them.

7.  <u>The District' own affidavit tends to establish Plaintiff's Monell claim because it establishes that the district does not have a reliable system for promptly communicating release data about in-custody defendants to the Records Office.</u>

"According to Ms. Ireland's affidavit, 4 of the 5 named Plaintiff' overdetentions involved release orders that did not make it the Records Office on a timely basis.  Paragraph 4 of the affidavit says that a judge ordered Dernard Hawkins released on 2/15/06 but the records Office did not receive a copy of the release order until late on the evening of 2/21/06.  Paragraph 5 says that a judge ordered David Peterson released on 2/19/06 but the DC Jail did not release him until it received an order on 2/21/06.  Paragraph 6 says that Carl Barnes was admitted to the DC Jail on 2/15/06

20

but that documents necessary to calculate his release date did not arrive until 2/17/06.  Paragraph 6 implies that a judge issued a release order on 2/8/06 ordering Mr. Williams released (and Plaintiff' Exhibit #34, page 10, copy of the release order, and page 9, docket entry, confirms that the judge issued a release order on 2/8/06) but the Ireland affidavits says that the Records Office did not receive the release order until 3/1/06.  These facts (along with two of the new affidavits from overdetained persons submitted in support of this Rule 56(f) motion from persons who say that DC Jail staff told them or their families that their overdetenion was due to not having court paperwork, Plaintiff' Exhibit ## 37 and 40) establish that the district does not have a reliable system for transmitting release data about in-custody defendants from the Superior Court courtrooms where release decisions about in-custody defendants are make to the Records Office where release decisions are processed.

8.  The District's own affidavit establishes that the DC Jail regularly admits court returns without judicial paperwork are flip sides of the same coin.  If the Records Office does not receive release orders for days, then it stands to reason that the DC Jail and CTF must be admitting court returns back into their facilities without paperwork or (in the case of court returns sent to court for more than one case) without all paperwork from all their cases.  Therefore, a corollary of the Records Office receiving release orders days and weeks after judges issue them is that the DC Jail is admitting court returns back into the DC Jail without release or commitment orders.  This

problem of the Records Office not receiving release order issued by the
Superior court judges in a timely manner and the DC Jail admitting court
returns without judicial orders in all cases is a major cause of overdetentions
at the DC jail.  For example, in Mr. Williams' case, the only detention order
holding him was superseded[12] by a release order issued 2/8/06 and the
Ireland affidavit says that the Records Office did not receive it until 3/1/06,
21 days later.  This means that on 2/8/06 the DC jail admitted Mr. Williams
and booked him back into the jail without any judicial orders.  He remained
in the DC Jail by virtue of the original 2/2/06 detention order until his release
on 3/1/06.

Booking Mr. Williams back in the DC Jail on 2/8/06 without court
paperwork had the additional consequence of making it impossible for Jail
staff to identify him as a court return entitled to release and so divert him to
the off site facility where he could be out-processed without being strip
searched.  Mr. Williams was subjected to illegal strip searches on 2/8/06.
2/27/06 (when he was returned to the DC Jail after his probation hearings)
and upon discharge."

        "Accepting inmates from Superior Court without court orders is one
of the major causes of overdetentions at the DC Jail because the DC Jail does
not maintain its own calendaring system for court events for un-sentenced
inmates.  The Superior court would not have called for Mr. Williams for

---

[12] In the case of a person held in a pre-conviction status on a commitment order, the basis
for the detention expires when the court enters a release order.  Slone v. Herman, 983
F.2d 107 (8th Cir. 1993) (prison official who refused to release inmate after court order
suspended sentence violated inmate' due process rights).

another court event in either 06ctf2022 or 04cmd6502 and 05cmd9764 because Superior Court records showed Mr. Williams as released in all of these cases.  This is exactly how Joseph Heard was overdetained for two years in the DC Jail.  Mr. Heard went from the DC jail to Superior Court for the court event, the Superior Court judge dismissed his last court case, but Mr. Heard was returned to the DC Jail without a release order.  The Records Office put him back in jail, and the DC Jail forgot about him because the Superior court never called for him (his case had been dismissed) and the DC Jail does not keep a calendaring system for inmates, or run checks on unsentenced persons held more than 60 days without a court event."

