Stuart Grassian, M.D.

Testimony on Impact of Isolation, July 19 2005.
Commission on Safety and Abuse in United States Prisons

My name is Dr. Stuart Grassian. I am a Board-certified psychiatrist, licensed in the Commonwealth of Massachusetts, and was on the teaching staff of the Harvard Medical School for over 25 years. I have had extensive experience in evaluating the psychiatric effects of stringent conditions of confinement. In the course of this professional involvement, I have been involved as an expert regarding the psychiatric impact of federal and state segregation and disciplinary units in many settings. My observations and conclusions regarding this issue have been cited in a number of federal court decisions. I have made available to staff a much lengthier and more detailed written statement concerning the issues which I discuss herein.

During the course of my professional work, I have personally evaluated scores of inmates who have psychiatrically deteriorated during the course of their confinement in solitary. Many of these inmates have become psychotic, and many have engaged in self-injurious and self-mutilatory behavior.

It has in fact long been known that severe restriction of environmental and social stimulation has a profoundly deleterious effect on mental functioning. For example, this issue has been a major concern for patients in intensive care units, spinal patients immobilized by the need for prolonged traction, and patients with impairment of their sensory apparatus. The issue has also been a very significant concern in military situations and in exploration — polar and submarine expeditions, and in preparations for space travel.

The prison setting is a particularly toxic environment, and there is a particular problem associated with it. Many of the inmates who end up confined in the most severe conditions of confinement are precisely the group least capable of tolerating such conditions. These often include individuals with long histories, beginning in childhood, of emotional lability, hyperactivity, impulsivity, or other indications of subtle central nervous system dysfunction. As a result of this dysfunction, such individuals are almost pathologically stimulation-seeking, and pathologically incapable of tolerating stimulus deprivation. When placed in stringent conditions of confinement, they become agitated and paranoid, their emotional state and behavior deteriorates, and finally they "max out" — many become floridly psychotic, or so agitated that they engage in awful, grotesque behaviors: they cover themselves and their cells with feces, they mutilate themselves, they try to kill themselves.

Unfortunately, the prison system has traditionally had little capacity to understand or cope with this problem. Instead, once such an individual gets into this downward spiral of disturbed behavior and punishment, he cannot get out. He just stays there, being punished more and more for his behavior,

and he mentally rots. Some inmates go through a grotesque "revolving door" pattern, remaining confined in a stringent, punitive condition until they finally become so ill as to require psychiatric hospitalization, a setting where they eventually recover just enough, to then be returned to the very same toxic environment which had caused this psychiatric decompensation.

It is a great irony that the United States was in fact the world leader in introducing prolonged solitary confinement as a means of dealing with criminal behavior. The "penitentiary system" was introduced by the Philadelphia Quakers in the early 19th century. It was born of a spirit of great social optimism about the possibility of rehabilitation — a belief in the inherent goodness of man, a belief that, freed from the corrupting influences of the larger society and left to his own devices in his solitary monastic cell, the inmate would naturally heal and reform.

The American penitentiary, and the Philadelphia System, became world-famous; no important visitor to the United States neglected to tour its penitentiaries and to bring back their principles for emulation in Europe. Some, such as de Tocqueville of France, came specifically for that purpose. Others, such as Charles Dickens, wrote eloquently of the profound mental disturbances which were observed in these prison settings.

American concern about the effects of rigid solitary confinement began as early as the 1830s. Statistical comparisons began to generate compelling evidence that "it was unnatural to leave men in solitary, day after day, year after year; indeed, it was so unnatural that it bred insanity." The results of this national experiment with prolonged solitary confinement were catastrophic. The incidence of mental disturbances among prisoners so detained, and the severity of such disturbances, was so great that the system fell into disfavor and was ultimately abandoned. By 1890, the U.S. Supreme Court specifically condemned solitary confinement as a major cause of psychotic disturbances among prisoners.

As statistical evidence accumulated during the nineteenth century that solitary confinement was toxic to human functioning, the system fell into disrepute. Unfortunately, it gradually was transformed from an open, optimistic experiment in social reform into a hidden, secretive place of punishment and control.

Its devastating psychological impact, however, did not change, a fact which became suddenly and very painfully evident in the 1950s as the American public began hearing the frightening and dramatic reports of "brainwashing" of American prisoners of war in Korea — reports that alterations in the sensory environment were being intentionally imposed upon these prisoners in a seemingly Orwellian attempt to profoundly disrupt their psychological equilibrium. By the 1950s, reports had already appeared of major psychiatric disturbances among survivors of prolonged solitary confinement in war, but during the decade of the Korean War, major attention was riveted on the occurrence of these disturbances, not only in war, but in a variety of other settings as well.

In summary, the historical experience with solitary confinement is compelling, and it is inescapable. It is shocking to realize that today, those in charge of planning and implementing our correctional systems so often seem to be blind to it.

Moreover, there is something intrinsically illogical for any correctional system to become so preoccupied with control and punishment as to lose sight of the fact that virtually all of the inmates in its custody will someday be released back into our communities. A correctional policy almost purely devoted to "getting tough on the prisoners" will inevitably pull towards having inmates who leave our prisons in the worst possible mental condition which we can produce. Such correctional policies inevitably decrease the chance that the released inmate will manage to reestablish himself in the larger community, and thus such policies create a great danger for us — for those who live in the communities which the inmate will someday reenter. I have seen many inmates who were released directly to the street from solitary confinement settings, totally unequipped to deal with people or with the tasks of free life.

Lastly, the failure to provide meaningful programming in our prisons produces a toxic environment, not just for inmates, but for everyone involved in the prison setting — correctional officers as well. The work of a corrections officer in a high security prison is enormously stressful. In a prison without positive programming, every workday is filled with tension and with tedium. Nothing good ever happens in a sterile high security prison. The only things that ever happen are bad — sudden and violent. In such a setting, the tension becomes unbearable. Some COs take it out at home — alcohol abuse and domestic violence are big problems. Others take it out on the prisoners; they itch for something to happen — to have control over when it happens and how it happens. So they make it happen.

It is not just the prisoners who need meaningful programming and rehabilitation. The COs need it. And perhaps most important, the community to which the prisoner will return needs it.