"This problem of overdetention orders issued by Superior Court judges not reaching the Records Office and the corresponding Department of Corrections admitting inmates without commitment or release orders or other paperwork issued by a judge is an ancient one.  In July 2002 the Chief Judge of the Superior Court Rufus King issued *Administrative Order No. 02-22 (dated July 25, 2002)* noting that "occurrence of erroneous and/or late release from the DC Jail has increased over the past several months," and ordering that US Marshals (1) not remove any in-custody defendant from the courtroom until the appropriate paperwork has been completed by the courtroom clerk and signed off on by the judge; and (2) not return any in-custody defendants to the DC jail unless the marshals had "paperwork in all [their] corresponding cases."  "Handling of In-Custody-Defendants," Administrative order No. 02-22, District of Columbia Superior Court, Chief

**Judge Rufus King, III, July 25, 2002.  Superior Court** website,

http://222.dccourts.gov/dccourts/docs/02-22.pdf. Copy attached as Plaintiff'

**Exhibit # 31."**

"**The American Correctional Association's Standards for Adult Local Detention Facilities require an inmate population accounting system that includes records on the admission, processing, and release of inmates. American Correctional Association's Standards for Adult Local Detention Facilities, 3d. ("ACA Standards"), 3-ALDF-1F-04.  ACA Standards 3-ALDF-1F-01 to 11 are attached as Plaintiff' Exhibit 36.  The ACA Standards also require a detention facility to record for every person booked into the facility booking information including the date and duration of confinement, and a copy of the court order or other basis of confinement.  ACA Standards 3-ALDF-1F-07.  The ACA Standards also require a detention facility to make a determination for every person admitted to the facility that the inmate is legally committed to the facility.  Id.**

9. "**Problems with communicating release data from Superior Court to Records Office caused in part by the system the District has set up to handle the release of in-custody defendants ordered released at a court event at the Superior Court.**

**Problems with communicating release data from the Superior Court courtrooms to the records Office is caused in large part by the system the District has set up to handle the release of in-custody defendants ordered released at court events at the Superior Court.  The District of Columbia**

inmate management system for managing the flow of in-custody defendants to and from the District of Columbia Superior Court courthouse for court hearings has three components:  (1) the Superior Court system (now Court view and before late 2005 CIS), (2) the Department of Corrections system (now JACCS and before October 2000, CRYSIS, and (3) transmittal of Superior Court orders between the Superior Court courtroom and the Records Office.  This system is actually a combination of two separate, parallel paper driven offender management systems linked by a "sneaker" network in which the systems communicate via paper hand-carried from Superior Court to the DC Jail by the transport officers.  The structure of the system invites both "redundancy" problems (the Jail starts the booking process from scratch without using booking data already compiled by the MPD and the Superior Court) and "data transmission" errors (delayed, misplaced, lost court orders) because each of the Superior Court and the Department of Corrections has its own "booking" protocol for obtaining intake information from offenders, its own paper system for processing and storing data obtained from offenders, and its own computer system, and communication between the two systems is by a "sneaker network," that is, hand carried documents, rather than by electronic transmission.  As described below, many of the problems inherent in this system are exacerbated by the lack of electronic communication between the two systems, which requires that paperwork hand carried between the two systems, and which inhibits a unified booking system.  An electronic solution

is needed to fix the problem.   An electronic solution is workable.  The MPD and the Superior Court have a unified booking system in which data about persons arrested and booked into the MPD computerized booking database is transmitted electronically to the Superior Court system, obviating lost data and the need to book the same person twice.

"This type of system, a "paper-driven system, which is nearly defenseless to clerical error, is ultimately doomed to produce over-detentions and mistaken releases."  Los Angeles County Sheriff's Department 7th Semiannual Report[13], Special Counsel Merrick J. Bobb (April 1997) at 4-5 (describing Los Angeles county inmate management system identical to the District of Columbia system (available at

http://lacounty.info/7th_Shrf_Rpt.pdf).  The outmoded system has a

---

[13] In 1993 the Los Angeles County Board of Supervisors appointed a special counsel (Merrick Bobb) and staff to conduct ongoing monitoring and critical review of the Los Angeles County Sheriff's Department's ("LASD") performance and to publish semiannual reports setting forth their findings.  As the request of the Board and sheriff, special counsel has also participated in the formulation and implementation of risk and liability management strategies with the LASD.

Since at least April 1997, in the 7th Semi-annual report, the special counsel has devoted a great deal of attention to the Los Angeles County jail.  The Los Angeles Jail is the largest jail in the world, swerving 42 courthouses in a geographic area the size of Switzerland.  The Los Angeles County has the same type of system as the District of Columbia for moving inmates to and from the jail and the courthouses for court appearances.  The courts have a different computer system from the jail, and these are no electronic communication between the two systems.  County orders are hand carried by sheriff's deputies between the courthouse and the jail on the buses that carry inmate back and forth to court.  Until 2001, when the sheriff changed his practices in response to series of class action lawsuits, the sheriff transported all court returns back to the jail after court, and strip searched all court returns, even those entitled to release by virtue off their court appearances, before processing releases.  The jail developed a program for identifying likely releases, and releasing them from the courthouse.  The court release program is discussed below.

**structure that simply cannot support the weight of the daily flow of inmates going between the courthouses and the DC jail. Moreover, the system is poorly administered, mainly because of problems in the DC Jail's Records Office, which compounds the structural problems." *Id.***

10. <u>Returning court returns to the DC Jail or CTF for processing before release rather than making court house releases exacerbates the overdetention problem and creates the strip search problem</u>

       **Returning court returns to the DC Jail or CTF for processing before release rather than making court house releases exacerbates the overdetention problem because frequently the DC Jail or CTF admit court returns without court paperwork, as Ms. Ireland's affidavit and Chief Judge King's administrative order show. Upon his arrival at the DC Jail, the in-custody defendant is booked back into the DC Jail, subjected to a strip search and a visual body cavity search, and detained or released depending on an examination of his court orders, his institutional file and a check of warrants and detainers. The processing of a court returns paperwork sometimes happens on the same day that he returned from court, but frequently does not happen until the next day or much longer. The only reason the District does not make courthouse releases is because the Records Office cannot provide reliable release data on a same-day basis."**

11.     **" <u>Electronic Solution to problem and lessons from the LA County Jail</u>**

The key to solving the overdetention problem and the strip search problem within the current structure is (1) implementing a system for promptly and reliably communicating release data from the courtrooms to the Records Office; (3) fixing the Records Office so that it can track inmates and generate reliable release information; and (3) releasing court returns entitled to release by virtue of their court appearances directly from the courthouse. Of course, the ultimate solution lies in the introduction of global booking and tracking system for use by the MPD, the Superior Court and the DOC. As the Bobb Report said of the similar system employed by LA County:

> "What is needed is a consolidated information system fed by timely and accurate information from the courts, the district attorney, local, state, and federal databases, and from data within the Sheriff's Department itself. In order to perform due diligence on an inmate for purposes of identification, classification, assignment to a CBAC, provision of adequate medical and mental health care while in jail, or release, it is necessary to be able to access complete and comprehensive data. We call on the Board of Supervisors to order a detailed plain for developing the needed automated data system described above."

<u>Los Angeles County Sheriff's Department 7th Semiannual Report, at 28-29.</u>

The Los Angeles Jail recently solved a similar overdetention problem. LA County maintained the same kind of inmate management system as the District of Columbia, that is, a court computer and jail computer connected by sheriff's deputies transporting inmates and their paperwork between the courthouse and the jail (actually an inmate reception center that processed all intakes into the various jails). The sheriff transported all in-custody defendants back to the jail after their

court appearances, even those ordered released, to process their paperwork and to run checks for warrants and detainers on the inmates before releasing them. Like the DC Jail, the LA County subjected all court returns to blanket strip searches. Like the DC Jail, the LA county jail suffered from a premature release problem.

LA County discovered that the key to relieving the overdetention and premature release problem was releasing court returns entitled to release from the courthouse. A standing committee on the LA County Sheriffs' office that has been studying the jail and issuing reports and recommendation since 1996 found that sending court returns back to the Jail for release (1) exacerbated the overdetention problem, because many overdetentions result from illegible, misplaced a lost court orders connected with court returns, and committing court returns back into the DC jail only further taxes an already overburdened system; and (2) created the strip search problem in the first place, because if court returns entitled to release by virtue of their court appearances were released from the courthouse they would not have to go back to the Jail, and thus would not present a security issue.

The 2003 17th semi-annual report explains in detail how instituting a court release program reduced overdetentions and erroneous releases and completely eliminated the illegal strip search probe. http://lacounty.info/mbobb17.pdf. " (End of quoted text)

It is established law that a plaintiff, at the pleading stage, "need not allege all that a plaintiff must eventually prove." *Atchinson,* 73 F/3d at 422. This include naming defendant York, predecessors to defendant Devon Brown, defendant Clay, successor to initial defendant Corbitt, warden, and defendant Nelson, successor to defendant York as

Director of the Records Office, DCDC.   Recently, J. Myrick, immediate recent director

of the Records Office also has been recently replaced by a John Manuel. Defendant

District of Columbia Government, is of the opinion that it can evade municipal liability

by continuously and repeatedly replacing the various policy makers, i.e. the Director of

the Department of Corrections, the Warden of the District of Columbia Central Detention

Center and the Director of the Department of Corrections Records Office.

Moreover, "when a district court converts a Rule 12(b)(6) motion to one for

summary judgment, it must allow all parties a reasonable opportunity to present all

material made pertinent to such a motion by Rule 56, and a chance to pursue reasonable

discovery." (citing *Taylor v. Federal Deposit Ins. Corp.*, 132 F.3d 753 (D.C. Cir. 1997).

The District of Columbia Government defendants condoned a policy of

overdetention, reckless indifference, negligent training, deprivation of basic human

needs, medical needs, and medical malpractice through improper assessment,

investigation, and implementation of the District overdetention problem by tolerating

such conduct through inaction.  *See Daskalea v. District of Columbia,* 227 F.3d 433, 441

(D.C. Cir. 2000) ("a city's inaction, including its failure to train or supervise its

employees adequately, constitute a 'policy or custom' under ***Monell*** when it can be said

that the failure amounts to 'deliberate indifference' towards the constitutional rights of

persons in its domain." (citations omitted).  See *Atchinson,* 73 F.3d at 423-24 ("we think

it possible for a section 1983 plaintiff to satisfy Rule 8 by alleging both a failure to train

and an unusually serious instance of misconduct that, on its face, raises doubts about a

municipality's training policies."). *Cf. Dant v. District of Columbia,* 829 F.2d 69, 77

(D.C. Cir. 1987).

To survive a motion to dismiss that is brought under Rule 12(b)(6), a complaint need only provide "a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47 (1957)(citing Fed. R. Civ. P. 8(a). and, when reviewing a motion to dismiss, the court must accept as true all the factual allegations contained in the complaint. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164 (1993). Thus, a complaint should not be dismissed for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle [him] to relief." *Conley,* 355 U.S. at 45-46.

WHEREFORE, Plaintiff respectfully moves this Honorable Court to grant the relief requested above

_____//s//_____
Simon Banks, J.D.


## CERTIFICATE OF SERVICE

I, hereby certify that a copy of this pleading, Plaintiff's Motion for

_____mailed, via electronic mail,

this day of 20th day of November, 2006, to the following:


**VIA EMAIL TO**
**Denise.baker@dc.gov**
Denise J. Baker,
Assistant Attorney General, DC
441 Fourth Street, NW
Sixth Floor South
Washington, DC 20001

(202) 442-9887


**VIA EMAIL TO**

Megan.benary@eclairryan.com
Megan S. Ben'Ary
LeClair Ryan
225 Reinekers Lane, Suite 700
Alexandria, VA 22314


**VIA EMAIL TO**

dstruck@jshfirm.com

**Facsimile 602 263-1784**

Daniel P. Struck
Jones, Skelton & Hochuli, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012



_____//s//_____
**Dr. Simon Banks, J.D.**
**P.O. Box 17052**
**Alexandria, Va. 22302**
drsbanks@msn.com,