# REPORT TO THE ATTORNEY GENERAL

# REVIEW OF THE HANDLING OF LEO GONZALES WRIGHT AND SIMILAR OFFENDERS SENTENCED BY THE U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**Prepared by**

**OFFICE OF THE CORRECTIONS TRUSTEE FOR THE DISTRICT OF COLUMBIA**

**John L. Clark, Corrections Trustee**

**October 5, 1999**

# District of Columbia
## Office of the Corrections Trustee

John L. Clark                                             800 K Street NW, Suite 450
Corrections Trustee                                          Washington, DC 20001

October 5, 1999

The Honorable Janet Reno
Attorney General
United States Department of Justice
Washington, D.C. 20531

Dear Attorney General Reno:

Enclosed is the report you requested for an independent review of the commitment procedures used in the Leo Gonzales Wright case and in those of similarly situated offenders sentenced under both local and Federal statues.  This report responds to the Order issued by U.S. District Court Judge Emmet G. Sullivan on June 23, 1999, requesting that such a review be conducted.

The report is the culmination of extensive research and interviews to evaluate the commitment processes for Federal cases and dual U.S./D.C. Code cases.  It includes an evaluation of the Department of Corrections classification, housing and records management systems, and the escorted trip and community release procedures.  Finally, the report also details specific issues related to the handling of Leo Gonzales Wright since his re-arrest in December 1995 and his subsequent conviction and commitment to prison.

The report contains 35 major findings regarding operational procedures for the processing of dual code cases.  It also includes 24 major recommendations for the involved Federal and District agencies and judicial components.

Thank you for the opportunity to assist in this most important project.

Sincerely,

John L. Clark
Corrections Trustee

# TABLE OF CONTENTS

## Introduction

Mission and Scope of the Trustee's Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i
Role of the Office of the Corrections Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii
Team Membership and Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

## Executive Summary

Part A: Narrative Description . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii
Part B: Major Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xi
Part C: Major Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xviii

## Chapter One:  Commitment Process for Cases Sentenced in Federal Court

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Statutory Authority for Commitment to the BOP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Judgement in a Criminal Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
USMS Role in Designations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
BOP Role in Designations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Special BOP Procedures for Superior Court Commitments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Special Considerations in the District of Columbia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
The Impending Impact of the Revitalization Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
The Impact of Judicial Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
USMS/BOP Coordination on Policies and Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Review of Actual Designation Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Ongoing Internal Monitoring of BOP Designations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
Cases Committed to Imprisonment by the Federal Court 1996-1999 . . . . . . . . . . . . . . . . . . . . . 12
Findings and Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## Chapter Two:  Commitment Process for Dual Code Cases:
## Those with Both Federal and D.C. Code Sentences

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
Summary of Historical Developments on the Responsibilities for the Housing of the District's Felons . 20
Handling of Dual Code Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Findings and Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## Chapter Three:  DOC Inmate Classification, Case Management, and Record
## Keeping

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
Classification Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
Classification in DOC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
Case Management Operations in DOC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Records Office Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
Findings and Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

## Chapter Four:  Escorted Inmate Trips and Release Procedures in the DOC

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
Issues and Practices Related to Community Trips by Felons from Prisons . . . . . . . . . . . . . . . . . . . . . . 63
Escorted Community Trips in the Department of Corrections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
DOC's Community Work Release Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
Altered Practices on Emergency Release Procedures to Reduce Overcrowding . . . . . . . . . . . . . . . . 72
Findings and Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

## Chapter Five:  The Leo Gonzales Wright Case Since December 1995

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
Sentencing Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
DOC's Post-September 9, 1996 Treatment of Wright . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89
Findings and Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96
Leo Gonzales Wright Chronology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

## Appendices

### Appendix 1:  Correspondence Requesting the Review
        a.    Order from Judge Sullivan, dated June 23, 1999
        b.    Letter from Deputy Attorney General Holder, dated August 3, 1999

### Appendix 2:  Agency Responses to the D.C. Office of the Inspector General Report Recommendations
        a.    Metropolitan Police Department, dated January 28, 1999
        b.    Court Services and Offender Supervision Agency, dated May 10, 1999
        c.    D.C. Department of Corrections, dated September 24, 1999

### Appendix 3:  Inmates Sentenced in D.C. District Court 6-30-96 Through 6-30-99 With BOP Designations Over 3 Months After Date Sentenced

### Appendix 4:  Memorandum of Understanding Agreements
        a.    MOU between USMS and BOP, dated October 14, 1993
        b.    MOU between USMS, BOP, DOC & USPO, dated September 6, 1994

### Appendix 5:  Letters to the Corrections Trustee
        a.    From the D.C. Department of Corrections, dated July 19, 1999
        b.    From the Federal Bureau of Prisons, dated August 16, 1999

### Appendix 6:  D.C. Department of Corrections Documents
        a.    Department Order - Escorted Trips, dated November 15, 1991
        b.    Draft Program Statement - Escorted Trips, dated July 16, 1999
        c.    Memorandum, dated October 26, 1998

### Appendix 7:  Documents that Pertain to the Leo Gonzales Wright Case

a.      DOC Face Sheet # 1, commitment date December 26, 1995

b.      Federal District Court Commitment to BOP, dated March 13, 1996

c.      J&C filed in CR 96-99, USMS return dated May 20, 1999

d.      J&C filed in CR 96-297

e.      Federal District Court Commitment to BOP in case CR 96-99, dated September 9, 1996

f.      Federal District Court Commitment to BOP in case CR 96-297, dated September 9, 1996

g.      District Court Order amending the J&C, dated March 20, 1997

h.      DOC Escorted Trip form, dated July 31, 1997

i.      DOC Face Sheet #2, dated January 28, 1977

j.      DOC Escorted Trip form for Edward Williams, dated July 31, 1997

k.      DOC Corrected Face Sheet #2, dated July 21, 1998

l.      BOP Request for Pre/Post Sentence Report, dated March 26, 1999

m.     BOP Sentence Monitoring Computation Data, dated October 4, 1999

# Introduction

## A.  <u>Mission and Scope of the Trustee's Review</u>

On June 23, 1999, U.S. District Court Judge Emmet G. Sullivan issued an Order that requested that the Department of Justice investigate the policies, procedures, and operations related to several areas that emerged from the circumstances of the Wright case.  In that Order, Judge Sullivan asked that a review be conducted "regarding:

- the commitment of prisoners to the Bureau of Prisons,

- the so-called Memorandum of Understanding regarding the placement of individuals sentenced for local and federal offenses,

- the security classification and housing of prisoners by the Department of Corrections, and

- the policies and procedures for the housing, transfer, release, and furlough, including escorted trips, of prisoners under the control of the Department of Corrections."

Judge Sullivan also noted that he and his colleagues "need to know when we sentence and commit individuals to the Federal Bureau of Prisons, those commitments will be carried out in a timely and professional manner."

In response to this request, on August 3, 1999, Deputy Attorney General Eric H. Holder, Jr. requested that the Corrections Trustee for the District of Columbia conduct an independent review of the commitment procedures used in the Leo Gonzales Wright case and in those of similarly situated offenders sentenced under both local and Federal statutes.  He also requested that the Trustee review a number of other operational areas relating to the D.C. Department of Corrections and the Federal agencies involved in processing sentenced offenders.

Deputy Attorney General Holder addressed a number of  public concerns in his letter.  Specifically, the Trustee was asked to examine:

- Reported unexplained and lengthy delays in the designation and transfer process of dual jurisdiction prisoners to the Federal Bureau of Prisons (BOP);

i

Introduction

- Classification and housing of these prisoners while in the custody of the D.C. Department of Corrections (DOC);

- Escorted trips, furloughs and any other releases taken by the prisoners while in DOC custody;

- Policies and procedures governing these matters, including both formal rules and informal practices;

- Level of compliance or noncompliance with governing policies, as well as the effectiveness of communication among the involved agencies; and

- Efforts made by these agencies to respond to reported problems and the adequacy of that response.

Upon completion of the investigation, the Trustee was asked to include:

- Detailed assessments of relevant policy, procedures and operational issues; and

- Recommendations for corrective action and overall improvements, including specific language for suggested revisions to existing policy and/or establishment of new policy.

The Office of the Corrections Trustee structured its report to respond directly to the issues and concerns outlined in the Judge's Order and in Deputy Attorney General Holder's request.   Accordingly, the report includes chapters responding to each of these principal areas:

- The commitment processes for Federal cases (Chapter 1) and dual U.S./D.C. Code cases (Chapter 2);

- Department of Corrections classification, housing and records management related issues (Chapter 3) and escorted trip and community release procedures (Chapter 4); and

- The details related to the handling of the Leo Gonzales Wright case since his re-arrest in December 1995 and his subsequent conviction and commitment to prison (Chapter 5).

This report also includes findings and recommendations regarding interagency financial management problems identified during the course of conducting the review that are not strictly within the specifically requested scope of the review, but which are closely related

Introduction

to the movement of inmates between the District and Federal institutions.  Improvements are recommended in tracking, transfer, and payment procedures.

Attached as Appendix 1 are the above referenced  Court Order issued by Judge Sullivan and Deputy Attorney General Holder's letter.

## B.  Role of the Office of the Corrections Trustee

The National Capital Revitalization and Self-Government Improvement Act of 1997, Public Law 105-33, created the position of  Corrections Trustee to serve as an independent Officer of the District of Columbia government.  As established, the Trustee was appointed directly by the Attorney General of the United States, after consultation with leading officials of various branches of the District government, and may only be removed by the Attorney General.  John L. Clark was appointed by Attorney General Janet Reno to serve in this capacity in September 1997 and was sworn in shortly thereafter.

The mission of the Office of the Corrections Trustee  is  to provide financial oversight to the District of Columbia's Department of Corrections; to facilitate the closure of the Lorton complex and the transfer of all sentenced felons to federal custody by December 31, 2001; and to ensure the District of Columbia develops and maintains a viable correctional system that promotes the safety of staff, inmates and the community.  The responsibilities of the Office of the Corrections Trustee are carried out by a small staff who possess extensive experience in the field of corrections and financial management.

## C.  Team Membership and Structure

In order to conduct the review, the Trustee formed a team primarily using staff from the Office of the Corrections Trustee.  Significant assistance was provided by several staff from the Court Services and Offender Supervision Agency (CSOSA).  Collectively, the team members have extensive correctional, legal and financial management experience, including  knowledge and expertise in such specialty areas as prisoner classification and records management, institution security, policy development,  and internal control/auditing procedures.

Corrections Trustee John L. Clark is a former  Assistant Director of the Federal Bureau of Prisons and an experienced warden, having managed the United States Penitentiary in Marion, Illinois, and the Metropolitan Correctional Center in Miami, Florida, as well as having served as Chief of the Bureau's Correctional Programs Branch (Classification).

While every effort was made to maintain objectivity and independence, it must be noted that  Mr. Clark, who led the Review Team, and some other members were Federal Bureau of Prisons administrators during part of the period of time covered by this review (the early and mid-1990s).  Deputy Trustee Devon Brown, another member of the Review Team,

served on detail from the Office of the Corrections Trustee, as Interim Director of the DOC for three months in early 1999.

## D.  Methodology

Based on the Deputy Attorney General's request and the court order, the principal areas reviewed included the policies and operational procedures of several primary agencies, namely the D.C. Department of Corrections, the Federal Bureau of Prisons, and the United States Marshals Service. To a lesser extent the Review Team found it necessary to examine practices at the United States Probation Office, the Office of the Clerk of the United States District Court, and the U.S. Attorney's Office.

The Review Team conducted extensive interviews with numerous current and former staff of the various agencies, including both central office administrators and operational field staff.  They also directly observed and field tested various field operations, including an examination of critical logging and tracking systems, both automated and manual.  A large sample of offender files from the D.C. Department of Corrections, Federal Bureau of Prisons, and the United States Marshals Service were examined.

The Review Team also undertook an ambitious examination, comparing computer generated lists and case processing information from the District Court and several agencies to determine the flow of critical documents in the designation and commitment process, including examining the time frames of the designation and commitment of the 1,200 cases sentenced to prison by the U.S. District Court between July 1, 1996, and June 30, 1999.

In reviewing the classification, records management and escorted trip policies and practices of the DOC, the Review Team often used the accreditation standards of the American Correctional Association (ACA) as an important reference for best practices around the country.  In several sections of this report, the relevant sections of those Standards are directly referenced.

Likewise, in relation to certain questions or the soundness of particular practices, the Review Team sought the advice and expertise of correctional administrators from neighboring jurisdictions in the Washington Metropolitan area, as well as from the respected heads of several national correctional associations and institutes.

Finally, a close examination was given to all documents and file material available in the Leo Gonzales Wright case.

## E.  Background on the Leo Gonzales Wright Case

Introduction

The criminal involvements of Leo Gonzales Wright have generated a great deal of public and legal attention in the District of Columbia for several years. His history of repetitive predatory behavior is extensive and includes two separate murders and other acts of violence.

At the age of 19, Wright received a 15-60 year aggregated D.C. sentence in November 1976 following his plea of guilty to the armed robbery and murder of a cab driver. Through 1989, he compiled a record of 38 disciplinary reports and transfers due to drug use, lack of program involvement, possession of weapons, and assaults on inmates and staff. Due to improved conduct, beginning in February 1992 he participated in a Work Training Furlough Program which allowed him to work outside the prison system at a charitable organization's thrift store in suburban Maryland. Based on his behavior in that program and after having spent 17 years in prison, Wright was paroled on November 23, 1992, with maximum supervision and continued participation in a drug treatment program. Upon returning to the community, his conduct became negative as he was found to have engaged in illicit drug use and failed to report for parole supervision sessions as required.

Wright's proclivity toward drug use and to take whatever actions were necessary to support his drug habit resulted in his arrest in July 1995 for possession with intent to distribute cocaine. After being released pending trial for that arrest, he used a butcher knife to rob and carjack a female motorist in December 1995. Four days later, he repeated this crime, fatally stabbing a young attorney, Bettina Pruckmayr, thirty-eight times. He was later arrested following a high speed police chase and ultimately sentenced in U.S. District Court for the District of Columbia to life without parole for this murder. In imposing this term of imprisonment, the sentencing judge stated his intentions that Wright never be released and that the inmate be transferred to the Federal Bureau of Prisons (BOP).

Immense public and official outcry over the events surrounding Wright's earlier pre-release and post-release handling by criminal justice authorities and his murder of Bettina Pruckmayr prompted an investigation by the D.C. Office of the Inspector General (OIG). In a report issued in January 1999, the OIG found several serious deficiencies throughout the processing of this case and recommended that a series of corrective measures be promptly implemented (see Introduction, Section F).

After reading the OIG's report and learning that Wright had not been transported to BOP custody, the family of Bettina Pruckmayr again raised their concerns. After notification to the Court, several court hearings, further examination by the OIG, and a request by the Attorney General, the present review by the Office of the Corrections Trustee was undertaken.

**F. Update on Implementation of the Recommendations in the January 1999**

Introduction

## D.C. Office of the Inspector General Report

The D.C. Office of the Inspector General (OIG) released a thorough report in January 1999 which reviewed the issues regarding the handling of the Wright case during his first term of confinement and his time in the community under parole supervision.  Accordingly, the Review Team generally did not examine these areas except where directly related to the stated mission of this review.

As previously indicated, the OIG's report included a series of recommendations for the affected agencies.  The Review Team contacted each of the agencies to determine to what extent, if any, their operations and programs were impacted based on the OIG's report. Those agencies, namely the Metropolitan Police Department, the Court Services and Offender Supervision Agency, and the D.C. Department of Corrections, each issued formal responses to the OIG's recommendations detailing the actions taken to date and those planned for future implementation.   Those responses are attached as Appendix 2 to this report.

As a quick reference, the OIG's report recommendations are provided below:

- DOC establish and maintain tighter controls to protect the security and integrity of inmate record files.

- DOC tighten controls on the release of inmates for the purpose of alleviating overcrowding, consistent with any court orders, so as to prevent dangerous felons from being returned to the community.

- Parole Officers be required to attend all parole revocation hearings for parolees assigned to them, or at the very least to submit in writing all information relevant to those parolees.

- The D.C. Board of Parole reduce the caseloads of Parole Officers to bring them in line with applicable national standards.

- The D.C. Board of Parole strengthen the standard for revocation, so that parole is automatically revoked after two positive drug tests for serious offenders - and that the standard be enforced.

- The MPD and Adult Court Pretrial Services establish and maintain improved communication with the D.C. Board of Parole so as to ensure that relevant criminal information is promptly transmitted to the Board, including automatic notification when a parolee is arrested.
- D.C. Board of Parole warrants be automatically issued after 30 days of the loss of contact with a parolee.

vi

Introduction

- Appropriate administrative action be taken against [a parole officer] for failing properly to monitor the actions of Leo Wright; for failure properly to report Wright's parole violations; and for failure to issue a Parole Violations Warrant in time to be considered at the preliminary hearing on July 7, 1995.

- Appropriate administrative action be taken against [a correctional official] for failing properly to report Leo Wright's inmate disciplinary record, which at that time was her responsibility.

- Appropriate administrative action be taken to determine the reason for [a police officer's] failure to appear at Leo Wright's preliminary hearing, and, if such failure was other than proper, disciplinary action be taken against him.

- The Mayor and City Council, even in the context of the current shift of prisoners to federal and state facilities elsewhere, reexamine the resources devoted to the housing of prison inmates at Lorton, recognizing that a failure to provide sufficient housing necessarily results in the premature release of dangerous individuals into the community.

# Executive Summary

## Part A: Narrative Description

**Chapter One.**  Although the process for designating institutions for newly sentenced prisoners from the U.S. District Court in the District of Columbia and affecting their transfer to those institutions is part of a well-designed national system, local implementation is flawed by significant inefficiencies and a lack of adequate coordination and communication among the Federal agencies.  These inefficiencies unnecessarily prolong the stays of sentenced Federal prisoners in the D.C. Department of Corrections (DOC), cost the U.S. Marshals Service (USMS) unnecessary contract funds, and exacerbate crowding at the already troubled D.C. Jail.  Fundamental improvements are needed in coordinating, communicating and planning by all of the involved agencies and the U.S. District Court for the District of Columbia.

**Chapter Two.**  In the 1990's, a significant change occurred in the handling of the unique dual U.S./D.C. code cases after the Federal Bureau of Prisons (BOP) returned most DOC cases from its custody and directed that most newly sentenced dual code cases be committed only to the DOC.  That change in practice was implemented in the District through an unsigned, de facto Memorandum of Understanding (MOU) and a local operating agreement worked out by the field staff of the U.S. Probation Office, USMS, BOP, and DOC.

Because that operating agreement was understood differently by staff of the various agencies, and was never formally communicated to the Court or the Federal prosecutors, significant confusion crept into the handling of these dual code cases resulting in delayed placement.  However, the key agencies have already begun taking steps to address the problems identified by this review.

**Chapter Three.**  The DOC has been a troubled agency for some years, but significant positive changes have begun under the leadership of the new Director, Odie Washington, who arrived in March 1999 and was confirmed by the City Council in June.  Nonetheless, this review found that serious problems continue in the areas of case management, classification, and records management that negatively impact the commitment, housing, transfer, and release of inmates.  Related DOC policies and procedures are inadequate and outdated, training and direction are insufficient,  and management controls virtually nonexistent.  Moreover, the antiquated state of automation and information technology in these important prison management areas seriously hampers the operations of the DOC.

Executive Summary Part A: Narrative Description

Problems in the records and classification areas have been pointed out by previous studies, but until recently little has been done by DOC management to change "business as usual" and to repair the problems by implementing the repeated recommendations. Director Washington has begun the process of taking remedial action, with a focus on internal controls and policy development.

**Chapter Four.**  During the period reviewed, the DOC's policy and practice on escorted community trips had serious shortcomings and were quite lenient in comparison to many other correctional systems.  Director Washington rescinded the deficient policy in June and is finalizing a new formal written policy that, among other improvements, raises approval authority to the Director level for emergency family trips for all but the lowest security inmates.

In addition, issues were raised in the January 1999 Report of the Inspector General regarding a pattern of early releases of felons from the DOC as a response to overcrowding in the District's prison system.  The Review Team's examination revealed that from 1987 to 1996, the District invoked the Prison Overcrowding Emergency Powers Act  26 times to release large groups of certain non-violent felon and misdemeanor cases 90 days early to relieve crowding.  That Act has not been invoked since 1996 and likely will not be during the coming two years before all felons are transferred to the BOP. Further, there has been significant improvement by the DOC over the past year and a half in the process by which most felons are released to the community.  Rather than the previous practice of direct release into the community, virtually all new cases are placed in highly structured residential community corrections programs for at least 90 days.

**Chapter Five**.  Before and after the sentencing of Leo Gonzales Wright in Federal Court in September 1996, there was a series of false assumptions and miscommunications among the organizations charged with the processing of convicted felons.  Consequently, Wright was not transferred to a Federal prison as was the intent of the sentencing judge, the prosecutor, and the family of the victim.  Also, the approval of his escorted trip to a funeral home in the District was unwise and reflected some of the weaknesses in policy, management control, and daily operations in case management and records practices that are outlined in Chapter 4.

The Trustee and the Review Team have been encouraged by the responses of the agencies in seeking joint solutions to the problem areas.  Apart from some of the internal DOC operational issues addressed in Chapters 3 and 4, all the recommendations require coordinated interagency efforts.

Several of the deficiencies and problem areas identified by the Trustee's Review Team, have serious financial implications, particularly for the USMS and the DOC.  Better control and accountability must be utilized to improve the potential financial short-fall which impact

Executive Summary Part A: Narrative Description

both agencies.

A more detailed summary of the Review Team's findings and recommendations follows.

# Executive Summary

# Part B: Major Findings

**F-1**    There is a very well designed set of procedures in place at the national level to coordinate and manage the complex process of designating and committing the wide variations among 56,000 cases sentenced annually in 345 Federal court cities to over 100 federally operated or contracted prisons.  A national MOU between the directors of BOP and the USMS clearly details each agency's responsibilities. Good national planning and communication vehicles are in place among the affected agencies and between them and the Federal courts.  (Chapter 1)

**F-2**    A screening and analysis of the 1,200 cases sentenced to prison from D.C. Federal Court from 1996 to 1999 reveals significant inefficiencies in the local design and implementation of the national agreements.  During that period, there were delays in designating and committing almost half of the cases.  These lapses result from delays of from one to six or more months in delivering the most critical documents to BOP, including the commitment order, the USMS designation request and/or the PSI.  Important factors appear to be the lack of adequate logging systems or full use of automation in tracking the flow of cases and documents by the USMS and, to a lesser extent, the BOP's former practice of returning a PSI to Probation if the J&C and designation request did not arrive in a timely fashion.  Time constraints did not permit a further analysis of all the causes of the delays in delivery.  (Chapter 1)

**F-3**    The level of communication and coordination among the various agencies involved in the commitment process of cases from the Federal Court over recent years has not been sufficient to deal with the ongoing difficulties in the system and has contributed to the inefficiencies.  (Chapter 1)

**F-4**    These delays are likely costing the USMS considerable contract confinement funds spent on cases housed at the D.C. Jail awaiting transfer to BOP after sentencing. Likewise, DOC is losing the availability of precious bed space in a facility that struggles daily to comply with a court-ordered population cap.  (Chapter 1)

**F-5**    DOC's process of tracking and accounting for contract Federal cases it holds for the USMS is inaccurate and disorganized, with no senior administrator responsible for its oversight and accuracy.  As a result, there are large disparities of over 150 inmates between DOC's and the USMS's monthly lists and total numbers of billable Federal prisoners in DOC.  (The accuracy of the USMS listings could not be finally

Executive Summary Part B: Major Findings

verified due to time constraints.)    These discrepancies likely have led to inaccuracies in the billing process and in DOC's verification of the billings.  Further, the $70.50 per inmate per day cost billed to the USMS is outdated, having not been modified since 1991, and does not fairly reimburse the DOC for its costs of over $90.00 per day at the D.C. Jail.  Because the District government's accounting procedure credits these funds only to the District's general fund rather than to the DOC's budget, there is less built-in agency incentive for efficiency and accuracy in this process.  (Chapter 1)

**F-6**    Due to the 1997 Revitalization Act, the current designation and commitment process in the District is undergoing a dramatic change, as BOP is gradually taking over the responsibility of processing and confining an additional 1,800 to 2,000 cases sentenced annually in Superior Court in addition to between 900 and 1,000 parole violators per year.  The current interagency designation apparatus is not adequate to deal with this coming eight-fold increase in total cases from the District. (Chapter 1)

**F-7**    Each of the three primary agencies (BOP, USMS and DOC) lacks clear, written, formal policy guidance on the designation and handling of D.C. dual code  cases. (Chapter 2)

**F-8**    In the early 1990's, the BOP precipitated a major change in the long-standing manner of handling dual code cases when it effectively closed its doors to all D.C. Code cases, including those also serving Federal sentences, unless there were special circumstances in the case.    Prior to about 1990, virtually all dual Federal/D.C. Code cases were placed in the BOP.  The change in the handling of the dual code cases occurred in the context of the return to DOC custody of more than 2,000 D.C. Code cases by the BOP  due to crowding in its facilities and after the resolution of a lawsuit between the Federal Government and the District. (Chapter 2)

**F-9**    As this major change in procedure was implemented at the time of the 1994 MOU, apparently neither the headquarters, policy level administrators nor the legal sections of the USMS and the BOP were  involved as they should have been. (Chapter 2)

**F-10**   The Federal bench was neither consulted in the process nor notified after the change in practice was implemented, leading to significant misunderstandings among the sentencing judges.  Likewise, neither the prosecutors in the U.S. Attorney's Office nor the local defense bar were notified.  (Chapter 2)

**F-11**   The manner of handling dual Federal/D.C. code cases which developed locally over the past five to seven years within the system of responsible agencies has been

very problematic.  The several agencies have operated under a confusing and inconsistent set of understandings, including the unsigned 1994 MOU. There was no clear written understanding, nor a generally agreed upon, consistent practice. Instead, the actual practice was haphazard and understood inconsistently by the different parties.  (Chapter 2)

**F-12**  Until recently, most dual code cases sentenced in Federal Court and those sentenced there solely on D.C. Code charges were never brought to the attention of the BOP for designation, and when they were, they were usually declined. Although the BOP could legitimately designate DOC facilities for service of sentence, they were not actually doing so because they never received the case material.  (Chapter 2)

**F-13**  A review of the cases revealed that there have been considerable delays of six to twelve months in identifying, designating and removing inmates from DOC and to the BOP who have completed D.C. Code sentences and who must begin serving consecutive Federal sentences.  During the interim, it appears that the DOC may be inappropriately bearing the financial cost of these prisoners.  Time constraints did not allow an in-depth assessment of the causes of the delays in transfer. (Chapter 2)

**F-14**  DOC case management, classification and records office management, have not been adequately driven by written policy and procedures.  Most of their written policies are at least several years old, with many being ten to twenty years old, and virtually all are either ignored and/or ineffective.  Over the past year, strong steps have been taken, particularly in records management, to systematically update written policy; however, case management is far from completion.  (Chapter 3)

**F-15**  Efficiency and sound management of these three critical areas are severely hampered by a totally inadequate level of automation, and in some cases by the lack of the most basic technology.  Without upgrades, especially at those components which will continue to operate after the closure of Lorton, DOC will never be able to reach an acceptable level of sound correctional practice in classification, case management, and records management.  (Chapter 3)

**F-16**  For a number of years, including the time at which Leo Gonzales Wright was recommitted to DOC in 1996, an inadequate classification system was used to manage DOC's inmate population.  Because there were not physical facilities available to adequately meet the security needs of large numbers of higher security inmates, the former system was artificially altered to lower the custody scoring of prisoners to the level of available facilities. (Chapter 3)

Executive Summary Part B: Major Findings

**F-17**  In 1997, the then-Director of DOC adopted the well-recognized Federal Bureau of Prisons classification model.  By mid-1998, after extensive staff training, all DOC inmates, including those in contract facilities, were classified using the Federal model.  This move provided a major improvement to the Department, making the facilities more orderly and safer for staff and prisoners.  Coupled with the closing of certain inadequate DOC prison facilities and the transfer of 4,000 prisoners to Federal and contract facilities, this move eliminated most of the mismatching of tougher prisoners with lower security facilities.  (Chapter 3)

**F-18**  As determined in at least two previous reviews, the case management area of the DOC  is in need of major reform.  The level of disorganization and inefficiency in this area jeopardizes the sound management of prisoners and DOC's overall operation. Although staffing levels and caseload sizes are normal, case managers generally do not have adequate training, guidance, automation, or supervision to perform their jobs effectively, and there are no internal controls to ensure cases are correctly and efficiently managed.  Recently, an effort to develop internal controls has been initiated.  (Chapter 3)

**F-19**  DOC's designation process, wherein prisoners are initially placed and later transferred between DOC facilities, is often haphazard, is not based on clear policy and guidance, nor is it sufficiently automated to either promote efficiency or maintain an accurate paper trail for planning or other critical purposes.  As a consequence, there appears to be a significant backlog of between 100 and 200 transfer-ready sentenced felons clogging up precious bed space at the D.C. Jail. This backlog is compounded by a serious breakdown in the processing of medical clearances by the court-appointed medical receiver's office whose procedures appear disorganized and non-automated.  (Chapter 3)

**F-20**  The inmate records offices management in DOC is overwhelmed and in distress and  suffering from years of prolonged inattention from  top management.  Despite several outside reviews and other interventions over the past 20 years, the recommendations of previous studies have not been seriously implemented. (Chapter 3)

**F-21**  Field-testing and observation by the Review Team revealed that institutional records management is inconsistent from prison to prison.  Formal staff training is inadequate, guiding policy is either outdated,  nonexistent or inadequate, the inmate files in two facilities are not sufficiently secure, the files are not organized consistently in a standardized way, and there remains no one accountable for this operation at the headquarters level.  (Chapter 3)

**F-22**  Institutional prisoner disciplinary records are not readily retrievable because they

Executive Summary Part B: Major Findings

are not systematically or chronologically recorded and they are not maintained in an automated fashion separate from individual case files. This deficiency leaves the disciplinary records vulnerable to potential misplacement of important records. (Chapter 3)

**F-23** The practice of escorted community trips for various purposes, including medical treatment and compassionate family visits, is common to correctional agencies around the country. These escorted trips are not considered releases from custody for either legal or operational purposes, but present serious security risks and require close agency planning and oversight. Good practice requires senior level approval, especially for high security cases. (Chapter 4)

**F-24** The Escorted Trips policy previously in place was minimally adequate, but flawed and should be strengthened during the current agency update. (Chapter 4)

**F-25** DOC's escorted trip practice has been more lenient than those of surrounding jurisdictions or the federal prisons. (Chapter 4)

**F-26** In the past year, there has been significant improvement in DOC's process for the release of cases paroled into the community at the end of their terms, as virtually all are placed into well-structured community correctional centers where transitional assistance is provided by supervision officers of the D.C. Board of Parole, now part of the CSOSA. (Chapter 4)

**F-27** The Prison Overcrowding Emergency Powers Act of 1987 was invoked 26 times between 1987 and 1996 by the Mayor at the request of DOC to allow for the early release by up to 90 days for nonviolent felons and misdemeanants at the end of their sentences. It was invoked as a measure to relieve crowding in DOC facilities. The Act has not been invoked since 1996 and it is not anticipated that it will be during the current transition of cases to the federal system. (Chapter 4)

**F-28** After his sentencing in September 1996, Leo Gonzales Wright was not properly classified and processed as a dual code prisoner. Though securely confined, he was left in bureaucratic limbo and as a result, "administratively lost" within the criminal justice system for more than two years. The commitment process involving several components of the Federal government and the DOC broke down badly, as the entire system failed due to the convergence of multiple problems. Were it not for the litigation by the Pruckmayr family and subsequent D.C. OIG Report highlighting his status, this situation may well have continued. Some of the major contributing factors included: (Chapter 5)

- Interagency confusion and poor design of the process by BOP,

Executive Summary Part B: Major Findings

USMS, USPO, and DOC in the proper handling of dual Federal/D.C. Code cases.

- Poor communication by these agencies to the Federal judges and prosecutors regarding the 1994 change in practice which by then presumptively placed these dual code cases into DOC rather than in the federal prisons. This communications failure impacted on the use by the sentencing court of routine commitment language in the Judgement and Commitment Order (J&C), rather than a specific, targeted recommendation for federal placement.

- Inaccuracies in the sentencing language in the J&C and the apparent non-delivery of the J&C by the Marshal to the DOC for 19 months after sentencing.

- The lack of preparation of either a crucial Pre- or Post-Sentence Report for use by correctional authorities and the fact that no federal probation officer was in the courtroom at sentencing.

- No one in the courtroom who heard the Judge's verbal order followed up to see how or if Wright was committed to a federal prison. There is normally no expectation of or procedure for the Assistant U.S. Attorney to do such follow up. However, such communication with the BOP does occasionally occur, especially in high profile cases, as it ultimately did here.

**F-29** The DOC case management staff for at least 19 months repeatedly failed to perform a full and accurate initial classification assessment as required by policy and good practice. As a result, they did not discover the lack of all the key classification documents, a Judgement and Commitment order, a Pre- or Post-Sentence Report, a current sentence computation or a current Face Sheet. Partly because of the inadequate flow of complete documents to the DOC, Wright was mistakenly treated for over a year after sentencing in 1996 as not finally sentenced, but rather as a prisoner still awaiting final sentencing on some charges. Even when the lack of necessary documentation was discovered in mid-1997, the DOC case manager and her supervisor, who took part in Wright's Initial Housing review at the Maximum Facility, took no action to correct those deficiencies. The DOC case management system should have had a way to alert correctional administrators and, in some fashion, to take into account the widespread notoriety of the case. (Chapter 5)

**F-30** Some of these failures, as well as those mentioned below, result from the lack of management oversight or internal controls at the institutional or headquarters level of the DOC's case management and inmate records operations. (Chapter 5)

**F-31** The escorted funeral trip did not constitute a release from custody from either a

Executive Summary Part B: Major Findings

legal or operational standpoint. It was within the authority and policy of the DOC and was handled, with one security exception initiated by the Transportation Administrator, within DOC's normal practice, however flawed that normal practice might be considered. (Chapter 5)

**F-32** Approval of this community trip for a notorious murderer was unwise on the warden's part, especially as he was in his first week in the agency, and he did not consult with his supervisor or director but only with subordinate staff. He also did not review the full case file, but only a very brief summary form with a few attached pages, although that apparently was the common practice in the agency until recently. (Chapter 5)

**F-33** The one page Escorted Trip Summary provided to the Warden, as well as most of the information conveyed to the warden by the case manager and other subordinate administrators, was materially inaccurate, failing to convey all the available information about the current convictions, sentences, notoriety or judicial concern, and focusing instead on 20-year old data from the 1976 case. The case manager and her supervisor performed poor staff work both during the intake screening process on Wright at the Maximum Facility, and soon after in reviewing the file and summarizing the case for the Warden as he made his decision on the escorted trip. (Chapter 5)

**F-34** Although additional armed security officers were present at the funeral home to assist escorting officers and to protect the public, it was poor practice and severely stretched the limits of agency policy for only two officers to be sent to escort Wright and another prisoner also serving a life sentence for murder together in a vehicle from Lorton to the funeral viewing in the District. Apparently, neither warden was aware of the other inmate's potential participation when he approved the trip for his own inmate. (Chapter 5)

**F-35** Once it was brought to their attention in January 1999 that Leo Gonzales Wright was being inappropriately held at Lorton, the federal apparatus did not move expeditiously in affecting his transfer from Lorton to federal custody, which occurred in May 1999. (Chapter 5)

# Executive Summary

# Part C: Major Recommendations

**R-1**     An interagency committee should be established to better coordinate the handling of similar issues and problems.   Administrators from all agencies involved in the detention and processing of felons sentenced in Federal Court should participate. The committee should meet periodically throughout the year to communicate about ongoing issues.  It would be advisable that the U.S. District Court assign at least one Federal judge to act as a liaison with the committee. (Problems highlighted in Chapter 2 reinforce this recommendation.) *U.S. District Court Judges and Clerk's Office, U.S. Probation Office (USPO), U.S. Marshals Service (USMS), Bureau of Prisons (BOP), D.C. Department of Corrections (DOC), U.S. Attorney's Office, Court Services and Offender Supervision Agency (CSOSA), U.S. Parole Commission (USPC).*  (Chapter 1)

**R-2**     Court officials and those of the other key agencies involved in the sentencing and commitment process should hold periodic joint training meetings, similar to small, local sentencing conferences. Such structured communication would  minimize future problems and enhance understanding of complicated issues among the many components involved in the process.  *Federal Court Judges and Clerk's Office, USPO, USMS, BOP, U.S. Attorney's Office, USPC, CSOSA, Federal Public Defenders, Local Defense Bar.*  (Chapter 1)

**R-3**     A joint task force of all involved Federal agencies should be formed to eliminate any current designations backlog and to closely review the designation system, particularly the logging or automated data systems in place to track the flow of thousands of documents annually between agencies. This group might serve as a subcommittee of the committee recommended above in R-1. *Clerk of Court, USMS, USPO, BOP.*  (Chapter 1)

**R-4**     An audit should be performed by the District Government and the USMS to assess the counting, billing, and billing verification procedures used for contract Federal prisoners held in DOC.  Further, the daily reimbursement rate between the DOC and the USMS should be renegotiated from the 1991 rate of $70.50 per inmate per day to reflect the true current costs to the DOC of over $90 per day.  *DOC, USMS, District Government.*  (Chapter 1)

xviii

Executive Summary Part C: Major Recommendations

**R-5**   D.C. Superior Court officials and the various executive branch agencies should begin the planning process for designating and expeditiously transporting over 3,000 additional D.C. Code cases annually to BOP, as indicated in F-6. If these steps are not taken, the inefficiencies and problems cited in F-2 will lead to further crowding at the D.C. Jail and would have significant financial and operational impact on DOC.  BOP must make special provisions for that eight-fold increase in its designations caseload from the District, including considering establishment of a designations office near the courthouse. *D.C. Superior Court, USMS, BOP, DOC, USPC, CSOSA, U.S. Attorney's Office.* (Chapter 1)

**R-6**   A new written understanding on dual code cases should be developed by representatives of  the USMS, BOP,  DOC and Federal Probation, in consultation with the Federal Court.  The document should outline agreed upon written procedures for the consistent handling of the variations of dual code cases and should be reviewed and approved in each agency at the appropriate level of policy administration.  Each agency involved in implementation of the agreement should develop its own written internal policies and operational procedures. *BOP, USMS, DOC, U.S. Probation, U.S. District Court Judges and Clerk of Court.* (Chapter 2)

**R-7**   Because of the serious logistical and financial consequences involved, the United States Attorney's Office, USMS, and DOC should strengthen the manner and timeliness of the notification procedures which occur when the United States Attorney's Office decides to proceed with a case in Federal Court against a defendant as to whom they previously proceeded in Superior Court.  DOC and the USMS need to be able to place these cases on the list of billable, contract Federal prisoners. *U.S. Attorney's Office, USMS, DOC.* (Chapter 2)

**R-8**   In view of the fact that all sentenced felons in the DOC will be placed in the BOP over the course of the next two years, the BOP should consider designating all newly-sentenced dual code cases to Federal prisons. *BOP.* (Chapter 2)

**R-9**   Whatever agreement is reached, all cases sentenced by Federal judges in the U.S. District Court for the District of Columbia, including those sentenced under D.C. Code, should be referred by the USMS to the BOP for designation, even if the BOP at times exercises its discretion to designate a DOC facility for the place of confinement.  Sentencing judges should be notified of such decisions in writing. *BOP, USMS, U.S. Probation.* (Chapter 2)

**R-10**   Whatever agreement is reached, full verbal and written communication of the planned practice needs to be communicated to the U.S. District Court judges in the District of Columbia and the Eastern District of Virginia, probation officers, U.S. Attorney's Office prosecutors, and the local defense bar.  This information,

Executive Summary Part C: Major Recommendations

including the specific steps necessary to convey recommendations for placement in a Federal facility, might well be part of a joint training session or small local sentencing conference. *U.S. District Court, USMS, BOP, U.S. Attorney's Office, U.S. Probation, Federal Public Defender, DOC.* (Chapter 2)

**R-11**  The interagency committee recommended in R-3, or a joint  USPO, USMS, BOP and DOC work group should closely review the causes and rectify the procedures with the delays in the identification, designation and transfer from DOC to BOP of D.C. Code cases which have completed their sentences and must commence their Federal sentences.  They should also review the billing procedures involved in these cases. *USPO, USMS, BOP, DOC.* (Chapter 2)

**R-12**  The current process DOC has undertaken to thoroughly review and update all written policy in case management and records management needs to be brought to completion and operational staff adequately trained.  (Chapter 3)

**R-13**  There needs to be a major upgrade of the basic automation and technology systems available to staff to manage these areas.  Of particular need is an independent automated prisoner information system that is developed, managed, and maintained by DOC.  While this system should have relational capabilities with the systems maintained by other law enforcement agencies, it should be owned by DOC.  Some significant short-term, cost-effective improvements can be made by simply developing databases using available equipment.  (Chapter 3)

**R-14**  DOC's system for initial assessment and review of committed prisoners needs to be significantly strengthened and  given more structured supervision by institution and headquarters management.   (Chapter 3)

**R-15**  The process withing DOC for initially designating sentenced prisoners to facilities or re-designating them to other prisons should be reorganized into a more formal system, set forth in detailed written policy and automated.  The Medical Receiver should better organize and automate the system for pre-transfer medical clearances in order to be responsive to the daily management needs of the Warden's staff and to help clear the backlog at the D.C. Jail.  (Chapter 3)

**R-16**  The case management operations in DOC need to be reorganized, including consideration of the recommendations of the previous NCCD studies and the recent April 1999 report; particularly, those urging the Department to systematize the process, installing both automation and management oversight through a system of internal controls.  (Chapter 3)

**R-17**  As  DOC becomes more of a municipal system holding primarily pretrial prisoners, it should consider developing a classification system for its Jail population and

Executive Summary Part C: Major Recommendations

requesting the technical assistance of the National Institute of Corrections in this process.  (Chapter 3)

**R-18**  DOC administration should respond expeditiously to the problems in records office management and implement the recommendations of previous studies in 1985, 1989, 1996, and 1997. Particular attention to the need for a headquarters record office administrator, increased security, and a separate J&C file system should be a priority.  (Chapter 3)

**R-19**  The process of filing and recording institutional disciplinary actions should be reorganized to include chronological summary sheets and the automated posting of all disciplinary records in a database.  (Chapter 3)

**R-20**  The Office of the Mayor of the District of Columbia and the DOC Director should develop a mechanism whereby accountability is established for tracking, evaluating, and implementing the results and recommendations of significant reports on the DOC.  (Chapter 3)

**R-21**  During the present agency review, DOC's escorted trip policy should be tightened. The process of case presentation for management screening needs to be upgraded to provide more extensive file material, including the availability of the entire file for screening and approving officials.  A mechanism for weighing public and judicial concerns in high risk cases and conducting a thorough security risk assessment of the details of the trip should be implemented.  (Chapter 4)

**R-22**  DOC's community service work program needs to be thoroughly reevaluated and revamped, if it is to be retained.  (Chapter 4)

**R-23**  The pre-release placement program for felons placed in structured community facilities by DOC during the final weeks of their sentences should be expanded to include all eligible cases, including those released by mandatory release procedures.  To accomplish this improvement in the program, some additional community beds may be temporarily needed for the next year.  (Chapter 4)

**R-24**  A formal internal administrative review should be commenced regarding the actions, omissions, and competency of Wright's caseworker and casework supervisor while he was at the Maximum Facility at Lorton.  (Chapter 5)

# Chapter One

# Commitment Process for Cases Sentenced in Federal Court

**Introduction.**  Among the matters U.S. District Court Judge Emmet G. Sullivan requested be examined were "problems regarding the commitment of prisoners to the Bureau of Prisons."  Separately, U.S. District Court Judge Gladys Kessler asked for information about the number of Federal prisoners in the D.C. Department of Corrections awaiting placement in Federal institutions.

When Federal judges in the U.S. District Court for the District of Columbia sentence criminal case defendants to a term of imprisonment, it is the role of the U.S. Attorney General and the Attorney General's designees to see that the judgement of the court is faithfully carried out.  There is a well designed set of procedures in place at the national level to coordinate and manage the complex process of designating and committing the wide variations among 56,000 cases sentenced annually in 345 Federal court cities to over 100 federally operated or contracted prisons.  A national MOU between the directors of BOP and the USMS clearly details the agency responsibilities.  In view of the post-sentence handling of the Leo Wright case, the Court raises legitimate concerns about the quality control of the processing of felon cases sentenced in this Federal Court.

To respond to the concerns of both judges, the Review Team examined the timeliness of inmate placement in BOP of all cases sentenced in the Federal Court from July 1996 to June 1999.  The related procedures of each component of the complex process, including the BOP, the USMS, the USPO, the Clerk's Office of  U.S. District Court for the District of Columbia, and the DOC, were closely examined. The review considered the written policies, actual practices, and management systems (including logs and databases) in place to ensure timeliness and accuracy, as well as  the mechanisms in place for carrying out specific court recommendations in individual cases.

An analysis of the1,200 cases sentenced to prison from D.C. Federal Court from 1996 to 1999 reveals significant inefficiencies in the local design and implementation of the national agreements.  During that period, there were  lengthy delays in designating and committing almost half of the cases.  These delays result from delays of from one to six or more months in delivering to the BOP for processing the most critical documents.  The Federal commitment  process generally was found to have a well-developed set of procedures for handling most cases.

**A.  Statutory Authority for Commitment to the BOP**

1

Commitment Process for Cases Sentenced in Federal Court

Section 3621 of Title 18 of the U.S. Code provides that a person who has been sentenced to a Federal term of imprisonment shall be committed to the custody of BOP and that the BOP shall designate the place of the prisoner's imprisonment.  BOP may designate any available, appropriate, and suitable penal or correctional facility that BOP determines meets minimum standards of health and habitability, whether maintained by the Federal government or otherwise.  Therefore, while the standard language in every Federal and District of Columbia court order for imprisonment is that the defendant is committed to the custody of BOP, not all are placed in Federal prisons.  In addition to prisoners housed in the DOC, over 16,000 of the 130,000 prisoners in BOP's custody are actually housed, on a contractual basis, in privately operated prisons,  private or nonprofit halfway houses, or state or local facilities.

Although it is BOP, not the sentencing judge, that designates the place of confinement, 18 U.S.C. 3621 provides that, among the factors BOP must consider is any statement made by the sentencing court concerning the purposes of the sentence or recommending a type of penal or correctional facility in making its designation decision.  Ordinarily, such judicial recommendations are included in the sentencing judge's commitment order, as discussed later in this chapter.

## B.  Judgement in a Criminal Case

In July 1990, the Administrative Office of U.S. Courts issued two forms, both entitled "Judgement in a Criminal Case" -- form AO 245 for offenses committed prior to November 1, 1987 and form A 245S for offenses committed on or after November 1, 1987.  In practice, these forms are usually referred to as Judgement and Commitment Orders or J&Cs.  In March 1995, the Judicial Conference of the United States adopted revisions of those standard forms for nationwide use to ensure that all significant information required by all components of the criminal justice system was properly communicated.  Form 245S was replaced with form AO 245B to communicate the sentence imposed plus any court recommendations regarding a specific institution or specialized program.  BOP's policies and practices in regard to judicial recommendations are discussed later in this chapter.

## C.  USMS Role in Designations

Section 4086 of Title 18 of the U.S. Code indicates that the USMS "shall provide for the safe-keeping of any person arrested, or held under authority of any enactment of Congress pending commitment to an institution."  Therefore, when a Federal judge sentences a defendant  to imprisonment, the Clerk of the Court sends the J&C to the U.S. Marshal (USMS) for that district, and the USMS office requests that BOP designate the place of confinement.

Commitment Process for Cases Sentenced in Federal Court

In practice, the USMS submits that request in writing to the office of the local BOP Community Corrections Manager (CCM), who obtains additional information about the defendant and the offense and then, ordinarily, requests a designation decision from the BOP Regional Designator, located in one of the six BOP Regional Offices.[1]  BOP has 29 CCM offices assigned to various geographical areas throughout the United States.

There are 345 Federal Court cities in 94 Judicial Districts.  Nationwide, 56,000 cases were committed to the BOP in 1998.  There are great variations and legal requirements in the types of cases processed, and inmates are placed in over 100 BOP institutions of various security levels and in various facilities with which BOP has contractual arrangements.

The sheer volume of cases handled annually, nationwide, as well as locally by the D.C. Federal Court, dictates that each agency's policy and procedures are clear and that there is close interagency planning and ongoing coordination among those agencies.

## D.  BOP Role in Designations

BOP Program Statement 5100.06, *Security Designation and Custody Classification Manual* (6/7/96), outlines the following normal chronology of a designation decision:

1.  The offender is sentenced.

2.  The Clerk of the Court sends the J&C to the USMS.

3.  The USMS makes a written request to the appropriate BOP Community Corrections Manager (CCM) for a designation.

4.  If not already provided, the BOP CCM requests a certified copy of the J&C, a copy of the custody record from the USMS, and two copies of the Presentence Investigation Report (PSI) from the U.S. Probation Officer (USPO).

5.  The BOP CCM or medical designator also must use available information to determine if any special precautions need to be taken, for example, if the inmate must be separated from any other inmates.  That information is usually provided by the U.S. Attorney's office.

---

[1] If the PSI or other documentation indicates that the inmate presents medical or mental health concerns, the CCM refers the case to the Medical Designator in the BOP Central Office, rather than the Regional Designator, so the inmate can be initially placed at a facility with resources adequate to address his or her special needs.

Commitment Process for Cases Sentenced in Federal Court

6. Within two work days, the CCM usually enters into the BOP on-line computer system (SENTRY) all of the data the Regional Designator needs to designate an appropriate institution for the inmate. As is addressed in Chapter 3, the PSI is also very important when the inmate arrives at the designated institution for use in the inmate's classification, case management, program planning, and release preparation. Also, any special considerations, including any recommendations from the sentencing court on the J&C, are noted in SENTRY.

7. Within one work day, the Regional Designator reviews the designation request information in SENTRY, designates the institution in which the inmate is to be placed, and notes the reason for that decision.[2]

8. Upon completion of the initial designation ("Security Designation") by the Regional Designator or Central Office Medical Designator, that decision is immediately available through SENTRY to:

- The CCM office that requested the designation,
- The designated BOP institution,
- Any BOP facility (Metropolitan Correctional Center, Detention Center, etc.) that may be holding the inmate, and
- The USMS Prisoner Transportation Division in Kansas City.

9. The CCM informs the USMS of the designation, by whatever means is appropriate, and immediately forwards all of the supporting documents to the designated institution.

10. At the designated institution, staff monitor the arrival of the supporting documentation, which will be pertinent for the inmate's classification. If the inmate does not arrive within specified time limits, institution staff must ascertain the reason for the delay or whether the designation, for some reason, is no longer valid.

## E. Special BOP Procedures for Superior Court Commitments

The BOP *Security Designation and Custody Classification Manual* also addresses a number of exceptions to regular designation procedures for new commitments. Among

---

[2] If the BOP CCM determines that a non-Federal facility is appropriate, the CCM is authorized to make such placements. Examples of such cases are inmates sentenced to one year or less (often "boarded" in a local jail), juveniles under the age of 18, and court-recommended direct commitments to contract Community Corrections Centers (halfway houses).

Commitment Process for Cases Sentenced in Federal Court

these exceptions are inmates sentenced under the D.C. Code by the District of Columbia Superior Court.  When D.C. Code inmates are accepted for BOP placement, their cases are screened, loaded into SENTRY, and designated only by the Central Office Correctional Programs Branch, which BOP policy requires that each request be considered on an individual basis and in accordance with the following procedures:

- The D.C. Superior Court sentencing Judge may refer a designation directly to the Correctional Programs Branch or make a notation on the J&C. Ordinarily, in either case, the request is prepared and submitted by the Superior Court Office of Legal Assistance (OLA).  Requests for placement submitted by the U.S. Attorneys Office must first be reviewed by the DOC, which in its discretion may forward the request to the BOP after a determining whether the placement in BOP custody is appropriate.[3]

- The BOP Central Office Designator reviews the request and documentation to determine whether the inmate is appropriate for placement in a BOP facility.

- Approval of the Assistant Director of the Correctional Programs Division is required for a BOP institution to be designated.  When the designation is complete, the Designator sends the PSI and relevant documents to the designated institution and provides a copy of the designation and certified copies of all applicable J&Cs to the D.C. USMS.

- If the D.C. Superior Court sentencing Judge initiated the request for BOP placement, he or she is notified in writing of the acceptance or denial, with a copy to the Superior Court.

- If the DOC or U.S. Attorneys Office initiated the request, the DOC is notified in writing of the acceptance or denial, with a copy to Superior Court.

## F.  Special Considerations in the District of Columbia

While this report is focused on the Federal Court and the events surrounding the sentencing and subsequent handling of the Wright case, the foregoing discussion of the distinction between the Superior Court, which may sentence under the D.C. Code only, and the Federal Court, which may sentence inmates under both the U.S. Code and the D.C. Code, is just one aspect of how the local and Federal systems in the District of Columbia relate in a unique way and in ways that are relevant to this case.

―――――――――――――

[3] The District of Columbia has an interest in this process, since it is responsible for paying the costs of BOP imprisonment of D.C. Code violators (24 D.C. Code 424).

5

Commitment Process for Cases Sentenced in Federal Court

In the District of Columbia, there are two Presidentially-appointed U.S. Marshals and therefore two separate offices – one for the Federal Court and one for the Superior Court. The latter fulfills a role similar to a local sheriff in detaining and moving prisoners charged with D.C. Code offenses.

The Superior Court Division of the U.S. Attorney's Office fulfills the role of the local prosecutor for most D.C. Code criminal offenses.

DOC historically had both a local jail and the State prison-like function.  As a result of the National Capital Revitalization and Self-Government Improvement Act of 1997, the Federal government is in the process of assuming the State-like correctional functions whereby sentenced felons (no matter under which court or which criminal code) will be the responsibility upon completion of BOP.  DOC will continue to house pretrial prisoners, inmates temporarily in D.C. on writ, and sentenced midemeanants for both Marshals and both courts generally in the Central Detention Facility (the D.C. Jail) and the Correctional Treatment Facility.

The D.C. Board of Parole, which has traditionally handled parole matters for inmates in DOC institutions, is also being phased out, and upon certification of the Court Services and Offender Supervision Trustee, all parole decisions will be made by the U.S. Parole Commission (USPC) by August 2000.

The probation and parole supervision functions for Superior Court probationers and parolees are now the responsibility of the Court Services and Offender Supervision Agency (CSOSA), while Federal Court probationers and parolees will continue to be supervised by the U. S. Probation Office.

In short, while clear agency policies and procedures and close interagency planning and ongoing coordination are essential throughout the Federal system, these D.C.-specific cross-jurisdictional complexities require even greater attention and clarity in order for the District of Columbia criminal justice system to function.  The insufficiencies of local policies and procedures, particularly in regard to "dual code" cases, are addressed in Chapter 2.

## G.  **The Impending Impact of the Revitalization Act**

Briefly, Section 11201 (a) of the Revitalization Act requires that

Commitment Process for Cases Sentenced in Federal Court

"Not later than October 1, 2001, any person who has been sentenced to incarceration pursuant to the District of Columbia Code . . . shall be designated by the Bureau of Prisons to a penal or correctional facility operated or contracted for by the Bureau of Prisons. . . ."

As a result, the current designation and commitment process in the District is undergoing a dramatic change as the BOP gradually takes over the responsibility for processing and imprisoning annually an additional 1,800 to 2,000 cases sentenced by the Superior Court, plus between 900 and 1,000 parole violators. The current interagency designation apparatus is not adequate or organized to deal with that coming eight-fold increase in total cases from the District.

To avoid disruptions and delays, the Superior Court, USMS, BOP, DOC, USPC, and CSOSA must begin planning for the process of requesting designations from the BOP on more than 3,000 cases per year resulting from sentencing by the Superior Court or violating parole and expeditiously transporting them to the institutions designated.

## H. **The Impact of Judicial Recommendations**

BOP Program Statement 5070.10, *Responses to Judicial Recommendations and U.S. Attorney Reports* (6/30/97), addresses how courts communicate recommendations about inmates to the BOP and USPC. When the BOP receives a J&C that indicates the court's preference for a specific institution, geographic area, or specialized program, BOP makes every effort to comply with the court's request, as long as there is no conflict with BOP policy or sound correctional practice. When it cannot comply with a court recommendation, BOP policy requires prompt notification of the court with an explanation in writing.

BOP policy requires a "judicial response tracking system" log at each Regional Office and an "executive tracking and log system" at each institution. The Regional Director must write to the court, within five days, when a recommendation for a specific institution or geographic area cannot be followed, and the warden is required to write to the court, within 35 days of the inmate's arrival, when program recommendations cannot be met.

For many years, the BOP has published a *Judicial Resource Guide to the Federal Bureau of Prisons* to assist U.S. Courts. In the 1999 issuance, the BOP policy and procedures regarding judicial recommendations are summarized in Chapter IV, section C1.

## I. **USMS/BOP Coordination on Policies and Procedures**

## 1. **National Level Coordination**

Commitment Process for Cases Sentenced in Federal Court

At the national headquarters level, the USMS and BOP have defined and coordinated their fiscal responsibilities and operational procedures since at least 1977. Joint written agreements were made in Memoranda of Understanding (MOUs), signed in 1977, and updated in 1985 and in October 1993. BOP issued Program Statement 7010.05, *Interagency Agreement Between Bureau of Prisons and U.S. Marshals Service* (12/6/93) to distribute the latest MOU to all BOP locations. The Program Statement states that "generally, the new MOU makes no significant changes [but] only formalizes and clarifies practices which were widely accepted but had not been committed to writing in an agreement."

The 1993 MOU provisions for placement in prison of sentenced inmates parallel those in BOP policy, as described in section D. Briefly, a defendant remanded to a USMS by a Federal court is the responsibility of the USMS until the prisoner is sentenced, a J&C is provided to the BOP, and the prisoner has been transported and delivered to the facility designated by the BOP. At that BOP institution, the return portion of the J&C is completed and returned for the file of the sentencing court.

Within 48 hours of receipt of a signed J&C, the USMS furnishes BOP with copies of the J&C. It also provides the PSI and the record of the defendant's time in custody (form USMS-129, *Individual Custody and Detention Report*). BOP provides a designation to the USMS within 72 hours of the request, unless there is a delay in the arrival of the PSI.

While the 1993 MOU is clear and consistent with the BOP Program Statement on *Security Designations and Custody Classification*, the Review Team was unable to locate an internal USMS policy delineating the USMS responsibilities on designations. Therefore, it appears that the MOU is a critical, controlling document for USMS in this process.

There are also forums for continuing coordination not only between the BOP and the USMS, but among other Department of Justice criminal justice agencies, such as the DOJ Detention Planning Committee. BOP, the Chiefs Advisory Council, and the Probation Division of U.S. Courts meet regularly. The BOP director and other BOP officials meet semiannually with the Criminal Law Committee of the Federal Judicial Conference on issues of concern to the court with BOP carrying out sentences of the judges.

## 2. Local Coordination

In addition to this national USMS/BOP MOU, another MOU was implemented at the local level for the D.C. Federal Court in June 1994 by the Clerk of the Court, the Chief U.S. Probation Officer, the U.S. Marshal, and a representative of the BOP's Baltimore, Maryland, CCM Office responsible for designations from both D.C. courts – the U.S. Court and the D.C. Superior Count. That CCM office is also responsible for designations from the districts of Eastern Virginia, Maryland, Northern West Virginia, and Delaware.

Commitment Process for Cases Sentenced in Federal Court

The local MOU is generally in accord with the national USMS/BOP MOU, but also specified who in each office was responsible in for delivering documents and for communications if the delivery of a PSI or J&C was delayed beyond seven days.

Several months later, in September 1994[4], a second local MOU was drafted but never formalized among the Chief U.S. Probation Officer, the U.S. Marshal, the same representative of the BOP CCM office, plus a representative of the DOC. The draft stated that the USMS would "forward all paperwork concerning an inmate sentenced in the U.S. District Court under a D.C. Code" to the DOC. The draft MOU is addressed in more detail in Chapter 2.

It is apparent that over the past several years, the various agencies involved in the commitment process of cases from the Federal Court have not coordinated sufficiently to finalize the agreements and deal with the ongoing difficulties in the system which has contributed to the inefficiencies. Recently, the respective agencies have initiated dialogues and plans to ameliorate the issues at hand.

## J.  Review of Actual Designation Practices

### 1.  Clerk of the Court

A review of 27 original files in the Court Clerk's office revealed a pattern of timely judicial signatures, filing of J&Cs, and delivery of certified copies to the USMS and USPO. The Clerk's office maintains a log that documents USMS and USPO receipt of J&Cs.

### 2.  U.S. Probation Office

The U.S. Probation Office's (USPO) response to the Review Team's inquiries confirms a pattern of timely submissions to the USMS or BOP, based on their documentation of dates mailed and receipted. Before 1997, the USPO hand-delivered PSIs to the USMS, but in 1997 it initiated mailing them directly to the BOP, after some were reportedly misplaced. Unfortunately, until sometime in 1999, if the BOP did not soon receive a request for designation and J&C from the USMS, it was BOP practice to return the PSI to the USPO. (See Section K2 on BOP and Section L, *Cases Committed to Imprisonment by the Federal Court 1996-1999*.)

### 3.  U.S. Marshals Office

---

[4] There is inconsistency in date references to this second MOU among various agencies, apparently stemming from the fact that the MOU was dated September 6, 1994, but then mailed under a cover memo from the USM dated October 3, 1994.

Commitment Process for Cases Sentenced in Federal Court

The USMS office acknowledges that at times over the years there has been a level of disorganization and administrative overload, resulting in delays in their requests for BOP designation. The USMS made available for the Team's review two separate manual logs it maintains to record their receipt of J&Cs from the clerk's office and its mailing of J&Cs to BOP. Because they are maintained manually, it would be a lengthy process to research specific cases. A database the USMS also uses indicates dates on which J&Cs were "worked on" but does not document the dates of requests for designation and mailings of J&Cs to the BOP or their receipt by the BOP.

The Assistant Director for Prisoner Services of the national U.S. Marshals Service headquarters located in Arlington, Virginia, in an interview with members of the Review Team, indicated an awareness that the unique arrangement of having two courts and two USMS offices in the District of Columbia has sometimes fostered local variations in what are otherwise standard procedures in most judicial districts. The USMS central office was apparently not specifically aware of what some of those local arrangements were, especially regarding dual code inmates.

On the other hand, the Assistant Director did offer that the USMS does conduct periodic on-site auditing of each USMS office, including the timeliness of designation requests, which should have revealed any problems. Such timeliness is a financial issue for the USMS, since it is the USMS that pays for the housing of pretrial inmates and sentenced inmates awaiting designation and transportation to the institutions designated. The Review Team asked for copies of any audits that were done on the U.S. Court USMS, but had not received them by the time this report was completed.

## 4. Bureau of Prisons

The Review Team examined the procedures and practices of the BOP Baltimore CCM office, as well as of the BOP Mid-Atlantic Regional Designator's office. The USMS/BOP MOU and BOP policy anticipate that the USMS will usually provide the PSI with the J&C and USM-129 for most cases from the D.C. U.S. Court. In most cases, however, the USPO immediately sends the PSI directly to the BOP CCM, since the USPO is usually present at the sentencing. This is a result of past concerns by the USPO that their PSIs were being misplaced by the USMS. (The CCM reported that, for the other districts serviced by the Baltimore CCM office, the PSI usually does come from the USMS with the J&C and USMS-129.)

Because the PSIs may arrive at the BOP CCM office before there is even a request for a designation from the USMS, the CCM logs in the PSI, places it in a file, sends the USMS a form letter request for the rest of the material, and then follows up by phone.

To ensure that all material related to a designation request is maintained and assembled,

10

Commitment Process for Cases Sentenced in Federal Court

the BOP CCM office now:

- has someone assigned full-time to make follow-up calls seeking missing documents,

- retains any partial designation materials indefinitely until they can assemble a complete package (rather than sending it back to the originator), and

- has a tight tracking procedure, with requests for information being elevated in the chain of command with each passing week.

The Review Team examined those procedures and found them to be effective, along with an automated designation log that has been in place in its current form for about two years.  At the time of our visit, eight cases from the D.C. U.S. Court were waiting for additional documents.  The oldest case had been pending for six weeks.

## K.  Ongoing Internal Monitoring of BOP Designations

### 1.  Systematic Internal Controls

The Baltimore CCM office's designation processes are subject to ongoing auditing and oversight of all of its major functions, as part of BOP's internal controls.  Primarily, that system involves formal, regularly scheduled operational reviews of each operational component throughout the country conducted by the staff who actually work in each of those areas, plus program reviews of each of those same operational areas conducted by BOP auditing specialists from outside of the particular offices that are responsible for those functions.

Both operational reviews and program reviews for a particular function are accomplished by applying the same set of formal Program Review Guidelines, so that the approach and standards are the same nationwide.  For deficiencies found through either type of review, the audited component is required to take corrective action and document what that action was.  Often, an on-site follow-up review is then conducted to ensure that the corrective action was appropriate and successful before that review can be officially "closed."

### 2.  Results of BOP Internal Reviews of Baltimore CCM Office Designations

For this review, the Review Team examined several of those formal audit reviews of the Baltimore Community Corrections office:

- a Program Review conducted in February 1996
- an Operational Review conducted in May 1997

11

Commitment Process for Cases Sentenced in Federal Court

- • an Operational Review conducted in October 1997
- • a Program Review conducted February 1998, and
- • an Operational Review conducted February 1999.

One of the major areas reviewed each time was designations.  The findings indicate that referrals to the Regional Designator for designations were not always completed in a timely manner, but in each instance, those findings led to some sort of corrective action. In the 1998 and 1999 reviews, one reason for the delays was that designation requests were often received in "batches," ranging from 10 to 32, making it difficult for all of them to be processed within the two-day time frame required by BOP policy.  The numbers reported in the 1998 review, however, do not indicate a general serious delay.  Out of 898 designations in a four-month period, seven percent (63) were completed between three and ten days late.  A follow-up in 1999 found that all designations during the time period reviewed were timely.

## L.  Cases Committed to Imprisonment by the Federal Court 1996-1999

The U.S. Court provided the Review Team with a list of 1,221 defendants sentenced to imprisonment from June 30, 1996, to June 30, 1999.   Nearly 80 percent of them (957), were analyzed, while others were not readily retrievable (e.g., 162 were sealed by the court,  and others were serving short sentence).

BOP provided data on 1,047 cases.  BOP did not formally designate institutions for 90 of them, 78 of whom were sentenced to a year or less.  By the time the BOP received the designation documents, the inmate's release date was so soon that the BOP decided to leave the inmate in the D.C. confinement facility to complete the sentence.

Unfortunately, in eight cases, after computing the sentences, BOP determined that the inmates should have already been released – from two days to several months earlier.  For a variety of reasons, designations were not formally made on twelve inmates with sentences longer than a year on whom sentence computations had been completed.

Of the 957 designations, from the date of sentencing, designation decisions were made:

- • on 57% within 1 month,
- • on 83% within 2 months, and
- • on 91% within 3 months.

Commitment Process for Cases Sentenced in Federal Court

The Review Team examined the 9 percent (85 cases) for which the designation decision took longer than three months. In the majority of cases (58%), the delays were attributed to the BOP's not receiving the basic documents from the USMS and/or USPO. Only 8 percent of those cases were specifically delayed for lack of a PSI after receipt of the J&C and USMS-129 from the USMS. However, it should be noted that in numerous cases, USPO had documentation of a first mailing of the PSI to BOP. BOP, prior to 1999, returned the PSI to USPO if the USMS documentation had not been received. When the J&C and the USMS-129 arrived, BOP would make a second request for the PSI. This resulted in unnecessary duplication and delays.

Other categories are shown in the table and graph.

In regard to the questions asked by Judge

| Time from Sentencing to Designation Delays Greater than Three Months | |
|---|---|
| Pending All Basic Documentation [1] | 12 |
| Pending J&C and USM-129 [2] | 49 |
| Pending PSI [3] | 7 |
| Pending Special Documentation [4] | 16 |
| Awaiting Medical Designation [5] | 1 |
| **TOTAL** | **85** |

[1] J&C, USMS-129, PSI
[2] From USMS
[3] From USPO
[4] U.S. Attorney, PV report, Superior Court PSI, Special Designation Request Corrected J&C
[5] Medical cases are done by BOP Headquarters

## Designation Delays Beyond 3 Months



Pending Special Documentation 19%

Pending J&C and USM-129 58%

Awaiting Medical Designation 1%

Pending PSI 8%

Pending All Basic Documentation 14%

Commitment Process for Cases Sentenced in Federal Court

Gladys Kessler,[5] the Review Team attempted to reconstruct and screen the status of the population of Federal cases held in the DOC at that time. Time requirements and the lack of accuracy of available information hampered the precision of this discreet portion of the review. Hopefully, the screening and analysis of the 1200 cases in the previous section, while not meeting the specific request of Judge Kessler, will nevertheless be helpful in responding to her well-placed concerns.

A screening of records from the Clerk of the Court, the USMS, the BOP and the DOC revealed 75 cases that had been designated by the BOP and were still awaiting transfer. The average length of time between the date of sentencing or the completion of a previous D.C. sentence and the date of designation was over 2 months.

That figure was skewed upward by the fact that there was a significant number of cases who were paroled or released from their D.C. sentence to a Federal detainer for service of the consecutive Federal sentence. In many of these cases, there was a delay of six months to a year in obtaining a designation. This delay often being a reflection on the DOC's process in identifying these cases and requesting movement. Likewise, in a several of these cases there was no available Presentence Investigation Report and it took some time to have a new Post-Sentence Report completed. It appears that most of the backlog of this type of case had been cleared up by late September. The inefficiencies with moving this latter group of cases are detailed further in Chapter Two below, along with several specific case studies.

Also, by the time of this screening in late September, virtually all of these 75 cases had long since been transferred to BOP custody. The average length of time between the date of designation and the removal to the BOP facility was 44 days.

The Review Team was further able to identify 6 additional cases who had been sentenced and were awaiting designation as of July 15, 1999. There may well have been some additional cases which were missed by this particular screening due to time constraints. Even after the submission of this report, the Review Team will continue to screen and analyze the Federal population in the DOC to determine an updated status of sentenced

---

[5] By order dated August 17, 1999, U.S. District Court Judge Gladys Kessler ordered the government within two weeks after submission of this Report in United States v. Wright, No. 96-66 (EGS), to submit a copy of this Report in United States v. Miller, No. 98-326 (GK) and to file a response to Judge Kessler's July 13, 1999, order in that case. The Review Team was not represented at the Miller hearing before Judge Kessler on July 13, 1999, but the Team has been informed that the Court orally requested a one day "snapshot" in July 1999 (on the 15th) that shows: (1) the total number of sentenced Federal prisoners in DOC custody awaiting BOP designation; and (2) the length of time each of them had been in DOC custody awaiting BOP designation.

14

Commitment Process for Cases Sentenced in Federal Court

Federal prisoners as to designation and movement to the BOP.

While the foregoing numerical analysis provides one view of how well the designation process has been working, it is also instructive to look at some individual cases:

- Leonard Miller was sentenced by Judge Gladys Kessler to a 5-year U.S. Code sentence on October 29, 1998. The U.S. Marshal requested a BOP designation on November 16, 1998, and the BOP subsequently requested from the USPO a Post-sentence Report on January 11, February 17, March 22, and March 26, 1999. The BOP received it on July 1, 1999, and designated a BOP institution that same date. Mr. Miller was transferred to BOP custody on July 14, 1999. In summary, the designation was delayed because a Presentence Investigation Report was not done, and the Post-sentence Report was not prepared until eight months after sentencing, more than five months after the BOP requested it.

- Donnell Abney was sentenced in Federal Court to 110 months on October 14, 1998 and held in the D.C. Jail. The USMS requested a Federal designation from the BOP on October 28,1998. The BOP made several requests for the PSI on October 28, 1998, January 11 and March 22, 1999. The BOP did not receive the PSI until July 9, 1999. Mr. Abney was designated to Federal custody on July 12, 1999, 9 months after he was sentenced.

- Marcus Boyett was sentenced in Federal Court to 48 months on November 10, 1998 and held in the D.C. Jail. The USMS requested Federal designation one month later on December 10, 1998. U.S. Probation reported that a PSI was not prepared and a post sentence report was requested on November 12, 1998. The BOP received the Post Sentence Report on February 3, 1999. On June 17, 1999, a second J&C was requested from the USMS. Mr. Boyett was not designated to Federal custody until June 24, 1999, 7 months after he was sentenced.

- Gregory Byrd was sentenced to a 135-month U.S. Code sentence on January 13, 1999. The USMS did not request a BOP designation until May 24, 1999. BOP received a Post-sentence Report on July 9, 1999, and designated a BOP institution on July 12, 1999. Mr. Byrd was transferred to Federal custody on July 26, 1999.

## M. **Findings and Recommendations**

15

Commitment Process for Cases Sentenced in Federal Court

## Findings

**F-1**   There is a very well designed set of procedures in place at the national level to coordinate and manage the complex process of designating and committing the wide variations among 56,000 cases sentenced annually in 345 Federal court cities to over 100 federally operated or contracted prisons. A national MOU between the directors of BOP and the USMS clearly details each agency's responsibilities. Good national planning and communication vehicles are in place among the affected agencies and between them and the Federal courts.

**F-2**   A screening and analysis of the 1,200 cases sentenced to prison from D.C. Federal Court from 1996 to 1999 reveals significant inefficiencies in the local design and implementation of the national agreements. During that period there were delays in designating and committing almost half of the cases. These lapses result from delays of from one to six or more months in delivering the most critical documents to BOP, including the commitment order, the USMS designation request and/or the PSI. Important factors appear to be the lack of adequate logging systems or full use of automation in tracking the flow of cases and documents by the USMS and, to a lesser extent, the BOP's former practice of returning a PSI to Probation if the J&C and designation request did not arrive in a timely fashion. Time constraints did not permit a further analysis of all the causes of the delays in delivery.

**F-3**   The level of communication and coordination among the various agencies involved in the commitment process of cases from the Federal Court over recent years has not been sufficient to deal with the ongoing difficulties in the system and has contributed to the inefficiencies.

**F-4**   These delays are likely costing the USMS considerable contract confinement funds spent on cases housed at the D.C. Jail awaiting transfer to BOP after sentencing. Likewise, DOC is losing the availability of precious bed space in a facility that struggles daily to comply with a court-ordered population cap.

**F-5**   DOC's process of tracking and accounting for contract Federal cases it holds for the USMS is inaccurate and disorganized, with no senior administrator responsible for its oversight and accuracy. As a result, there are large disparities of over 150 inmates between DOC's and the USMS's monthly lists and total numbers of billable Federal prisoners in DOC. (The accuracy of the USMS listings could not be finally verified due to time constraints.) These discrepancies likely have led to inaccuracies in the billing process and in DOC's verification of the billings. Further, the $70.50 per inmate per day cost billed to the USMS is outdated, having not been

16

Commitment Process for Cases Sentenced in Federal Court

modified since 1991, and does not fairly reimburse the DOC for its costs of over $90.00 per day at the D.C. Jail.  Because the District government's accounting procedure credits these funds only to the District's general fund rather than to the DOC's budget, there is less built-in agency incentive for efficiency and accuracy in this process.

**F-6**    Due to the 1997 Revitalization Act, the current designation and commitment process in the District is undergoing a dramatic change, as BOP is gradually taking over the responsibility of processing and confining an additional 1,800 to 2,000 cases sentenced annually in Superior Court in addition to between 900 and 1,000 parole violators per year.  The current interagency designation apparatus is not adequate to deal with this coming eight-fold increase in total cases from the District.

## Recommendations

**R-1**    An interagency committee should be established to better coordinate the handling of similar issues and problems.   Administrators from all agencies involved in the detention and processing of felons sentenced in Federal Court should participate. The committee should meet periodically throughout the year to communicate about ongoing issues.  It would be advisable that the U.S. District Court assign at least one Federal judge to act as a liaison with the committee. (Problems highlighted in Chapter 2 reinforce this recommendation.) *U.S. District Court Judges and Clerk's Office, U.S. Probation Office (USPO), U.S. Marshals Service (USMS), Bureau of Prisons (BOP), D.C. Department of Corrections (DOC), U.S. Attorney's Office, Court Services and Offender Supervision Agency (CSOSA), U.S. Parole Commission (USPC).*

**R-2**    Court officials and those of the other key agencies involved in the sentencing and commitment process should hold periodic joint training meetings, similar to small, local sentencing conferences. Such structured communication would  minimize future problems and enhance understanding of complicated issues among the many components involved in the process.  *Federal Court Judges and Clerk's Office, USPO, USMS, BOP, U.S. Attorney's Office, USPC, CSOSA, Federal Public Defenders, Local Defense Bar.*

**R-3**    A joint task force of all involved Federal agencies should be formed to eliminate any current designations backlog and to closely review the designation system, particularly the logging or automated data systems in place to track the flow of thousands of documents annually between agencies. This group might serve as a subcommittee of the committee recommended above in R-1. *Clerk of Court, USMS, USPO, BOP.*

Commitment Process for Cases Sentenced in Federal Court

**R-4**   An audit should be performed by the District Government and the USMS to assess the counting, billing, and billing verification procedures used for contract Federal prisoners held in DOC.  Further, the daily reimbursement rate between the DOC and the USMS should be renegotiated from the 1991 rate of $70.50 per inmate per day to reflect the true current costs to the DOC of over $90 per day.  *DOC, USMS, District Government.*

**R-5**   D.C. Superior Court officials and the various executive branch agencies should begin the planning process for designating and expeditiously transporting over 3,000 additional D.C. Code cases annually to BOP, as indicated in F-6. If these steps are not taken, the inefficiencies and problems cited in F-2 will lead to further crowding at the D.C. Jail and would have significant financial and operational impact on DOC.  BOP must make special provisions for that eight-fold increase in its designations caseload from the District, including considering establishment of a designations office near the courthouse.  *D.C. Superior Court, USMS, BOP, DOC, USPC, CSOSA, U.S. Attorney's Office.*

**Chapter Two**

**Commitment Process for Dual Code Cases:
Those with Both Federal and D.C. Code Sentences**

**Introduction.**  An exception to the generally well-designed designation and commitment process described in Chapter 1 is the handling of what is termed "dual code" cases, or those serving sentences under both Federal and local District statutes.  The Court, in its June 23 Order, requested that this review examine "the so-called Memorandum of Understanding (MOU) regarding the placement of individuals sentenced for local and Federal offenses. . . ."

In that regard, the D.C. Inspector General, in his June 11, 1999, Memorandum to the Court on these issues, found that this same unsigned 1994 MOU, in combination with a de facto working agreement between several agencies, effectively served as the basis for the handling of these dual code cases by the Federal and local agencies in the District of Columbia for at least the past five years.  This Review Team agrees with the Inspector General's  conclusion.

A major change in the handling of these cases occurred in the early 1990's when BOP declined to accept dual code cases into their custody and returned most of those in its custody to DOC.  The return of about 2,000 cases over several years occurred at a time when DOC was already under court-imposed population caps and was ill-prepared to deal with this massive influx of inmates.  After BOP made the decision to close its doors to most of these cases, confusion and delays arose in their post-sentence handling which continues today.  Not only did this massive return adversely affect DOC, but the Superior Court U.S. Marshal's office expended excess contract money to house these inmates.  These situations directly led to the USMS initiating meetings with the affected agencies to develop the 1994 MOU.

In recent years, the processing of these dual code cases has been characterized by confusion and a lack of an adequate interagency policy between BOP, USMS, and DOC.  There have not been consistent, well-developed interagency practices or communication between those agencies directly involved, principally the U.S. Marshals Service, DOC, the Bureau of Prisons, the Clerk of the Court, and U.S. Probation.  Even more problematic has been the inadequate communication by these agencies with the Federal Judges who are sentencing these cases in the District of Columbia  and in the Eastern District of Virginia, as well as with the prosecutors and local defense bar regarding the operational practices

19

Commitment Process for Dual Code Cases:
Those with Both Federal and D.C. Code Sentences

developed to handle dual code cases.  The communication breakdown played a major role in the confusion surrounding the Leo Gonzales Wright case.

To a significant extent, the problems in handling these cases are the product of the unique and sometimes confused or uneasy relationship between the District and the Federal government in relation to responsibilities for the confinement of sentenced felons.  The root of the confusion may lie with the statutory provisions by which Congress placed all felons convicted of violations of D.C. Code  "in the custody of the Attorney General," similar to the language long utilized in the sentencing and commitment of Federal prisoners.  An understanding of the meaning of the provision is critical to the sorting out of the handling of these dual jurisdiction cases.  In short, the law provides the Attorney General with legal custody and discretion to designate the place of confinement when as determined appropriate, rather than requiring the physical custody of prisoners.

The brief review of historical developments clarifies the manner in which dual code cases are handled, and more importantly, should help point to useful short- and long-term solutions.

## A.  Summary of Historical Developments on the Responsibilities for the Housing of the District's Felons

### 1.  History

The issues surrounding the respective responsibilities of the Federal and District governments for the handling of convicted felons have a long history.  The following summary relies directly on a review of that history as summarized by U.S. District Judge Thomas F. Hogan in United States v. District of Columbia, 703 F.Supp. 982 (D.D.C. 1988).

The holding in  United States v. District of Columbia concluded that since 1866 the Congress has appropriated funds to permit the construction of correctional facilities in the District of Columbia and in Northern Virginia to house the District's prisoners and that Congress "intended the District's prisoners to be housed in them and not in Federal prisons." (Supra, at 988).  The 130-year pattern was altered by the 1997 Revitalization Act mandating the closure of Lorton by December 31, 2001, and the gradual intervening movement of District felons into Federal prisons.

The *Act of July 25, 1866*, 14 Stat. 231, authorized the Secretary of Interior to construct a jail in the District of Columbia.  In *The Revised Statutes of the United States Relating to the District of Columbia passed at the First Session of the Forty-Third Congress*, Congress enacted further measures in 1873 regarding the administration of the recently built jail and the treatment of the prisoners there.  It also intended that the District would have a

20

Commitment Process for Dual Code Cases:
Those with Both Federal and D.C. Code Sentences

penitentiary constructed to house all D.C. felons serving sentences elsewhere around the country. The penitentiary was never built. Congress clearly directed D.C. prisoners detained awaiting trial or convicted of a crime to be housed in those facilities in the District which Congress created for that purpose.

Beginning in 1909, Congress authorized the purchase of a site and the construction of prisons at what would become the Occoquan Workhouse and the Lorton Reformatory. In the *Act of September 1, 1916,* Congress directed that sentences imposed on D.C. prisoners were to be served at Lorton and that D.C. prisoners serving sentences in other penitentiaries be transferred there. Those prisons were subsequently constructed at the Lorton site. Other facilities were added later until there were seven facilities there, and the Lorton complex served as the primary location for housing District felons for the past 80 years.

The court pointed out that: "At no point in the history of the District of Columbia did Congress ever hint that it intended prisoners, convicted in or detained for trial by the District of Columbia courts, to be housed in Federal prisons rather than in the very institutions created by Congress in the District of Columbia, at Lorton, and Occoquan for their incarceration. To the contrary, Congress specifically directed these prisoners to be incarcerated in the D.C. Jail, Occoquan or Lorton, and ordered D.C. officials to take them into their custody." (Supra, at 989)

In the *Act of June 6, 1940*, which became the precursor to the present D.C. Code 24-425 governing the authority of the Attorney General to designate the place of confinement of District felons, Congress responded to recommendations by the D.C. Parole Board and the Department of Justice to make improvements in the D.C. Parole system. One problem it wanted to eliminate was the situation where a parolee at a distance from the District who violated his parole had to be transported from the remote place of apprehension back to the District, in spite of the proximity of a nearby Federal prison where the parolee could serve out the rest of his/her sentence. Congress made clear the Attorney General could cause the parolee to serve his sentence at the remote Federal prison, authorizing the Attorney General to designate as the place of confinement "any . . . institution(s) whether maintained by the District of Columbia Government . . . or whether within or without the District of Columbia."

In 1966, the Congress revised D.C. Code at 24-468 to allow the Attorney General to designate the Mayor as the authorized representative to perform the functions to determine the "availability, suitability and appropriateness" of D.C. correctional facilities. However, the Attorney General has continually declined to take advantage of this provision, retaining the authority to determine suitability in his/her office.

21

Commitment Process for Dual Code Cases:
Those with Both Federal and D.C. Code Sentences

Until the relatively recent creation of the D.C. Superior Court in the 1970 District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub. L. No. 91-358, 84 Stat. 473 (1970), all defendants in felony cases brought in the District of Columbia could only be prosecuted in the Federal Court in the District.  Only criminal misdemeanor cases were handled by the Court of General Sessions.

## 2.  Housing of Some D.C. Cases in Federal Prisons

There is a long history of the Attorney General designating Federal prisons for the housing of a relatively small number of D.C. Code offenders.  Certain cases such as those inmates of special notoriety, those in need of protection, those in need of specialized treatment programs, and high security or disruptive cases at times were moved out of D.C. facilities. Likewise, from 1966 to 1992, the Attorney General designated Federal prisons for all female offenders serving sentences of over one year.  With the opening of the newly constructed Correctional Treatment Facility in 1992, female inmates were returned to the District.

A growing number of higher security and difficult to manage cases from the DOC were accepted into the BOP from the mid-1970's through 1985.  DOC transfers accounted for a significant proportion of the prisoners in several of the BOP's highest security penitentiaries, such as at Marion and Leavenworth.  In effect, the BOP became the location of last resort for the District in handling difficult cases.

By the mid-1980s, the number of inmates within the DOC had grown very rapidly and with the growth came numerous operational difficulties.  In 1975, there were 3,500 prisoners in the DOC.  By 1985, the count more than doubled to 8,000 and then increased to almost 13,000 by 1990, including those being held in the BOP and at other remote locations. Crowding, operational difficulties, and the accompanying violence resulted in several major class action law suits challenging conditions of prison confinement.  As a result, Federal Courts placed population ceilings on at least two facilities, the Jail and the Central facility, under consent decrees.

As a result of this crisis, the Attorney General temporarily ceased designating the District's correctional facilities for prisoners convicted in Superior Court, instead designating Federal prisons.  In August 1985, the Deputy Attorney General agreed to an interim solution, advising the Mayor that the Attorney General would designate Federal prisons for all sentenced prisoners.  From August 21, 1985, until January 13, 1986, the Bureau of Prisons took into its facilities every prisoner sentenced in Superior Court on the same day of sentencing.

The 1,589 prisoners accepted during these months brought to 2,376 the total of number

Commitment Process for Dual Code Cases:
Those with Both Federal and D.C. Code Sentences

of D.C. felons in the BOP. The Department of Justice ceased taking the new prisoners in January 1986, asserting that the District had not lived up to provisions for its remedial actions during the crisis. After a serious riot occurred at the Occoquan facility in July 1986, however, the Attorney General agreed to take another 300 cases into Federal prisons,



**D.C. Inmates in BOP**

temporarily pushing the total number of District felons in the BOP to well over 2,500 -- a significant proportion of the District's 9,000 prisoners.

This situation was maintained through October 4, 1988, at which time the District government announced, partly in response to capacity limits placed on two facilities by Federal judges, that it would no longer accept newly sentenced prisoners into the District of Columbia Department of Corrections. Part of the District's assertion was that the prisoners were the legal responsibility of the Attorney General, not of the District. The Department of Justice sued the District of Columbia, asserting that the Attorney General had the legal authority to designate prisoners to District facilities, that Congress intended that D.C. Code offenders serve their sentences in District facilities  and that the District was not carrying out its own responsibilities to develop sufficient prison capacity for its own prisoners or to resolve the various operational problems in its correctional facilities. The District Court ruled for the Federal government and the ruling was affirmed on appeal, United States v. District of Columbia, 897 F.2d 1152 (D.C. Cir. 1990).

### 3.  Movement of D.C. Code Cases Back to the DOC

At the time of this decision, BOP was experiencing significant population growth, from an average of increase in population per year of less than 8,000 inmates in 1985 to more than 12,000 in 1990. The United States Parole Commission (USPC) which had been providing hearings for the DOC prisoners in BOP custody was being drastically reduced in size due to the abolition of parole by Congress beginning November 1987 and was not able to handle the heavy DOC caseload.  Accompanying the downsizing of USPC and the removal of D.C. cases from BOP was a drastic reduction of the staff of the Federal Probation Office of the Federal Court (who served as special USPC officers), due to formulas based on caseload ratios.  This change also meant a large new influx of cases for the supervision unit at the D.C. Board of Parole.

Commitment Process for Dual Code Cases:
Those with Both Federal and D.C. Code Sentences

The USPC was reluctant to be bound by the District Parole Board's more lenient parole guidelines, particularly in parole violation cases. One key issue in parole violator cases was the D.C. practice of allowing credit for time spent in the community on parole, i.e., "street time," against the term of the sentence. That procedure was overturned in Federal Court in August 1998. See, U.S. Parole Commission. v. Noble, 711 A.2d 85 (D.C. 1998)(en banc).

BOP began the gradual transfer of most of the DOC male prisoners back to the District. This occurred at about the same time that all female prisoners were being returned for placement in the CTF. From a high of about 2,500 total prisoners in 1986, the count of DOC cases in BOP was reduced to 1,500 in 1991 and to a low of about 200 in 1993 and 1994. BOP only retained special management prisoners, such as protection cases and disruptive or very high security prisoners.

To accommodate the influx of returning prisoners, a variety of steps were taken by both the Federal government and the District. In the late 1980's, Congress provided $70 million toward the construction of the new $85 million Correctional Treatment Facility adjacent to the D.C. Jail. That facility was opened in 1992. Further, the DOC initiated certain contracts to house some of its prisoners in out-of-state facilities. Additionally, in 1987, the District Council passed and the Mayor signed into law the Prison Overcrowding Emergency Powers Act, allowing for accelerated parole eligibility and/or early release for most non-violent felons and misdemeanor cases after the declaration by DOC and approval by the Mayor of an emergency due to crowding. The Act was invoked immediately and repeatedly over the next several years until 1996, as discussed in Chapter 4.

## B. Handling of Dual Code Cases

In the context of the events of 1993-94, including the return of almost all D.C. Code cases from BOP to DOC, the procedure for dual code cases changed, the new MOU was drafted, and a new local business practice was molded.

## 1. Description of Variations of "Dual Code" Cases

Although dual code cases primarily occur when an inmate is sentenced as described above, dual code cases also occur whenever inmates are sentenced in the U.S. District Court for the District of Columbia on two or more counts for violations that include both U.S. Code and D.C. Code statutes, or when inmates at Lorton are prosecuted in the

Commitment Process for Dual Code Cases:
Those with Both Federal and D.C. Code Sentences

Eastern District of Virginia for violations of the D.C. Code. [1]

The manner in which inmates are sentenced in dual code cases varies in several ways. Sentences may be imposed in Federal Court and Superior Court to concurrent or consecutive terms on the same date or on different dates, which can be days, months or years later. Also, sentences may be imposed in Federal Court, concurrent or consecutive to other dual code counts. It is not uncommon for many of such cases to arise when an inmate serving one or more D.C. Code sentence at Lorton is subsequently convicted in U.S. District Court in Eastern Virginia under Federal or D.C. criminal statutes, such as those for escape, assault or introduction of drugs.

One factor which complicated the handling of dual code cases was the drastic change in sentencing procedures for all Federal prisoners made by Congress through enactment of the Comprehensive Crime Control Act of 1984. This legislation, which went into effect in 1987, eliminated Federal parole and enacted a "Truth-in-Sentencing" requirement that all Federal prisoners serve at least 85 percent of their sentence(s). As a result of the implementation of the U.S. Sentencing Guidelines and the abolition of Federal parole eligibility, Federal and D.C. Code sentences could no longer be aggregated into a single sentence.

Another group of cases closely related and to which this Review Team paid particular attention are those where the felons were sentenced in Federal Court only on D.C. Code offenses, after having been initially charged there with both Federal and D.C. violations. Oftentimes, the Federal charges were dropped in a plea agreement or by the jury during a trial, but the defendant is sentenced by a Federal judge in Federal Court on the D.C. Code charges. In these cases, the Judgment and Commitment Order specifies that the prisoner be delivered "to the custody of the Attorney General." In many ways, these cases are a subcategory of the "dual code" cases and bear special consideration, especially since it is often the intention of the sentencing judge that the prisoner literally be placed in Federal custody.

## 2. Developments Prior to 1994

---

[1] Several terms, including "dual jurisdiction", "mixed code", and "dual code", are commonly used to describe the grouping of prisoners who have been convicted of offenses against both the Federal Criminal Code and the D.C. Code. For purposes of simplicity in this report, the term "dual code" is throughout this report.

25

Commitment Process for Dual Code Cases:
Those with Both Federal and D.C. Code Sentences

Although the Review Team was not able to definitively ascertain the details, it appears that prior to the events of 1985, most D.C. felons who received a Federal sentence in addition to a D.C. Code sentence were generally placed in BOP custody, particularly if the D.C. sentence was imposed in Federal Court. With the transfer of the large number of D.C. cases to BOP in the 1985 -1989 period, virtually all such cases continued to go directly to BOP.

That pattern changed, however, beginning in about 1989 or 1990, although the Review Team, through its interviews and review of agency records, did not discover any official policy change on this matter enacted by the top management of the various agencies, including BOP. However, interviews with a number of operational and management staff from all the involved agencies reveals a consensus that when BOP returned most D.C. Code cases to DOC in the early 1990's, it also returned most of the dual code cases.

It is also the strong consensus of those administrators and mid-level managers interviewed that the stance taken by BOP was the driving force in the revised manner of handling this issue, leading to subsequent meetings to develop a written agreement. In the early 1990's, BOP operational staff made it clear that the agency was not accepting new dual code cases until they had completed their D.C. Code sentences, unless there was a specific request by the sentencing Federal judge, or some other special management need. All newly referred D.C. Code cases, including any newly sentenced dual U.S./D.C. Code cases, were closely screened by a unit in the BOP central office using these criteria and relatively few were being accepted.

## 3.  Development of the 1994 Local MOU and Local Business Practice

**a.  Intervention of the U.S. District Court Marshals Office.**  After reviewing available documentation and conducting interviews with a number of current and former field and headquarters staff from BOP, USMS, DOC, and Superior Court and Federal Court Probation staff, it became apparent to the Review Team that the 1994 local MOU, which never was approved beyond the draft stage and was not signed by three of the four involved agencies, was the product of an ad hoc committee formed by mid-level managers of the respective agencies. A supervisory Deputy U.S. Marshal for the District Court took the lead in the development of this document in an effort to find a solution to a very practical problem his office faced as the result of an interagency impasse in handling prisoners sentenced in Federal Court who also had sentences under D.C. Code.

That official convinced his supervisors that some type of agreement among the involved parties was important after he realized that the Marshals Service, since about 1992, had been reimbursing the District government for Federal prisoners housed at the D.C. Jail

Commitment Process for Dual Code Cases:
Those with Both Federal and D.C. Code Sentences

much longer than necessary.  A number of the long-delayed prisoners were dual code cases whose status and possible transfer to Federal prison were left in limbo.  The Marshals office  wanted to streamline the paperwork process and move these inmates to their proper destinations as soon as possible, primarily for economic reasons.

Therefore, in an effort to bring order to a convoluted process and to resolve the impasse, the Deputy Marshal called a series of meetings with representatives of all the involved local offices, DOC, the BOP (Community Corrections Office), U.S. Probation, Superior Court, and the office of the Clerk of the Federal Court.  As a result of these meetings, the last of which occurred on August 30, 1994, and the general agreement that was reached, a draft document was prepared by the Deputy and reviewed by his supervisors, signed by one of them on behalf of the U.S. Marshal, and forwarded to BOP, DOC, and Federal Probation for review and possible signature (see Appendix 3b).  The contents of the agreement are discussed below.

**b.  MOU Not Completed, Unwritten Business Practice Established.**  Shortly after this draft was circulated, the deputy was transferred from that assignment to head a special task force and was replaced in his duties of handling the movement of Federal prisoners.  He only returned to those duties a few months ago.  Apparently after his transfer, the interagency attempts to consummate a formal agreement broke down.  The verbal agreements reached in those meetings, however, along with the contents of the draft MOU, have served as the basis for the processing of dual code cases locally.

The basic agreement, as understood by all parties, was that inmates sentenced for both U.S. Code and D.C. Code offenses would not be turned over to BOP until they were released or paroled from DOC to the remaining portion (if any) of the Federal sentence.  Except in a few special cases, the normal processing of Federal Court J&C orders, PSI's and Request for Designation would not be made to the BOP at all.  Only after an inmate had satisfied his/her sentence with the DOC would the USMS request his designation to a Federal facility.  The Federal sentence, if it were consecutive to or exceeded the D.C. Code sentence, was treated as a detainer while the inmate was serving his D.C. sentence.

**c.  MOU/Business Practice Flawed, Leads to Confusion.**  Unfortunately, there were a number of problems with the unfinished interagency agreement.  Principally, since there was no written document, there were varying interpretations of the outcome, particularly as the staff representing some of the agencies periodically changed.

Likewise, neither of the local offices of the principal Federal agencies, the BOP and the USMS, brought the draft document nor its underlying issues to the attention of agency lawyers or  policy level headquarters officials.  Part of the reason for this lack of

27

Commitment Process for Dual Code Cases:
Those with Both Federal and D.C. Code Sentences

satisfactory development of agency procedures and of the low level of policy priority given the matter appears to be that it involved a relatively small number of cases.

Further, the series of meetings did result in what has been described by the affected offices as a workable business practice which resolved the immediate crisis and left no significant, pending problem cases. Unfortunately, that business practice led to the subsequent confusion and the current problems, in part because it was not based on a well-grounded legal and policy analysis and it contradicted the national MOU between the BOP and USMS Directors. That national MOU required that the commitment papers on every case sentenced in Federal Court be forwarded within two working days by the local Marshals office to the BOP for designation.

As evidence of the confusion in the implementation of the MOU/business practice, it appears from the analysis described below in Section h, conducted by this Review Team of all currently incarcerated dual code cases, that there was inconsistency in handling similar cases over the past five years. Some cases which were processed to the BOP in a routine fashion were seemingly identical in status to others which were routinely only referred to the DOC for housing. These differences in handling similar cases may only be a function of different staff handling cases in the Marshals office at different times. However, it does reflect on the absence of clear written agency policy and clear written interagency procedures.

   **d. USMS Interpretation of the Draft MOU, Business Practice.** The District Court office of the U.S. Marshals Service is at the hub of the processing of these cases, being the agency which receives and then transmits the necessary documents from the Court and delivers them to correctional authorities in the Federal government or the District with a request for designation of a facility for service of sentence.

The Review Team interviewed the Acting U.S. Marshal for the D.C. Federal District and the Deputy U.S. Marshal who originally drafted the local MOU. In response to questions about the handling of dual code cases, they continued to stand by the validity of the 1994 draft MOU. They remain convinced that the Wright case was handled in accordance with the MOU and the local verbal agreement and business practice which was adopted by all the agencies. They maintain that their office was simply carrying out the decision of the correctional authorities, particularly the BOP which had the legal authority to make designation, including to the DOC facilities. These Marshals officials indicate they would handle these cases, including Leo Wright, the same way today, barring some new agreement between the correctional agencies.

   **e. Analysis of the MOU and the Local Business Practice.** Through the process of interviewing staff, administrators and lawyers from the several agencies, it became clear to the Review Team that even today there is considerable confusion and disagreement

28

Commitment Process for Dual Code Cases:
Those with Both Federal and D.C. Code Sentences

among the agencies as to the meaning and intent of the MOU and the actual business practice here and, indeed, as to whether the MOU plays any role at all in the handling of these cases. Within some agencies, there is no consistency between staff involved at headquarters and at the field level. In several cases, staff was not aware until this summer that the MOU existed.

  **f. Confusion Regarding the Meaning and Effect of the 1994 MOU.** Confusion about the effect of the September 1994 unsigned draft MOU is apparent when the various relevant documents are reviewed.

In an interview with the Review Team, the DC Federal Court Office of the USMS indicated that, after the September 1994 MOU,[2] it understood it was to send any J&C that included any D.C. Code sentence to the DOC rather than the BOP. Going even further, that office in its "Declaration" to the Court executed 6/3/99, stated

> "The relevant portions of the agreement established that dual case prisoners would be placed in the custody of the DCDC to serve the District of Columbia sentences before serving any part of a federal sentence."

Likewise, the BOP, in its "Response to May 20, 1999 Order of the Court," mailed 6/4/99 and signed by the U.S. Attorney and two Assistant U.S. Attorneys, stated

> "Leo Gonzales Wright was not transferred to a federal prison immediately following his sentencing . . . because he was convicted of violations of both the U.S. Code and the District of Columbia Code. . . . Pursuant to [that MOU], dual case prisoners would first serve the sentence imposed for the D.C. Code violations in the custody of the DCDC. . . . The MOU remained in effect until the enactment of the D.C. Revitalization Act in 1997."

Further, the D.C. Office of the Inspector General, under "Summary of Findings" in a "Memorandum to the Court" dated 6/11/99 stated

> ". . . Leo Wright was instead sent to the District of Columbia Department of Corrections . . . pursuant to a purported . . . [MOU] . . . that provides . . . that defendants convicted in the District Court for violations of both the D.C. Code and the U.S. Code would be housed by the DOC until sentences for D.C. Code violations were completed."

While it is probable that, for some five years, the USMS office interpreted the MOU to

---

[2] There is inconsistency in date references to this second MOU among various agencies, apparently stemming from the fact that the MOU was dated September 6, 1994, but then mailed under a cover memo from the USM dated October 3, 1994.

Commitment Process for Dual Code Cases:
Those with Both Federal and D.C. Code Sentences

mean what was subsequently stated to Judge Sullivan by the USMS, the USAs representing the BOP, and the D.C. OIG, the MOU does not actually state that dual code inmates will first serve  D.C. Code sentences in the DOC:

- The section, "Responsibility of U.S. Marshals Service," states

     1.  Designated personnel will forward all paperwork concerning an inmate sentenced in U.S. District Court under a D.C. Code [to the DOC]. . . .

     3.  Designated personnel will supply DOC's [sic] with a form for notification of inmates being released from a D.C. Code sentence to a U.S. Code sentence. . . .

- The section, "Responsibility of D.C. Department of Corrections," states

     1.  DOC is responsible for calculating jail credit/time for all inmates sentenced under the D.C. Code regardless of which court the sentence is imposed [sic].  Exceptions to this would be individuals that have concurrent District Court and Superior Court sentences with a U.S. Code sentence that is greater than the D.C. Code sentence or a District Court case with both U.S. and D.C. Code sentences on a concurrent commitment.

- The section, "Responsibility of the U.S. [sic] Bureau of Prisons," states

     1.  BOP is responsible for the calculations and designations of all U.S. District Court sentences imposed under a federal statute.

     2.  Bop [sic] will establish a relationship with the DOC . . . concerning special inmates that are sentenced under the D.C. Code or protective witnesses being housed in the DOC on a case by case bases [sic].  This will include individuals sentenced under both the D.C. and U.S. Code's [sic] that have either consecutive or concurrent sentences.

To summarize, while the MOU does not state that a dual code inmate must serve D.C. Code sentences in the DOC before serving any part of the U.S. Code sentence:

- The MOU does state that the USMS is to forward all paperwork on an inmate sentenced in U.S. District Court under a D.C. Code to the DOC.

- The MOU does state that the DOC is responsible for calculating jail credit/time for all inmates sentenced under the D.C. Code, unless the inmate

Commitment Process for Dual Code Cases:
Those with Both Federal and D.C. Code Sentences

has:

--    concurrent sentences with a U.S. Code sentence that is greater than the D.C. Code sentence, or

--    both U.S. and D.C. Code sentences on the same J&C (the apparent meaning of "concurrent commitment," which could only be from the District Court).

The MOU does not specifically state who is responsible for calculating jail credit/time for a concurrent sentence(s) with a U.S. Code sentence that is greater that the D.C. Code sentence, but it does state that the BOP is responsible for the calculations and designations of all U.S. District Court sentences imposed under a Federal statute.

An obvious question is how the BOP is to perform the calculations and designations if the USMS does not refer the case to the BOP.

1.    If the USMS is to give all the paperwork (J&C, PSI, and USMS-129) to the DOC, the BOP would only learn of the case if the DOC referred it to the BOP.[3]

2.    The MOU does not state the purpose of the BOP/DOC relationship concerning special inmates sentenced under the D.C. Code or protective witnesses in the DOC, although the inference is that the DOC may ask the BOP to take them. That paragraph would seem to regard inmates sentenced under both codes, whether consecutively or concurrently, as "special inmates."

3.    So, the only way the BOP would learn of an inmate sentenced under both codes, whether consecutively or concurrently, would be if the DOC referred the case to the BOP as a "special inmate."

4.    Again, nothing in the MOU states that the DOC will keep a dual code inmate in its custody until the D.C. Code sentence has been served -- only that the USMS will give the paperwork to the DOC so the DOC can determine whether to refer the case to the BOP.

5.    In fact, the D.C. OIG memo cited earlier goes on to conclude that "a *de facto* agreement existed between the USMS and the DOC concerning the housing

_____

[3] The USMS has now clarified that DOC does not need a form USM-129, as BOP does.

31

Commitment Process for Dual Code Cases:
Those with Both Federal and D.C. Code Sentences

> of federal and District of Columbia prisoners" and that interviews with representatives of the USMS ". . . disclosed that the DOC and USMS had a verbal agreement that an inmate serving a sentence for both District and federal code violations would complete the District term before being committed to the custody of the BOP. This verbal agreement was apparently separate from but based on the written MOU."

It may be that, in the series of meetings among several parties in 1994, leading to two MOUs (June and September), there may have been some underlying assumption or understanding that inmates would first serve their D.C. Code time -- but the MOU itself does not say that.

The BOP's initial response to the Corrections Trustee as part of this review added to the inconsistencies. First, the cover letter (8/16/99) stated that "the MOU dated September 6, 1994, played no part in the Bureau's handling of Mr. Wright or other similarly situated inmates," which contradicts the USA's 6/4/99 response to the Court on behalf of the BOP.

A second complication is the BOP's response to the Corrections Trustee that

> ". . . The process of determining "primary jurisdiction" which is outlined below was applicable only to inmates sentenced in the District of Columbia serving both U.S. Code and D.C. Code sentences and referred to the BOP from the United States Marshals Service (USMS) through a request for designation. . . .[4]

> "If a person was arrested jointly for U.S. Code and D.C. Code charges, and received a sentence for each charge at different times, jurisdiction is determined by which sentence was imposed first.[5]

---

[4] Prior to 1987, dual jurisdiction offenders did not present substantial issues for the BOP because sentences (D.C. Code and U.S. Code) for such inmates in BOP custody were aggregated and the District was billed for the time when the federal sentence was not running. In 1987, changes in the D.C. Code and the U.S. Code stopped the practice of aggregation. These changes in the law elevated the issue of primary jurisdiction and gave rise to the creation of the practices described above.

[5] Ordinarily, "primary jurisdiction" is determined by which law enforcement authority initially arrested and detained the individual, but, as the BOP subsequently explained in detail in its letter to the Corrections Trustee dated September 28, 1999, in the District it is often difficult for BOP to make that determination. Thus, particularly for inmates sentenced under both the U.S. and the D.C. codes, BOP determines "primary jurisdiction" by which sentence was imposed first.

32

Commitment Process for Dual Code Cases:
Those with Both Federal and D.C. Code Sentences

"If a person is sentenced on multiple offenses (D.C. Code and U.S. Code) simultaneously, once the case is referred to BOP for designation, the BOP would ordinarily contact the sentencing court to determine the intent of the court. If the court does not express its preference, the BOP makes the determination based on the order of imposition of the counts enumerated on the Judgement and Commitment Order."

So, in summary, there were three separate, and at times, competing viewpoints – that a dual code inmate would:

1.     First serve the D.C. Code sentence in the DOC and then any remaining portion of his U.S. Code sentence in the BOP. *[USMS, BOP, and OIG to Judge Sullivan]*

2.     First serve the D.C. Code sentence in the DOC if that was the first sentence imposed – or first serve the U.S. Code sentence in the BOP if that was the first sentence imposed. *[BOP to Corrections Trustee]*

3.     Be regarded as a D.C. inmate if the U.S. Code sentence will end first -- or as a Federal inmate if the D.C. Code sentence will end first. (Sometimes this distinction is expressed in terms of which sentence is longer, but that would only apply if the sentences were imposed at the same time.) *[This viewpoint is not specifically stated anywhere that the Review Team has found, but it could be inferred from the 1994 MOU, and the Team has heard it said by various parties. For example, when the DOC reported to the Corrections Trustee on a file review of dual code inmates, it distinguished between those where the U.S. Code sentence was longer and those where the D.C. Code sentence was longer.]*

In response to a request for clarification, on September 3, 1999, the BOP indicated that it saw no substantial contradiction between its statements to the court and later to the Corrections Trustee. In response to another request for clarification, however, the BOP in a letter dated September 28, 1999, stated:

"The BOP's designation decisions are normally based on the principle of primary jurisdiction. . . . However, due to the unique federal nature of the District of Columbia, and issues of fairness to the D.C. prisoners that were being placed in BOP custody to serve dual coded sentences, a mutually agreed upon practice  was developed among the BOP [and other parties] for the handling of these inmates [that was] never formalized in an MOU."

33

Commitment Process for Dual Code Cases:
Those with Both Federal and D.C. Code Sentences

That view of what happened after the time of the 1994 MOU is consistent with what the other agencies involved have reported, namely, that, no matter how "unofficial" the MOU was, it clearly affected the practices of those agencies, particularly the District Court USMS office, which forwarded all paperwork concerning an inmate sentenced in the Federal Court under a D.C. Code to the DOC, not the BOP.

The USMS indicates that it is now its practice to send all such Federal Court J&Cs to BOP and that BOP now advises the USMS in writing if it decides that an inmate is to remain in the DOC for service of sentence.  BOP endorsed that change in practice in its letter to the Corrections Trustee dated September 28, 1999.

### g.  Lack of Communication with the Federal Courts, U.S.  Attorney's Office.
One unfortunate aspect of this entire episode is that there is no indication that any agency administrators made the Federal judges of this District Court aware of the major change in practice in the handling of these cases in 1994.  Since it had been an established practice to place into Federal prisons all those serving Federal sentences, including those also serving concurrent D.C. Code sentences, any major change in policy should have been communicated to the Court in writing.

Indeed, it would have been wise to have consulted the Chief Judge or his representative before initiating an operational change, although some representatives of the Federal Probation Office, an arm of the Court, apparently attended most meetings.  However, direct communication with the judges, both verbal and written, was in order.

Again, it is the role of the Marshals and the correctional agencies to carry out the judgment of the Federal Court.  As noted in Chapter 1, it is within the sole discretion of the Bureau of Prisons to determine the placement of sentenced prisoners, including whether an individual might be committed to a non-Federal prison like a DOC facility, although they normally honor every specific request from a sentencing judge, barring some significant contraindication.

Therefore, if judges had known that it was now the agreed upon practice that these dual code cases were to be routinely placed in DOC facilities to serve their Federal sentences absent some contrary clear recommendation, they might more frequently have strongly recommended that certain cases be directly committed to Federal prisons.  Certainly, Judge Sullivan would have known that it was necessary to raise a flag as part of the commitment paperwork to trigger the placement of Leo Gonzales Wright into a Federal prison.

Likewise, it would have been good practice to have informed the prosecutors from the United States Attorney's Office and the defense bar of the change in practice and the necessary steps they would need to take to assure that particular cases they handled

Commitment Process for Dual Code Cases:
Those with Both Federal and D.C. Code Sentences

would be placed directly into Federal prisons, to the extent possible.

**h. A Review of Current Dual Code Cases in Both BOP and DOC.** Currently, 128 inmates in the BOP are considered dual code cases in at least some fashion, including those with consecutive sentences. The largest number of these cases have been in the DOC for at least five years or were referred more recently because of judicial recommendations or special management considerations, such as protective custody needs or disruptive behavior in the DOC.

The Review Team attempted to ascertain the number of true dual code cases presently housed in the DOC. The lack of an automated inmate information system necessitated an agency-wide audit of files of 8,000 felons. Following this review, the DOC reported 35 inmates serving dual code sentences and 16 inmates serving U.S. code sentences. These numbers have been questioned since the July 1999 DOC billing report of inmates in federal status reported a total of 375 inmates. When the DOC list was compared to the list of U.S. District Court cases sentenced from June 1996 to June 1999, 47 inmates were found who were serving sentences. In addition, a random check of the BOP computer system revealed 9 names of inmates who were not on the DOC list, but were serving federal or dual code sentences. In one case, an inmate whom the DOC listed as being at the D.C. Jail had been transferred to the BOP 2 months earlier. In another case, an inmate listed on the DOC July 1999 report of federal prisoners had been transferred to BOP custody 5 years earlier.

**i. Problematic Cases Discovered During this Review.** Several particularly troublesome cases were discovered. Below are several examples:

- Henry Anderson was sentenced in U.S. District Court to 24 years under the D.C. Code on October 11, 1996. The judge recommended on the J&C that he be incarcerated at a Federal institution. The case was never referred to BOP by the USMS for designation. This inmate is still serving his sentence in the DOC, and the sentencing court has not been contacted about the judicial recommendation for Federal custody.

- Darryl Jones was serving consecutive life sentence at Lorton when he was sentenced on April 22, 1998 in the Eastern District of Virginia to another life term. The Federal Judge made a clear recommendation on the J&C that the inmate be transferred to Federal custody. One year later, on May 5, 1999, the Bureau of Prisons designated the inmate to Leavenworth. Approximately 4 months later on September 3, 1999, the U.S. Marshal's Office scheduled the inmate for transfer. The inmate was not medically cleared for transfer until September 13, 1999. The inmate was transferred to federal custody

35

Commitment Process for Dual Code Cases:
Those with Both Federal and D.C. Code Sentences

on September 27, 1999.

- Antoyne White was sentenced in Federal Court on December 11, 1998, to multiple Life sentences under the D.C. Code. The Federal Court J&C recommended commitment to the BOP. On February 22, 1999, the BOP reviewed the case and decided the inmate would remain in the DOC for service of the sentence, but a letter was not sent to the court explaining the reasons for not following the judge's recommendation.

- William Johnson was paroled from his D.C. code sentence to his 262-month U.S. code term on September 6, 1998. The DOC did not send a request to the USMS to transfer the inmate until 7 months later on April 30, 1999. The inmate was transferred to federal custody almost 1 year after his parole date on September 13, 1999.

- John Adams was paroled from a D.C. code sentence to a 37-month U.S. code term on October 7, 1998. There was no explanation for the delay, however the inmate was not designated to federal custody until 10 months later on August 2, 1999.

- Joseph Lampkin was paroled from his Superior Court sentence on November 9, 1998 to a 57-month D.C. code sentence imposed in the Eastern District of Virginia. There was no explanation for the delay, however he was not transferred to federal custody until 8 months later on July 15, 1999.

**j. Financial Responsibility for Dual Code Cases.** At present, the expenses for all sentenced dual code cases are borne by the agency which maintains custody of them, either the DOC or the BOP. In short, after an exhaustive review, the Review Team found that there is a great deal of confusion in this area because communications and record keeping, particularly between the DOC and the USMS, are poor.

To illustrate, the Review Team compared the July 1999 prisoner billing lists for the DOC and the USMS. Theoretically, these two lists should agree with each other in that the same prisoners' names should appear on both lists. The Team found, however, that there was a difference of 129 inmates between them. Specifically, the USMS list showed billing information for 504 prisoners, while the DOC list reflected only 375 prisoners. A closer review revealed that there were 167 prisoners on the USMS list that did not appear on the DOC list. By the same token, there were 56 prisoners on the DOC list that did not appear on the USMS list. It was apparent to the Review Team, and substantiated by a Department of Justice audit team in 1996, that this is clearly an area that needs to be

36

Commitment Process for Dual Code Cases:
Those with Both Federal and D.C. Code Sentences

addressed quickly.

## C. Findings and Recommendations

**Findings**

**F-7**    Each of the three primary agencies (BOP, USMS and DOC) lacks clear, written, formal policy guidance on the designation and handling of D.C. dual code  cases.

**F-8**    In the early 1990's, the BOP precipitated a major change in the long-standing manner of handling dual code cases when it effectively closed its doors to all D.C. Code cases, including those also serving Federal sentences, unless there were special circumstances in the case.   Prior to about 1990, virtually all dual Federal/D.C. Code cases were placed in the BOP.  The change in the handling of the dual code cases occurred in the context of the return to DOC custody of more than 2,000 D.C. Code cases by the BOP  due to crowding in its facilities and after the resolution of a lawsuit between the Federal Government and the District.

**F-9**    As this major change in procedure was implemented at the time of the 1994 MOU, apparently neither the headquarters, policy level administrators nor the legal sections of the USMS and the BOP were  involved as they should have been.

**F-10**   The Federal bench was neither consulted in the process nor notified after the change in practice was implemented, leading to significant misunderstandings among the sentencing judges.   Likewise, neither the prosecutors in the U.S. Attorney's Office nor the local defense bar were notified.

**F-11**   The manner of handling dual Federal/D.C. code cases which developed locally over the past five to seven years within the system of responsible agencies has been very problematic.  The several agencies have operated under a confusing and inconsistent set of understandings, including the unsigned 1994 MOU. There was no clear written understanding, nor a generally agreed upon, consistent practice. Instead, the actual practice was haphazard and understood inconsistently by the different parties.

**F-12**   Until recently, most dual code cases sentenced in Federal Court and those sentenced there solely on D.C. Code charges were never brought to the attention of the BOP for designation, and when they were, they were usually declined. Although the BOP could legitimately designate DOC facilities for service of sentence, they were not actually doing so because they never received the case material.

37

Commitment Process for Dual Code Cases:
Those with Both Federal and D.C. Code Sentences

**F-13**  A review of the cases revealed that there have been considerable delays of six to twelve months in identifying, designating and removing inmates from DOC and to the BOP who have completed D.C. Code sentences and who must begin serving consecutive Federal sentences. During the interim, it appears that the DOC may be inappropriately bearing the financial cost of these prisoners. Time constraints did not allow an in-depth assessment of the causes of the delays in transfer.

## Recommendations

**R-6**  A new written understanding on dual code cases should be developed by representatives of  the USMS, BOP,  DOC and Federal Probation, in consultation with the Federal Court.  The document should outline agreed upon written procedures for the consistent handling of the variations of dual code cases and should be reviewed and approved in each agency at the appropriate level of policy administration.  Each agency involved in implementation of the agreement should develop its own written internal policies and operational procedures.  *BOP, USMS, DOC, U.S. Probation, U.S. District Court Judges and Clerk of Court*.

**R-7**  Because of the serious logistical and financial consequences involved, the United States Attorney's Office, USMS, and DOC should strengthen the manner and timeliness of the notification procedures which occur when the United States Attorney's Office decides to proceed with a case in Federal Court against a defendant as to whom they previously proceeded in Superior Court.  DOC and the USMS need to be able to place these cases on the list of billable, contract Federal prisoners.  *U.S. Attorney's Office, USMS, DOC*.

**R-8**  In view of the fact that all sentenced felons in the DOC will be placed in the BOP over the course of the next two years, the BOP should consider designating all newly-sentenced dual code cases to Federal prisons. *BOP*.

**R-9**  Whatever agreement is reached, all cases sentenced by Federal judges in the U.S. District Court for the District of Columbia, including those sentenced under D.C. Code, should be referred by the USMS to the BOP for designation, even if the BOP at times exercises its discretion to designate a DOC facility for the place of confinement.  Sentencing judges should be notified of such decisions in writing. *BOP, USMS, U.S. Probation.*

**R-10**  Whatever agreement is reached, full verbal and written communication of the planned practice needs to be communicated to the U.S. District Court judges in the District of Columbia and the Eastern District of Virginia, probation officers, U.S. Attorney's Office prosecutors, and the local defense bar.  This information, including the specific steps necessary to convey recommendations for placement

38

Commitment Process for Dual Code Cases:
Those with Both Federal and D.C. Code Sentences

in a Federal facility, might well be part of a joint training session or small local sentencing conference.  *U.S. District Court, USMS, BOP, U.S. Attorney's Office, U.S. Probation, Federal Public Defender, DOC.*

**R-11**  The interagency committee recommended in R-3, or a joint  USPO, USMS, BOP and DOC work group should closely review the causes and rectify the procedures with the delays in the identification, designation and transfer from DOC to BOP of D.C. Code cases which have completed their sentences and must commence their Federal sentences.  They should also review the billing procedures involved in these cases.  *USPO, USMS, BOP, DOC.*

**Chapter Three**

**DOC Inmate Classification, Case Management,
and Record Keeping**

**Introduction.**  The Court requested that this review examine the practices of the Department of Corrections in relation to the placement, transfer and release of prisoners as well as its system of record office management.  In doing so, it also recognized that the area generally described as classification and case management is one of the most critical functions performed by correctional managers.

The safe and orderly operation of prisons and often the protection of the public are closely tied to effective case management and classification processes, which determine the security needs of prisoners, house them with others of the same general background, and place them all in institutions of suitable security and programs.  The classification and case management processes rely on an effective records management system that enables correctional administrators to make decisions by reviewing complete case information, organized in a well structured, consistent fashion.  The Court was understandably alarmed with these processes as it reviewed DOC's handling of Wright's cases prior to release in 1993 and after he was sentenced to multiple life sentences in 1996.

The Review Team analyzed a variety of previous studies and reports conducted on DOC, evaluated the current state of DOC's policies and procedures, interviewed a number of staff, observed operations and performed on-site testing at each DOC-operated facility.  In summary, it found that while considerable progress has been made and improvement is ongoing in certain aspects of inmate classification and records management, there remain significant material weaknesses which will require the sustained, focused attention of the new Director and his top staff.

**A.  Classification Procedures**

Inmate classification is an assessment process through which prisoners are grouped together based upon documented behavioral histories and current custodial requirements.  The object is to house prisoners together who pose similar security risks in facilities commensurate with their security requirements.  The total classification process consists of two phases: an initial assessment or classification and periodic reviews or reclassification.

41

DOC Inmate Classification, Case Management, and Record Keeping

## 1. Initial Assessment or Classification

ACA Standard 3-4273 : *Written policy, procedure, and practice require the preparation of a summary admission report for all new admissions. This report includes at a minimum the following information (*abbreviated*): legal aspects of the case, summary of criminal history, social history, staff recommendations, pre-institutional assessment information.*

ACA Standard 3-4284: *The classification plan provides for maximum involvement of representatives of the relevant institutional programs and the inmate concerned in the classification reviews.*

After new prisoners are first committed to a prison or a correctional system, it is crucial that a thorough initial assessment is undertaken, usually by a multi-disciplinary team. In some large state systems, this assessment is performed at a single central prison, but in most systems, including DOC, this appraisal occurs after the inmate arrives at his/her first assigned facility.

During this assessment, often known as initial classification, a review involving several procedures should occur. Principal among them is a thorough examination of the inmate's file to determine whether all the key legal and commitment documents are available including an up-to-date criminal record summary, a judgment and commitment order, a completed sentence computation form and the presentence investigation report. Collectively, these documents provide details on the inmate's current offense, previous criminal and confinement history, and social and family history which help the institution staff confirm that the prisoner has been assigned to the appropriate institution.

Another important aspect of this assessment is to determine the special needs or problems of the inmate and to set out a plan to address those needs or problems with appropriate programs, resources or security operations. It is also wise and common practice for the findings of this review process to be summarized in an admission report and placed in the inmate's prison file for permanent use by staff.

This process of providing a thorough assessment of every aspect of a prisoner's case serves as an important screening tool for prison administration by identifying any unusual problems with the case, including a lack of proper case file information or legal documentation. The breakdown in this assessment, discussed in Chapter 5, was a major cause in the mishandling of the Wright case after his 1996 DOC commitment.

## 2. Objective Classification of Inmates

ACA Standard 3-4282: *Written policy, procedure and practice provide for a written inmate classification plan. The plan specifies the objectives of the classification system and methods for achieving them . . . The classification system should consider an assessment of risk and the efficient management of the inmate population.*

DOC Inmate Classification, Case Management, and Record Keeping

ACA Standard 3-4283:    *The classification system specifies the level of custody required and provides a regular review of each classification.*

As part of the initial assessment, one of the most important functions is for staff to differentiate prisoners into proper groupings by evaluating numerous factors, such as their gender, age, length of sentence, severity of the offense for which they are confined, and any history of escape or violence they may have.

The ACA Standard cited above suggests most correctional jurisdictions have some type of formal, objective system in place to accomplish this important task. The majority of systems are designed to predict behavior based primarily on an offender's history, present circumstances, and needs. Operational details of these systems vary among different jurisdictions, but most use the same fundamental criteria to assign the level of risk each prisoner may pose to society and/or the prison environment. Typically, prisoners are given point ratings and grouped into broad security categories, such as minimum, low, medium, high or close and maximum. A number of management decisions are based on these objective scores, although sound correctional judgment must also play a strong role.

As is true during the initial designation process, and pointed out in Chapter 1, the Presentence Investigation Report typically prepared for the Court by a probation officer is one of the chief source documents for background information on the prisoner for classification purposes and other vital case management processes.

In most systems, prison facilities are also rated by security level, based upon their architecture, staff-inmate ratios, and other security features. Institutions with walls, gun towers, and armed perimeter patrols are generally classified as maximum security, and house only those prisoners who are deemed to require that degree of security. At the other end of the spectrum, many minimum-security institutions do not have perimeter fences because prisoners housed in them are not considered to be escape risks, and are not considered a threat to the community. The goal is to match the individual prisoner with the institution and with the similar population grouping most suited for their safety, security, and/or rehabilitative needs.

## 3.  Periodic Case Review or Reclassification

ACA Standard 3-4287: *The written plan for inmate classification specifies that each inmate's classification status is reviewed at least every 12 months.*

Reclassification is the process of performing periodic reviews to ensure that decisions made regarding an inmate's case are based upon current information. Depending upon the circumstances, reclassification can result in a prisoner being moved to a more-secure or less-secure facility; or given more or less supervision at the same facility.

DOC Inmate Classification, Case Management, and Record Keeping

## B.  Classification in DOC

### 1.  Problematic Classification Approach from 1987 to 1998

Until recently, DOC's classification system was fraught with problems, routinely altered to meet DOC's population management demands, and never validated or formulated into an official departmental policy.  In addition, the staff responsible for performing classification procedures were not properly trained.

Because the security needs of the population were much higher than the physical security of the facilities available to DOC administrators,  the classification system was routinely altered to force the population into the available bed space.  A prime example of the impact of  the altered procedures is the recently-closed Occoquan facility.  This open dormitory style prison was designed to hold low-medium security inmates, but for some years held a large number of high security prisoners.  The results were very problematic.

As a consequence,  DOC did not generally assign prisoners to an adequately stratified set of security housing arrangements, a procedure that is a key component in the effective use by correctional managers of a classification system.  Some inmates remained at the jail for inordinate periods of time after being sentenced, a situation partly driven by the lack of an adequate range of housing facilities.   Also, complicating the situation was numerous court orders and population caps on several of the facilities.

Beginning in 1987, DOC implemented a classification system developed exclusively for its use by the National Council on Crime and Delinquency (NCCD), under a grant from the National Institute of Corrections (NIC).  Dr. James Austin, a recognized expert in prisoner classification systems  and former Executive Vice President of NCCD, was the primary consultant on the project.  For many years, Dr. Austin developed classification  systems and trained staff on how to manage them.  He worked intermittently under contract with DOC on inmate classification issues since the mid-1980's, including  the periods Leo Gonzales Wright was paroled from his first sentence in February 1993, and sentenced on his most recent case in September 1996.

In January 1996, after conducting a review of  DOC inmate classification operations, Dr. Austin identified five chronic problem areas with the process:

- • An outdated classification manual, resulting in inconsistent classification decisions being made by staff.  Some staff even had different, contradictory versions of the manual.

- • Improper modifications to the original classification system adopted in 1987. These modifications increased the number of inmates classified as minimum security, though many were inappropriate for that category, given their level of security risk.

DOC Inmate Classification, Case Management, and Record Keeping

- No central unit to oversee classification policy, monitor the classification system, and control inmate movements between and within facilities.

- A lack of automation, which limited the Department from monitoring classification and using data for planning purposes.

- The absence of a classification system for pre-trial detainees (the majority of jail inmates).

With the exception of the second finding, the Review Team concluded that most of the problems still exist. DOC corrected the second finding by implementing BOP's classification model in 1997 and 1998. Thus, inmates are no longer systematically under-classified.

Following these findings, NCCD and DOC collaborated to develop eleven tasks to correct the problem areas. Although new classification forms and procedures were one of the primary changes advocated, DOC never adopted or implemented any of the recommendations made.

In a subsequent letter in early 1998 to a Federal judge in Ohio, Dr. Austin stated, "It is important to note that the DOC does not utilize an objective classification system that has been properly pilot tested. A number of studies by NCCD have documented the deficiencies associated with the DOC classification criteria and organizational structure."

## 2.   Changeover to the Federal Classification Model in 1998

The 1997 Revitalization Act mandated that by the end of 2001, all sentenced felons in DOC would be placed under BOP's care and custody. Pursuant to this legislation then DOC Director, took an immediate step forward and decided to adopt the Bureau of Prisons' classification model. BOP's classification model has been operational since 1979 and is considered to be more restrictive and conservative, particularly for initial classification, than many similar systems, including the NCCD model. Although it has been tested, validated and modified over the years, several other jurisdictions adopted versions of this model long before DOC.

Further impetus for this initiative was provided after a number of problems surfaced at the Northeast Ohio Correctional Center in Youngstown, a private prison operated by the Corrections Corporation of America (CCA), and contracted by DOC to house a large number of prisoners. Many of these inmates were later found to have been under-classified and were ordered removed by a Federal district court judge and by an amendment to the District's 1999 Congressional appropriation.

DOC Inmate Classification, Case Management, and Record Keeping

By mid-1998, all prisoners in DOC's custody had been classified using the Federal model, and only that model was being used to classify all newly committed inmates. The Bureau of Prisons provided classification training to DOC case management staff, and performed quality control reviews as well. Unfortunately, DOC has not presently issued a formal policy adopting and implementing the Federal system, despite the fact that it has been using this system for approximately 18 months. While the Federal classification model is now being used to arrive at an inmate's initial security level, reclassification, or the periodic case review discussed earlier, has not yet been implemented following that system.

In line with one of Dr. Austin's observations, DOC's previous and current classification systems have been designed for sentenced prisoners and there is none in place for the pre-trial, jail population. Such jail classification systems are somewhat less common and are more difficult to construct, in that there is generally an absence of conclusive information regarding the potential sentence and other factors used in these systems. Nevertheless, there are jail classification models which could assist DOC in its future operations as it becomes more of a typical municipal system.

## 3.  The Current DOC Designations Process

At the present time, the process for designating DOC inmates to Lorton from the Jail can best be described as haphazard, risky, and slow. From the Review Team's field observations and through interviews with staff at both the Jail and the Case Management Services unit, the process appears to be driven more by the pressure to keep the Jail population from exceeding the court ordered population cap of 1674 inmates than sound correctional practice. Although this process appears to be based on a "Division Operations Procedure" memorandum dated in April 1989, there are no effective means of checks and balances. The only cue available to the designator that an inmate is ready to go to Lorton appears to be the presence of the inmate's case file on his desk.

The designator is a case manager who is assigned full time to the designations desk at the Jail, which is located in the record office. Although the current designator appears to be a knowledgeable and dedicated employee, he faces a daunting task. His only assigned duty is to review case files of inmates who have recently been sentenced, and his overriding objective is to keep the Jail population within compliance of the court-ordered cap. He reported that sometimes he has to work beyond his regular hours to accomplish this task.

As it presently stands, inmate case files are placed on his desk each day by record office staff, and there is no accounting for them. They are simply stacked up, with the expectation that he will know what to do with them. To assist him with his job, twice a day, the Case Management Services unit provides him with a list delineating current available bed space at the various Lorton facilities.

Then, based upon the information he has, the designator scores the inmate on a security level form to determine which Lorton facility is most appropriate, reviews the identity and

DOC Inmate Classification, Case Management, and Record Keeping

location of the inmate's separatees where appropriate, and forwards to the medical department for medical clearance a handwritten list of all the inmates being designated to Lorton that day.

The current DOC designations system is risky because there is no truly guaranteed method to determine the location or identity of the inmates' separatees and to ensure that files are not advertently misplaced, misfiled or removed by another staff member. By the same token, the whole system is antiquated, in that the very rudimentary automated system in place to facilitate the process is of little value. Most of the operation is accomplished manually and the handwritten records are too often illegible. Consequently, there is strong evidence to suggest that some inmates remain at the Jail far longer than is indicated, simply because they have been lost in the shuffle. The lack of automation and file security are material deficiencies with this whole operation.

## a. Poor Case Tracking in Designation Process Adds to Jail Backlog

A rapid screening and analysis of all cases in the Jail on a single date revealed that for no sufficient, identifiable reason 150 or more sentenced felons had not been transferred out. Determining the status of these sentenced felons was extremely time-consuming; however, the reason for the lack of movement could not be found in many cases.

Neither a manual nor automated system is in place to track or list pending cases and their status. This inefficiency adds significantly to the difficulty of the Warden and his staff in meeting the daily court-imposed population cap of 1674. A more thorough internal audit of sentenced cases at the Jail is in order.

## b. Backlog Compounded by Delays, Problems in Medical Clearances

One significant delay appears to be the slow, disorganized method of providing and tracking medical clearances by the court-appointed Medical Receiver. Communications and responsiveness to the operational needs of the Jail staff on the part of the Receiver are reported to be problematic. When the two daily lists of prospective transfer-ready cases are forwarded to the Receiver, there is reportedly no verbal or written response in a significant number of the cases. Reasons for non-approval or an acknowledgment of a denial or delay in approval are not provided to the case management staff. Virtually all of the prisoners are housed at the Jail for some time prior to sentencing and as such have completed their initial examinations and screening. Thus, there should be few legitimate medical reasons to delay their transfers to Federal or other DOC facilities.

The Receiver provided the Review Team with no indication of any procedure to place the non-approved cases on a follow-up review list, whether manual or automated. Cases are medically reviewed again only if the Jail's designations desk manager sends the particular case back to the Receiver on a subsequent daily list, with several repetitions often being

47

DOC Inmate Classification, Case Management, and Record Keeping

necessary. The Review Team received a sample list of cases reported to have been not medically cleared after being sent to the Receiver over several days. No response or immediate reason for denial had been provided to the designation's desk nor could any case-by-case explanation be readily provided to the Review Team.

Subsequently, the Medical Director did respond to the Review Team after two weeks but did not provide information on individual cases as requested but only a general summary by category. This lack of specific case information made it impractical for the Review Team to adequately evaluate the appropriateness of the denials of clearance prior to completion of this report.

The Medical Director reports that for the period in question, August 25 - September 2, 1999, a total of 241 names appeared on multiple clearance lists which were taken to the Medical Receiver for transfer clearance out of the Jail. Of those, he reports that 135 names were cleared upon initial review. He asserts that many of these names were duplicates, and as a result, the 106 names listed as "not cleared" actually represented 46 individual inmate cases. As a product of this inquiry, several improvements with this entire process on the part of the Medical Receiver have reportedly been made. This includes a tracking system to preclude the Jail staff from having to repeatedly request medical clearances on the same inmates.

Additionally, there has been a serious concern on the part of the Warden and involved Jail staff that the Receiver's staff have inappropriately denied medical clearance for reasons having nothing to do with their medical or mental health authority or responsibilities. In one recent case, a staff member of the mental health program denied approval in at least four cases where there was no legitimate reason, after being reported by Jail staff to state that if she transferred all these cases out of her unit, she would have no work left. After being alerted by the Warden, the Medical Director investigated, took corrective action with the employee, and cleared the prisoners for transfer.

The cumulative effect of the lack of organization and responsiveness by the Receiver's staff in medically clearing these cases is to unnecessarily add to the backlog of transfer-ready cases at the Jail.

## 4. Significant Improvement in Matching Security Levels of Prisoners with Facilities

Over the past two and a half years, the Department has begun to transfer large numbers of inmates from its system, many of a higher security level, while at the same time closing some of its less adequate prisons. (Of course part of that process did not take place without serious problems, particularly with the well-known difficulties at the private facility in Youngstown. Steps have been taken to rectify those problems and to set the oversight and operation of those contract facilities on a steady path.)

More than 4,000 felons are now housed in contract facilities or Federal prisons, accounting for at least half of the sentenced felons in the system, including a large portion of the higher security cases. As a result, the long-standing problem of the security level and

48

sophistication of the prisoners overmatching the physical structure and security of DOC's prisons has largely been alleviated, making the operation of DOC facilities much safer and more orderly for staff and prisoners.

## 5. Weaknesses in the DOC's Initial Assessment and Periodic Review Process

The Review Team found that in general the initial assessment or initial classification process in DOC is inconsistent, very often being rushed through in an incomplete fashion. The scoring of the numerical classification rating is consistently accomplished by case managers; however, the in-depth review of the legal and case documents and a thorough assessment of the inmate's program and security needs are often done inadequately, if at all. The written reports, when done, often do not sufficiently document a thorough case summary. Similarly, the 12-month review process is inconsistent and often not well documented.

Likewise, there is inconsistent management supervision given to staff involved in the process and there are no management review or internal control measures in place at the institution or headquarters levels to ensure the quality of this important assessment process. Had such an initial assessment been conducted in Wright's case in a timely fashion, the obvious case management and records management problems cited in Chapter 5 would have been highlighted and brought to the attention of management for handling. Hopefully, by doing so the problems would have been rectified before it was necessary that they be brought to the attention of the Court.

## C. Case Management Operations in DOC

In spite of a number of skilled and dedicated staff, case management operations within DOC have been plagued by a number of weaknesses over recent years. The initiatives launched over the past two and a half years to transfer a substantial number of inmates out of Lorton to contract and Federal prisons revealed a number of case management, classification, and record-keeping problems. Files at times were incomplete and disorganized, some sentence computations were inaccurate, and a number of prisoners had not been classified or were mis-classified. In addition, parole hearing dates in a number of cases were inadvertently delayed for some time. Prisoners were too often "falling between the cracks."

## 1. Organizational Structure

At the top of the current organizational structure for the discipline is a headquarters level operation identified as the Case Management Services Unit (CMS). An administrator who supervises two assistant administrators and nine other support staff heads this unit. It is located in the Correctional Treatment Facility (CTF), which is a contract facility adjacent to the Jail.

DOC Inmate Classification, Case Management, and Record Keeping

The CMS appears to function more as a clearinghouse for paperwork and a coordination office for prisoner movement rather than as a typical headquarters unit providing policy development, strategic planning, case management training, operational oversight, program monitoring, or technical assistance. The lack of an effective automated system and the failure to apply what is available, are major deficits hampering administrators and staff in this office as they attempt to coordinate the supervision, classification and transfer of thousands of cases each year.

At the institutional level, each DOC facility has a number of case managers who are supervised by 2-3 chief case managers. The chief case managers are in turn supervised by a deputy warden. Staffing is very adequate, as average caseloads are approximately 100 inmates per case manager, which is considered to be at least in line with those in most other correctional systems.

Case management within DOC has been described by some, including Dr. Austin, as too often chaotic and crisis-oriented. To the extent that this characterization is accurate, it is primarily because there is inadequate direction given to the individual case managers through policy and proper training, and there are inadequate systems in place at both the headquarters and institutional levels to provide sufficient management oversight.

Of particular concern is that the case management processes, very complex and involved systems at best, are simply not driven adequately by written, organized policy. For instance, DOC's Case Management Manual has not been updated in approximately ten years and many staff report it is not useful or it is outright ignored. By the same token, a hopeful indication is that the case management component has for several months been engaged in systematically rewriting the Department's case management policies and is beginning to develop elements of an internal control or audit process.

## 2. Antiquated or Non-Existent Technology and Information Systems

DOC has upgraded its technology and information systems in some of its operations; however, the lack of an adequate automated information management system for classification and case management seriously compounds the operational difficulties of this section. Because DOC does not maintain an independent automated inmate management system, upgrades or modifications to the current system must be approved by the system's owner, the Metropolitan Police Department (MPD). Reportedly, the data screens developed for case management's use are inoperable due to inadequate storage space on the  system to accommodate the data.

The few computer terminals that are in place are not accessible to most of those  who need the data for institutional management, and the data itself is unreliable in many cases. Consequently, most of the case management and classification processes are performed manually.

DOC Inmate Classification, Case Management, and Record Keeping

Not only are functioning personal computers not generally available to case managers for such simple matters as word processing and other daily duties, even the simplest technologies, such as dictating machines, are not in evidence. Thus, case reports and various other official documents are most often handwritten by case managers and sent through a typing pool. Photocopy machines are antiquated and there are few fax machines. This lack of ordinary automation continues to severely impede DOC case managers' abilities to work quickly and efficiently and to track their case loads and anticipate pending actions such as parole hearings, release dates, halfway house placements and other basic case management functions.

This is particularly highlighted as a problem because, within DOC institutions, the prisoners' official case files are maintained at a central record office, often at some distance from the case manager's office. While most case managers maintain work folders for each inmate on their caseload, complete file information is not readily accessible. An automated database and inmate information system would ameliorate many of these concerns and vastly improve efficiency.

It should be noted that DOC has tried to rectify its lack of technology and automation several times in the past. Specifically, in the last three budget cycles, the Department has sought funding from several different sources to upgrade and expand its automated systems. That funding has been cut and/or denied in each of those budgets.

## 3. 1999 Outside Review of Case Management Operation

In November 1998, after noting problems associated with case management in DOC, the previous DOC Interim Director requested technical assistance in this area from BOP. After discussions between the leadership of the two agencies, that initial verbal request was followed by a formal written request by the subsequent Interim Director in February 1999. These requests led to an in-depth review that began on March 1.

The study was conducted by a senior case management expert and it focused on the mission and operation of the Case Management Services department (CMS). The core responsibilities covered in the study included: Policy Development, Population Management, Classification and Designation Procedures, Staff Training, Parole Processing and Cooperating Witnesses/Protective Custody/Separation Cases.

Recurrent themes in the study were very similar to those of the NCCD report, specifically that the department is crisis-driven, with little evidence of long-range planning and virtually no system of self-assessment in place. There was little evidence found that the CMS headquarters office identified case management weaknesses and problems at the institutional level, or that the department effectively assisted field staff with training or technical advice.

The report further pointed out that this state of affairs is compounded by the fact that the

DOC Inmate Classification, Case Management, and Record Keeping

CMS has never been provided with a clearly delineated  mission from the Department's Executive Staff on its role and duties.  Moreover, the operation is hampered by various court-imposed restrictions on designations and facility capacities, as well as the aforementioned general lack of automated data management systems.  Many of the crises the department must contend with are also the results of historically poor planning at higher levels.

This very thorough report was based upon direct observations, reviews of policy and procedures, interviews with case management staff at all levels, and professional experience.  A total of 33 recommendations was provided, including a proposed new organizational restructuring plan for the CMS.  The most significant recommendations are paraphrased as follows:

- To provide guidance and delineate expectations, the CMS must be provided a clearly understood mission by the Department's Executive Staff.  From this mission statement, the CMS must develop written policy covering the key aspects of its operations, and disseminate this information to all applicable staff through comprehensive training.

- A system of internal controls, or self-assessment, must be put in place to monitor various case management activities.  This should be a system-wide, ongoing process.

- A new CMS organizational structure should be implemented which encourages the administrator to delegate to subordinate staff the responsibility for their assigned areas of expertise and which provides cross training for those staff who must handle divergent tasks.

- The CMS must be provided secure office and file space to maintain the confidentiality of prisoner files and sensitive information, and staff must be held accountable for information security.

- Automated systems of information  should be installed for managing prisoner case data, and linked with facilities throughout DOC.  The system should be accessible only to staff who have a need to know, and they should be properly trained in its use and utility.

- The CMS workload should be redistributed, and several duties currently assigned to the unit should be delegated to the wardens of the various facilities.  A minimal increase (only two administrative positions) in staffing of the unit was deemed necessary to optimize its effectiveness.

The report also notes that the Department is making some significant and positive strides in the right direction.  A prime example is its decision to adopt the Bureau of Prisons

inmate classification model. Also, for the past several months, the CMS administrator and key DOC case management staff have worked to remedy policy discrepancies and develop a system of internal controls. Additionally, the recently appointed DOC Director has taken several actions to address many of these issues. These also included personnel changes in several top management positions intended to have a positive impact.

## 4. On-site Review of Case Management Operations

The Review Team recently visited the Jail and the three remaining Lorton facilities to observe case management operations and interview case management staff on current practices and procedures. Although the Team encountered a number of staff who were enthusiastic about their jobs and knowledgeable about case management principles in general, most of the staff interviewed gave the impression that they were working without the benefit of effective leadership, direction, oversight and support by management. The absence of formal guidance through policy and training from headquarters was obvious because many of the common questions posed to the different interviewees elicited widely disparate responses. It was also obvious that case management processes differ widely from institution to institution. There does not currently appear to be a Department-wide approach to the discipline at all. The majority of the respondents stated that they operated day-to-day on an emergency basis, with inmate movement being the primary driving force behind their activities.

Most of those interviewed stated that the most recent meaningful case management training they had been afforded came from another agency, when they were trained on how to do security classifications on inmates using the Federal classification model, and on how to do progress reports for hearings in front of the U.S. Parole Commission.

It was also obvious that although the outdated DOC Case Management Manual dictates inmate classifications are to be done by a multi-disciplinary team one-on-one with the inmate, in reality this usually does not occur. Most case managers interviewed asserted that DOC's version of "classification" involved only the inmate and the case manager, and that the primary focus is on where to house the inmate. Likewise, regular program reviews, or reclassifications, are not done as frequently as they were in the past. The closest facsimile the Review Team found to a regular program review is done at the Maximum Security Facility, where inmates are reviewed every three months to ascertain whether or not they are still appropriately housed at that facility.

DOC Inmate Classification, Case Management, and Record Keeping

## D. Records Office Management

> ACA Standard 3-4092: *Written policy and procedure govern case record management, including at a minimum the following areas: the establishment, use and content of inmate records; right to privacy; secure placement and preservation of records; and schedule for retiring or destroying inactive records. The policies and procedures are reviewed annually.*

### 1. Previously Commissioned Reviews of DOC Records Management

Over the past 23 years, five major studies were conducted on the management and security of the DOC record office operations. A private company, RMC Research Corporation, conducted the first study in 1976. As they faced an impending crisis, former Directors of the Department requested additional studies. These studies were completed by: BOP in 1985 and 1997, the National Institute of Corrections (NIC) in 1989 and a DOC security workgroup in 1996.

BOP's 1997 review was at least partly in direct response to concerns raised by the Federal Court and the public in the Wright case, particularly with the lack of adequate security of records and the alleged unauthorized removal from Wright's file of disciplinary report records, a failure which apparently played a part in the decision-making process leading to the inmate's early parole. This review repeated several major recommendations addressed in previous studies.

In addition, there have been other outside interventions, primarily involving staff training. Both the January and June 1999 Office of Inspector General's reports to the court concerning the Wright case identified serious problems in the management and security of DOC's records offices. Despite these studies, technical assistance visits and task force efforts, recurrent problems persist in the operation of the records offices.

The following is a chronological list of studies and major recommendations provided over the years to the DOC management:

### 1976 RMC Research Corporation Analysis
Major Recommendations:

- Reorganization of the record office
- Increase staffing in the office

### 1985 BOP Evaluation
Major Recommendations:

- Create a position in the headquarters office to provide technical guidance and written policy

DOC Inmate Classification, Case Management, and Record Keeping

- Restrict removal of files from the record office
- Restrict access to the record office area
- Provide sentence computation training for staff
- Provide job descriptions for all positions
- Increase record office staff

## 1989 NIC Study

Major Recommendations:

- Assign technical responsibility to a Records Coordinator position (a new position)
- Standardize the organization of files
- Create case management files
- Develop a staff training program
- Develop written policies and procedures
- Develop a sentence computation manual
- Increase the number of positions (staffing)

## 1996 DOC Security Workgroup Study

Major Recommendations:

- Create a system of judgment and commitment files for the record office separate from the central inmate files
- Restrict access to institutional files
- Restrict access to the record office

## 1997 BOP Re-Evaluation

Major Recommendations:

- Establish an Inmate Record Administrator who reports to a Deputy Director (also a 1985 recommendation)
- Establish an Inmate Record Training Officer who reports to the Inmate Record Administrator (training addressed in 1985 and 1989)
- Produce a sentence computation manual (also a 1989 recommendation)
- Produce an Inmate Record Manual of policy and procedures (also recommended in 1989)
- Establish a separate file system for judgment and commitment documents (also recommended in 1996)
- Improve file control, security and maintenance (recommended in 1985 and 1996 as well)
- Improve security and impose staff traffic control in inmate record offices (recommended in 1985 and 1996 as well)

DOC Inmate Classification, Case Management, and Record Keeping

As noted above, most of the studies had similar recommendations with little or no follow through by the DOC.  Of particular note is the fact that although it was strongly recommended in study after study, DOC has not established a record office administrator position at the headquarters level to provide direction and be held accountable for the department's operations. In contrast to most major functional areas in DOC, records office management has no headquarters component nor any administrator below the level of the Director who has responsibility for such areas as policy development, staff training, quality and internal controls and short or long-range planning.  The BOP in consultation with the DOC has however,  retained a consultant to assist in developing a sentence computation manual, and that process is now well underway.

## 2. On-site Review and Testing of Record Office Operations

Recent field visits by members of this Review Team to the four record offices at DOC institutions revealed staff are dedicated and doing their best to perform their jobs and the required record office functions.  The operations however, are overwhelmed and in distress.  As noted in previous studies, procedures in each office are inconsistent since most of the staff have not received any formal training.

The record office staff have attempted to improve their operations on several occasions, but have often been unsuccessful due to a lack of support from upper management.  One example is a draft record office manual that was prepared by some of the more experienced staff several years ago, but was never finalized and issued by headquarters staff as official agency policy.  The findings resulting from the most recent field visits and testing by the Review Team are listed below.  It must be emphasized that due to the short time frame of this report, a thorough audit was not performed, but only a much more cursory inspection of each facility:

- The security of institution files is still a major concern at two facilities.  Case managers and correctional staff are permitted to remove files at the D.C. Jail and Central Facility without strict file accountability procedures.  At the Maximum and Youth Facilities, good file accountability procedures appear to be in place.[1]

---

[1] The District Court expressed concern about the current state of DOC record-keeping generally, which also covers Leo Gonzales Wright's current DOC file.  In the course of that task, the Review Team could make no findings or recommendations regarding the suggestion in the OIG's 1/25/99 report (at p.38) that important documents in Wright's file may have been intentionally destroyed. The Review Team was unable to confirm the D.C. OIG's suggestion that documents in Wright's file may have been intentionally destroyed ("by him, by his brother, or by a guard or other third party") or that his file was not "unadulterated" when reviewed by his caseworkers and the D.C. parole officials.  The OIG's Office stands by its original conclusion.  In any event, this review can recommend nothing further be done concerning this matter since we cannot identify any specific Wright document that has been destroyed nor can we find any situation relative to this issue that warrants either further investigation or reconstruction.

DOC Inmate Classification, Case Management, and Record Keeping

- Organization and maintenance of institution files continue to be a major problem. Documents are often misfiled in the wrong sections. A backlog of filing was identified at the D.C. Jail and twelve crates of filing was observed at the Central Facility.

- Many of the record office staff have not received any formal training in record office procedures or sentence computations. A few of the staff remembered the last formal training session as one conducted by the Bureau of Prisons in 1987. The Warden at the D.C. Jail sent a follow-up request in March 1999, for staff training that was requested a year earlier, to his supervisor in the headquarters office. As of September 1999, he had not received a response.

Although most of the record offices have policies which outline institution specific operational procedures, the policies are not current or consistent. Staff are in the process of revising and consolidating these procedures into agency wide policies. A new policy establishing a record office judgment and commitment file is also being developed which will greatly assist the record office with file accountability.

- Department of Corrections policy requires completion of each inmate's sentence computation at the D.C. Jail prior to transfer to another facility. A sentence computation program is used to calculate full term dates and presentence credit. However, this information is either typed or written on the Face Sheet 2 for distribution to the inmate, case management and the file. It was noted that a 1978 sentence computation manual, sentence computation policy which is currently being revised, and several Department memorandums were the primary guides available as reference material.

- Each record office supervisor reports directly to a deputy warden; however, technical questions are often referred to the Corporation Counsel's Office since the Department of Corrections does not have a position in the headquarters office to provide technical assistance.

- Time constraints did not permit a comprehensive analysis of staffing requirements for the record offices. It was noted; however, that two record office positions at the Central Facility were very inadequate to meet the workload and inmate movement with a population close to 2000 inmates.

- Records Office staff need clear guidance in responding to subpoenas for inmate records from the courts or attorneys. DOC's Freedom of Information Act and Consent to Release Information policies are over twenty years old and are ineffective.

Recommendations

- Establish a records administrator position in the headquarters office to provide technical assistance and guidance to record office staff.

DOC Inmate Classification, Case Management, and Record Keeping

- Establish policy and procedures at all facilities for file control and security.

- Establish policy and procedures for organization and maintenance of the institution inmate file and a record office judgment and commitment file.

- Provide formal training to all record office staff in sentence computation and record office procedures.

- Automate sentence computations and the completion of the sentence computation face sheet for D.C. Code sentences.

- Develop a records management manual of policy and procedures and update the current sentence computation manual.

- Assign additional staff to the Central Facility to assist with record office operations and filing of institution file material.

In combination with the recommendations of the previous studies, there is an excellent road map available for the new DOC administration to rectify the long-standing problems in this critical area. When those recommendations are implemented, correctional managers in the institutions will be able to be much more confident that when they review the case file on any inmate they have a full and accurate file upon which to base their decisions.

### 3. Inadequacies in Inmate Discipline Records

Another feature that is lacking in DOC, from both a record keeping and automation perspective, is the documentation of an inmate's disciplinary record. Because so many case management decisions, including security level classification, depend upon an inmate's institutional adjustment, it is critical that management officials are able to easily and reliably retrieve this information. In DOC, this is very difficult because there is neither a chronological listing of disciplinary actions in the case file nor an automated record of disciplinary actions in a separate database. The Review Team found that documents regarding an inmate's disciplinary actions are filed haphazardly, if at all, in case files. They are difficult to find because, as with other case materials, they are not consistently filed.

### E. Findings and Recommendations

### Findings

**F-14**  DOC case management, classification and records office management have not been adequately driven by written policy and procedures. Most of their written policies are at least several years old, with many being ten to twenty years old, and virtually all are either ignored and/or ineffective. Over the past year, strong steps have been taken, particularly in records management, to systematically update written policy; however, case management is far from completion.

DOC Inmate Classification, Case Management, and Record Keeping

**F-15**   Efficiency and sound management of these three critical areas are severely hampered by a totally inadequate level of automation, and in some cases by the lack of the most basic technology. Without upgrades, especially at those components which will continue to operate after the closure of Lorton, DOC will never be able to reach an acceptable level of sound correctional practice in classification, case management, and records management.

**F-16**   For a number of years, including the time at which Leo Gonzales Wright was recommitted to DOC in 1996, an inadequate classification system was used to manage DOC's inmate population. Because there were not physical facilities available to adequately meet the security needs of large numbers of higher security inmates, the former system was artificially altered to lower the custody scoring of prisoners to the level of available facilities.

**F-17**   In 1997, the then-Director of DOC adopted the well-recognized Federal Bureau of Prisons classification model. By mid-1998, after extensive staff training, all DOC inmates, including those in contract facilities, were classified using the Federal model. This move provided a major improvement to the Department, making the facilities more orderly and safer for staff and prisoners. Coupled with the closing of certain inadequate DOC prison facilities and the transfer of 4,000 prisoners to Federal and contract facilities, this move eliminated most of the mismatching of tougher prisoners with lower security facilities.

**F-18**   As determined in at least two previous reviews, the case management area of the DOC is in need of major reform. The level of disorganization and inefficiency in this area jeopardizes the sound management of prisoners and DOC's overall operation. Although staffing levels and caseload sizes for the most part are normal, case managers generally do not have adequate training, automation, or supervision to perform their jobs effectively, and there are no internal controls to ensure cases are correctly and efficiently managed. Recently, an effort to develop internal controls has been initiated.

**F-19**   DOC's designation process, wherein prisoners are initially placed and later transferred between DOC facilities, is often haphazard, is not based on clear policy and guidance, nor is it sufficiently automated to either promote efficiency or maintain an accurate paper trail for planning or other critical purposes. As a consequence, there appears to be a significant backlog of between 150 or more transfer-ready sentenced felons clogging up precious bed space at the D.C. Jail. This backlog is compounded by a serious breakdown in the processing of medical clearances by the court-appointed medical receiver's office whose clearance procedures appear disorganized and non-automated.

DOC Inmate Classification, Case Management, and Record Keeping

**F-20**  The inmate records offices management in DOC is overwhelmed and in distress and suffering from years of prolonged inattention from top management. Despite several outside reviews and other interventions over the past 20 years, the recommendations of previous studies have not been seriously implemented.

**F-21**  Field-testing and observation by the Review Team revealed that institutional records management is inconsistent from prison to prison. Formal staff training is inadequate, policy guidance is either outdated or nonexistent, the inmate files in two facilities are not sufficiently secure, the files are not organized consistently in a standardized way, and there remains no one accountable for this operation at the headquarters level.

**F-22**  Institutional prisoner disciplinary records are not readily retrievable because they are not systematically or chronologically recorded and they are not maintained in an automated fashion separate from individual case files. This deficiency leaves the disciplinary records vulnerable to potential misplacement of important records.

**Recommendations**

**R-12**  The current process DOC has undertaken to thoroughly review and update all written policy in case management and records management needs to be brought to completion and operational staff adequately trained.

**R-13**  There needs to be a major upgrade of the basic automation and technology systems available to staff to manage these areas. Of particular need is an independent automated prisoner information system that is developed, managed, and maintained by DOC. While this system should have relational capabilities with the systems maintained by other law enforcement agencies, it should be owned by DOC. Some significant short-term, cost-effective improvements can be made by simply developing databases using available equipment.

**R-14**  DOC's system for initial assessment and review of committed prisoners needs to be significantly strengthened and given more structured supervision by institution and headquarters management.

**R-15**  The process within DOC for initially designating sentenced prisoners to facilities or re-designating them to other prisons should be reorganized into a more formal system, set forth in detailed written policy and automated. The Medical Receiver should better organize and automate the system for pre-transfer medical clearances in order to be responsive to the daily management needs of the Warden's staff and to help clear the backlog at the D.C. Jail.

DOC Inmate Classification, Case Management, and Record Keeping

**R-16** The case management operations in DOC need to be reorganized, including consideration of the recommendations of the previous NCCD studies and the recent April 1999 report; particularly, those urging the Department to systematize the process, installing both automation and management oversight through a system of internal controls.

**R-17** As DOC becomes more of a municipal system holding primarily pretrial prisoners, it should consider developing a classification system for its Jail population and requesting the technical assistance of the National Institute of Corrections in this process.

**R-18** DOC administration should respond expeditiously to the problems in records office management and implement the recommendations of previous studies in 1985, 1989, 1996, and 1997. Particular attention to the need for a headquarters record office administrator, increased security, and a separate J&C file system should be priorities.

**R-19** The process of filing and recording institutional disciplinary actions should be reorganized to include chronological summary sheets and the automated posting of all disciplinary records in a database.

**R-20** The Office of the Mayor of the District of Columbia and the DOC Director should develop a mechanism whereby accountability is established for tracking, evaluating, and implementing the results and recommendations of significant reports on the DOC, such as those previous studies reported here in the areas of case management and records office management.

## Chapter Four

## Escorted Inmate Trips and Release Procedures in the DOC

**Introduction.**  The Court requested that this review examine the practices related to the release of inmates into the community, in reaction to the processes associated with the releases of Leo Gonzalez Wright from his first term of confinement, including the work release program in which he participated, and to a funeral home viewing at the time of the death of his mother. The January 1999 Office  of the Inspector General's report also raised concerns about the pattern of early releases of felons from the DOC as a response to overcrowding in the District's prison system.

This chapter will address these issues as they relate to the procedures of the Department of Corrections.  The release of Leo Gonzales Wright in 1993, a subject which has been thoroughly expounded upon in the Inspector General's earlier report, is not covered in this section.

## A.  Issues and Practices Related to Community Trips by Felons from Prisons

Trips into the community by imprisoned felons present special dangers and legitimate public concerns.  The Review Team therefore, found it appropriate to examine generally accepted, sound correctional practice related to such trips, and then apply those findings to its review of DOC's practices.

## 1.  Practices in Various Correctional Systems

> ACA Standard 3-4392:  *Written policy, procedure and practice provide for escorted leaves into the community*.

By requiring every agency or prison seeking accreditation to develop such policies and practices, the accreditation standards of the American Correctional Association acknowledge the necessity of community trips. The practice of taking felons who are serving sentences outside the perimeter security of prisons into the community is handled in a variety of fashions by the various federal, state, and local correctional agencies around the country.  Every agency finds it necessary or advisable, in certain circumstances, to provide for such trips with some regularity.  At the same time, it is commonly considered that great care must be taken by agencies  to regulate such trips in order to assure the safety of the community and of the escorting correctional staff; and to provide that neither the sensitivities of the general public nor the purposes of the sentencing court are offended.

63

Escorted Inmate Trips and Release Procedures in DOC

Aside from the transfer of prisoners between correctional facilities or moving them to court, the most common purpose of such community trips is the provision of medical treatment not available in the prison setting. At times, medical trips take the form of day visits to hospitals, emergency rooms, clinics or doctors' offices for out patient services, while on other occasions inpatient treatment requires temporary hospitalization.

A less used but not uncommon form of a community trip is for compassionate purposes, such as to visit the deathbed of a close family member, to attend a funeral or visit the remains of a deceased family member. Some systems also provide inmates who are near the completion of their sentences the opportunity to make brief social visits to their families to restore family ties and to facilitate the inmate's successful transition to life in the community. This latter form of a social integration trip is known commonly as a furlough. In contrast to the medical and compassionate trips which are almost always carried out under escort, usually by armed correctional staff, inmates in a furlough status are typically unescorted.

## 2. Practices in Surrounding Jurisdictions

A survey of the practices of the surrounding state and county jurisdictions revealed that, with the exception of the Maryland Division of Correction, most do provide for some kind of escorted trips to funeral home viewings or death bed visits with immediate family members. The policies and practices however, are much more restrictive than those which had been in place in the DOC until recently. In some jurisdictions, they are so restrictive as to make such trips a rarity. Also, some local jurisdictions require a judge's court order before they permit escorted trips for pre-trial prisoners. The Federal Bureau of Prisons has a policy governing these trips, but again they are a practical rarity, especially for any prisoners above minimum security level.

## 3. Do Escorted Trips Constitute Releases?

A review of the procedures and practices in a number of jurisdictions indicates those trips in which a prisoner is in the direct custody of correctional staff, whether for medical or compassionate purposes, are not considered releases from custody, either for legal or operational purposes, but rather an extension of the limits of confinement. State or federal laws governing those agencies generally make some provision for such practices under the discretion of the director of the agency. Although unescorted furloughs of prisoners into the community for any purpose are generally more in line with the public perception of releases, jurisdictions generally do not technically consider even these trips to be releases, but rather an extension of the limits of confinement. Offenders continue to accrue credit for time served during such trips, and should the individual require medical attention while in the community, the correctional agency retains the responsibility to provide it. The Review Team interviewed the heads of several national correctional associations and offices on this matter, including the Executive Directors of the American

Escorted Inmate Trips and Release Procedures in DOC

Correctional Association, the American Jail Association, and the Association of State Correctional Administrators, as well as the Directors of the National Institute of Corrections and the Department of Justice's Office of Correctional Programs. All of them have broad knowledge of the practices around the country and agree that in their experience such staff escorted trips are not categorized as releases for legal or operational purposes.

## 4. Escorted Trips Present Serious Security Dangers

At the same time, all these experienced correctional administrators, as well as various others interviewed, hasten to make clear that moving sentenced felons from a secure prison setting into a community poses severe security risks and constitutes a practice which requires careful agency regulation and oversight. Particularly for higher security offenders and those serving long sentences, any trip into the community presents serious potential dangers to the escort staff and to the public at large, both during the transport, and at the community site.

It is not uncommon for escape plots to be contrived by prisoners who become aware they are to be moved outside of their prison for some reason or who feign illness to generate trips to a community hospital. Such plots have often involved armed, outside assistance. During one such feigned medical emergency trip from a federal prison several years ago, an escorting correctional officer was ambushed and killed by the inmate's outside accomplices at a community hospital during a temporarily successful escape. Similarly, federal marshals have been subject to such planned outside assaults while moving prisoners. Numerous other examples have occurred around the country.

As a result of these serious security concerns, correctional administrators strongly acknowledge that such trips must be subject to very well defined agency policies. Each individual case should be given careful screening and security planning, with release decisions made only by experienced, high level administrators.

## 5. Concerns with Public Perception and Judicial Intent

Although it is generally within the authority and discretion of correctional administrators to authorize such trips, an important consideration is the potential public perception of both the general practice of granting such trips and particularly trips granted to dangerous or well-known prisoners. The public concern for the safety of the community, often represented by elected officials, prosecutors, and the media, would frequently suggest that such trips be kept to an absolute minimum.

DOC staff advised the Review Team, however, that for several years in the District, it has not been unusual for someone from the Mayor's Office to contact DOC officials to request or encourage them to approve trips to attend a viewing or funeral of a family member.

Escorted Inmate Trips and Release Procedures in DOC

Similarly, it is the role of correctional administrators to carry out the judgement of the sentencing court in the cases of felons committed to their custody. Sentencing judges often may have a serious concern about putting certain prisoners into the community, particularly on compassionate family trips, no matter how genuine the circumstance. While the court often may not have the statutory authority to either authorize or prevent such trips, correctional administrators must give great weight to the intent or recommendations of the court. It is a wise practice used in certain agencies to consult the probation office associated with the sentencing court before allowing non-emergency community trips. Such local probation offices have usually been involved in the preparation of the prisoner's PSI and are familiar with specific community, prosecutorial or judicial concerns which may not be known to prison staff.

## 6. Review and Approval Procedures

    **a. Importance of Thorough File Review, Case Preparation.** For these reasons, it is important that each case be closely examined, with a full review of all relevant information about the prisoner's criminal history, institutional adjustment, community ties, including ties to criminal elements in the community who may pose a threat to the escorting officers, the legitimacy of the emergency situation, and any potential concerns which would be raised by the court or the community. Reference to recommendations by the probation office of the sentencing court can be especially helpful. Typically, this review is initially performed by the inmate's case manager who should already be familiar with the case file. The material should be condensed into a brief thorough summary memo or other review document, along with a recommendation.

For higher security prisoners, in addition to input from case management staff, there should be a risk or threat assessment by security staff regarding the details of the trip, the particular area of the community, and any known criminal associates of the offender in the community. The recommendations of security staff should be weighed, particularly regarding details of the trips if it is to be approved.

    **b. Level of Administrative Review and Approval.** Because of the serious potential consequences of escorted community trips, particularly non-emergency compassionate trips, it is good practice for several levels of review to occur within the administration, with the administrator at each level having available the summary document and the entire case file. Needless to say, it is important that the case file contain all relevant documents, organized in a coherent fashion for easy review by upper levels of management.

Good practice would call for the final level of administrative approval to be no lower than the warden. For cases above a relatively low level of risk, it is common that the case also is reviewed at least at the level of the warden's supervisor, such as a deputy director or a regional director of the agency. This is particularly true with prisoners of a higher

Escorted Inmate Trips and Release Procedures in DOC

security level, those with long sentences, or those where there might be some significant community interest or notoriety.

## B.  Escorted Community Trips in the Department of Corrections

## 1.  Legal Authority and DOC Policy

The legal authority to authorize escorted community trips by incarcerated felons is 24 D.C. Code 442. It provides, in pertinent part, that DOC shall have charge of the management of the D.C. correctional facilities; shall be responsible for the safekeeping, care, protection, instruction and discipline of all persons committed to those facilities; and shall have the power to promulgate rules and regulations: (1) to govern such facilities; (2) to establish and conduct industries, farms and other activities; (3) to classify the inmates; and (4) to provide for their proper treatment, care, rehabilitation, and reformation.

From November 15,1991, until a few months ago, DOC's escorted trip policy was D.O. 4910.1D (see Appendix 6a).  After the problems and attention of the Wright case, DOC's Director rescinded that policy and implemented a draft policy in June 1999.  The draft policy, Escorted Trips/Community Transport, is currently pending approval (see Appendix 6b).  In the interim, all escorted trips for inmates who exceed the minimum security classification level, must be approved by DOC's Director.

**a. Previous 1991 Departmental Order.**  The previous policy recognized such trips for several purposes, namely emergency and non-emergency medical trips, athletic trips, job placement interviews, educational programs, sympathetic visits to dying immediate family members or to view the body of deceased family members.  The Review Team found no indication that athletic, educational or job placement trips are occurring generally. Medical trips are a continuing necessity, but there are extensive procedures in place and no indication that the Court in the present case was directly concerned with them. Therefore, this review focused on the sympathetic visits to critically ill immediate family members or to funeral home viewings.

The previous policy gave final review and signature authority for all such escorted trips to the warden of the institution.  Policy defined immediate family members as father, mother, brother, sister, spouse, child or persons "who can be reasonably considered as an immediate relative, e.g., step parents, stepchildren, legal guardians."

The policy was not elaborate and did not:

- Exclude any prisoner by offense, sentence, institutional conduct or any other criterion, though it did differentiate between security procedures used by escort staff based on the security level of the prisoner.

67

Escorted Inmate Trips and Release Procedures in DOC

- Define an administrative review process or the type of file material to forward to the warden for review.

- Identify a procedure to take into account concerns of the sentencing court or the public at large.

- Specify the methods for assessing risk in the community for the inmate or the staff escorting the inmate.

- Establish any procedures for communication by the warden and institutional staff to the escort officers of the centralized Transportation Unit of the particular dangers or security issues with the escort.

**b. New Draft Operational Policy.** The new draft policy that has not been finalized but is being used in the interim is significantly improved, particularly in that it elevates the level of approval for all but minimum security prisoners to two levels above the Warden. The Deputy Director must review the request and only the Director of the agency may finally approve. The policy tightens security procedures and mandates a more thorough written case history be forwarded for review by approving officials.

At the same time, the current draft could be strengthened in a few areas. It does not appear to provide extensive security information to the transport officers. There is still no provision for assessing public notoriety or judicial or community concern, nor is there a requirement for a threat assessment of community danger, especially in the case of higher security prisoners. Also, it would be helpful if there were one central office in the agency which maintained records of these trips for purposes of management analysis and review of numbers and trends.

## 2. DOC's Operational Practices

Until recently, it is clear that almost all requests for such trips were being approved. It is consistently reported that if the relationship of the deceased family member could be verified, the request was almost always approved, except in the most unusual circumstances, such as the deceased was the victim of community violence and there was the possibility of retaliation. Although the Review Team was unable to locate any central repository of records of such trips, it was informed that the number of trips had run from 2 to 14 per month. It is now reported that almost no trips are being approved during the current overall review by the new director.

The poor state of the records and case management operation in the Department call into question the reliability of the information in case files used to make decisions on the approval of the trips. Of concern was the practice, at most facilities, of the approving

Escorted Inmate Trips and Release Procedures in DOC

warden only reviewing a brief summary form and possibly a few other forms, but not the entire case file.  There is no indication that this practice has changed.

The Transportation Department provides the actual armed escort officers and appears to have solid security procedures.  In some cases they are supported with armed security by members of DOC's Warrant Squad.  The warrant squad is seldom if ever, provided with specific information about the security risks of the prisoner or of the possible community risks of the case.  Further, the Warrant Squad is small and stretched very thin as it performs its fugitive apprehension duties.  When it had been regularly required to perform armed security for escort trips, its primary public safety mission for the Department was negatively impacted.

## C.  DOC's Community Work Release Programs

No attempt was made by the Review Team to reconstruct a picture of the community work release programs which were operational in the DOC in the early 1990's as they are not relevant here, but only to review those in operation currently. In general, there are no longer work release programs where prisoners work in the community for public or private businesses except in two circumstances listed below.

## 1.  Community Service DOC Contract Programs

First, there is a very small community service program for about 50 minimum custody prisoners who work under direct supervision of DOC employees from the Office of Work Programs under contracts between the DOC and other District agencies, such as the Department of Public Works or the Parks and Recreation Service.  Inmates are reported to be closely screened and in the final stage of their sentences.  These prisoners continue to reside in one of the District's prisons, currently the Youth Center, and are escorted daily to the District.

The work performed is generally manual labor in the restoration of parks, streets,  and neighborhoods.  Correctional security staff are also assigned to make unannounced checks of the work details during the day around the District.  There are significant inefficiencies associated with the program which results in relatively short work days for most inmate workers due to transportation limitations.

This program has not been without its significant management problems and has been reduced in size and scope.  It is currently undergoing a thorough management review by the new director to determine its future viability and direction.  With the pending transfer of all lower security felons to federal prisons in the coming months as part of the long term transition, new arrangements must be made if this program is to continue under any guise. One possibility is to have the work details filled by misdemeanor cases performing community service work.  It may become necessary to house them in community correctional centers as the availability of expensive, secure bed space changes.

Escorted Inmate Trips and Release Procedures in DOC

## 2.  Transitional Pre-release Community Corrections Placements

**a.  Practices in the Early and Mid-1990's.**  In the early 1990's, prisoners such as Leo Gonzales Wright were often placed in residential community programs prior to their parole hearing and were allowed to look for work or to work in the community for private concerns for periods of time prior to a release determination.  Often enough, the decision of the Board of Parole was to deny parole and order the return of the prisoner from the community to prison, leading to a number of escapes and other disruptive situations.  This practice was terminated by the previous director in about 1995 and felons serving sentences are not placed in halfway houses prior to release until they have a specific, confirmed release date: either a parole date or a final mandatory release date.

During this same time period, all pre-release placements into community facilities of soon to be released cases were terminated in the wake of well-publicized problems in the DOC's halfway houses.  For several years, all felons being released from DOC facilities were released directly into the streets of the District without benefits of the close supervision a halfway house can provide.  Several experienced professionals in the community indicate that this practice likely has been a factor in the continuous revolving door of felons returning to confinement after being unable to satisfactorily adjust to law-abiding ways in the community.

**b.  Greatly Improved Policy and Practice Improved Local Public Safety.**  In a major recent improvement in DOC operations and a step forward in public safety, transitional pre-release placements were resumed under a highly structured program in June 1998.  The previous Director established the new program, working in collaboration with an interagency work group, including among others the U.S. Parole Commission, the U.S. Attorney's Office, the Offender Services Trustee, and the supervision staff of the D.C. Board of Parole.  These agencies combined their expertise to organize and supervise the program.

Several contract, local, nonprofit facilities are utilized, as this program was directly modeled on the federal community corrections pre-release approach.  Inmates placed in the program are only those about to be returned to the community on parole or at the end of their terms, with most placements typically running between 90 and 120 days.  Such programs which include a very closely supervised return to the community and support the reintegration of prisoners are generally considered to be important tools in fostering, not impairing, public safety.[1]

---

[1] In this context, the Review Team considers it appropriate to clarify any impression left from a comment on pages 43-44 of the D.C. Inspector General's January Report in reference to an October 26, 1998, memo from the DOC's Administrator of Community Release Programs.  In stating that this DOC

Escorted Inmate Trips and Release Procedures in DOC

The pivotal aspects of this program include close disciplinary controls, frequent drug testing with zero-tolerance for positive tests and a requirement of employment before final release on parole. Because of the stringent enforcement of the rules, approximately 210 prisoners have been temporarily returned from the community program to prison for periods of from one to several months as a sanction or for drug treatment, thus temporarily delaying their final releases. Those who are found to use drugs or alcohol are placed in the Correctional Treatment Facility for 30-60 days of treatment and then returned to the community facility if they cooperate with the program.

One of the most beneficial aspects of the program has been the active placement of supervising parole officers in the community facilities so that the transition from correctional staff to community supervision staff is seamless. These supervision officers have also been very helpful in providing job-placement assistance.

Since the inception of the program in June 1998 through mid-September 1999, 1,034 inmates were placed in the community facilities prior to release. Of that number, 164 walked away or escaped and all but 21 have voluntarily returned or been apprehended.

Of the total 1,034 placements, only 11 have been rearrested during their placement in the community program facility, of which:

- 4 had the charges dropped
- 4 were convicted (all misdemeanors)
  - Indecent Act (sentenced to 23 days)
  - Simple Assault (sentenced to 90 days)
  - Possession of Cocaine (sentenced to 220 days)
  - Shoplifting (sentence pending)
- 3 are awaiting trial
  - Forgery (misdemeanor)
  - Assault with a Deadly Weapon (felony)
  - Burglary II (felony)

---

initiative may endanger public safety, the author of the section seemed under the mis-impression that the October 26 DOC memo(see Appendix 6c) and the pre-release program to which it refers were intended to move prisoners prematurely into the community simply because of the pressures to free up beds for incoming prisoners. As is described here in Section C and below in Section D on Emergency Release procedures, the current practices do not include any early releases based on capacity concerns.

Escorted Inmate Trips and Release Procedures in DOC

Although virtually every parole case is now placed into the program prior to release, very few of the prisoners released on mandatory release can be accommodated. Often it is these more difficult cases who could most benefit from the use of these facilities. There is a need for additional bed space in community facilities to allow for placement of these cases.

## D. **Altered Practices on Emergency Release Procedures to Reduce Overcrowding**

The Review Team found that in contrast to some procedures found by the Inspector General to have previously been in place in the early 1990s, parole and release decisions currently are not being driven or influenced in any way by population pressures based on crowding or court orders. In fact, since the United States Parole Commission assumed responsibility in August 1998 for parole decisions for DOC prisoners, there has been an increase in the overall number of DOC offenders of almost 15% due in great part to the careful review procedures and cautious decision-making outcomes of the Commission. The Chairman of the Commission, in fact, made it clear to the Trustee that their decisions will not be influenced by bed space limitations, but only by the best interests of public safety.

Likewise, as noted in the previous section, the current community-based transitional pre-release program has delayed the release of 210 prisoners with their temporary return to prison as part of the program's sanctions for infractions. In this program, decisions regarding placement and release are not influenced by prison capacity concerns.

Further, as described in Chapter 2, in 1987, the D.C. City Council passed the Prison Overcrowding Emergency Powers Act. Under the provision of this act, DOC was able to declare an emergency due to overcrowding in the system. Once the Mayor invoked the Act, certain procedures were activated. Nonviolent prisoners who were within 180 days of parole eligibility were made eligible for parole 90 days early. Prisoners within 180 days of final release were given a 90-day advancement on their release date, or a ten percent reduction of sentence, whichever was less. A significant number of those released were reported to be misdemeanor offenders. Violent offenders and certain other classes of prisoners were excluded from consideration.

The Act was almost immediately invoked and was subsequently invoked again a total of 26 times from 1987 to 1996. Since that time, DOC has not declared an emergency and the Act has not been invoked. With the advent of the 1997 Revitalization Act and the transition of all felons to federal prisons, it is not anticipated that it will be invoked again.

Escorted Inmate Trips and Release Procedures in DOC

## E. **Findings and Recommendations**

### Findings

**F-23**   The practice of escorted community trips for various purposes, including medical treatment and compassionate family visits, is common to correctional agencies around the country.  These escorted trips are not considered releases from custody for either legal or operational purposes, but present serious security risks and require close agency planning and oversight.  Good practice requires senior level approval, especially for high security cases.

**F-24**   The Escorted Trips policy previously in place was minimally adequate, but flawed and should be strengthened during the current agency update.

**F-25**   DOC's escorted trip practice has been more lenient than those of surrounding jurisdictions or the federal prisons.

**F-26**   In the past year, there has been significant improvement in DOC's process for the release of cases paroled into the community at the end of their terms, as virtually all are placed into well-structured community correctional centers where transitional assistance is provided by supervision officers of the D.C. Board of Parole, now part of the CSOSA.

**F-27**   The Prison Overcrowding Emergency Powers Act of 1987 was invoked 26 times between 1987 and 1996 by the Mayor at the request of  DOC to allow for the early release by up to 90 days for nonviolent felons and misdemeanants at the end of their sentences.  It was invoked as a measure to relieve crowding in DOC facilities. The Act has not been invoked since 1996 and it is not anticipated that it will be during the current transition of cases to the federal system.

### Recommendations

**R-21**   During the present agency review,  DOC's escorted trip policy should be tightened. The process of case presentation for management screening needs to be upgraded to provide more extensive file material, including the availability of the entire file for screening and approving officials.  A mechanism for weighing public and judicial concerns in high risk cases and conducting a thorough security risk assessment of the details of the trip should be implemented.

**R-22**   DOC's community service work program needs to be thoroughly reevaluated and revamped, if it is to be retained.

Escorted Inmate Trips and Release Procedures in DOC

**R-23**  The pre-release placement program for felons placed in structured community facilities by DOC during the final weeks of their sentences should be expanded to include all eligible cases, including those released by mandatory release procedures.  To accomplish this improvement in the program, some additional community beds may be temporarily needed for the next year.

## Chapter Five

## The Leo Gonzales Wright Case Since December 1995

**Introduction.**  In addition to its concerns with the operations of the various agencies and components involved in the processes analyzed in the previous chapters, the Court has further expressed strong disapproval, even distress, over the specific problems in the handling of Leo Gonzales Wright since his re-arrest in December 1995 and his subsequent conviction and sentencing in September 1996.  This review, therefore, has very carefully examined the handling of Wright by each component involved in this case, particularly since the cumulative effect of even some seemingly minor mishaps, which went unnoticed at the time, later appeared to have serious negative consequences.

After sentencing in September 1996, Leo Gonzales Wright was returned to DOC and began serving his sentence in very secure prison quarters, despite not being properly classified or processed.   However, from a correctional standpoint, he was left in bureaucratic limbo and as a result, "administratively lost" within the criminal justice system for more than two years.  The commitment process involving several components of the Federal government and DOC broke down badly, and the entire system failed due to a convergence of multiple problems, detailed below.  Indeed, were it not for the litigation by the Pruckmayr family and a subsequent D.C. OIG Report highlighting Wright's status, this situation might have continued even longer.

Further, after Wright was committed to  DOC to serve his sentence, the case management and records office staff repeatedly failed to properly handle his case, including not identifying that there were no proper commitment papers (formal judgment and commitment orders), sentence computation (DOC's Face Sheet No.2) or other important documents (recent Pre or Post-Sentence Reports) available to manage his case.  Some of these failures resulted from a lack of DOC management oversight or internal controls, as reported in Chapter 3.

The escorted funeral trip of Leo Gonzales Wright in July 1997 did not constitute a release from custody and was within the authority, policy and normal practice of the DOC, however flawed those policies and practices may have been.  However, the decision to approve the trip by a newly appointed  warden on the basis of only two pages of summarized data was unwise and, unbeknownst to the warden, based on totally inaccurate and incomplete information, due partly to the very incomplete nature of Wright's official prison record and partly to shoddy work by subordinate staff who failed to accurately brief the warden.  The Review Team agrees with the D.C. Inspector General's June 1999 conclusion that "Record-keeping and inadequate case management and analysis led to the authorization of a sympathetic visit outside the prison facility by Leo Gonzales Wright."
Finally, once it was brought to their attention in January 1999 that Wright was

inappropriately held at Lorton, the federal apparatus did not move expeditiously in effecting his transfer from Lorton to federal custody, which finally occurred in May 1999.

## A.  Sentencing Issues

### 1.  Initial D.C. Superior Court Jurisdiction Over Leo Gonzales Wright

From the beginning of Leo Gonzales Wright's current period of confinement and even after he was indicted in Federal Court, his two earlier open D.C. Superior Court felony cases resulted in him being treated primarily as a local D.C. Code defendant.

The unique system in the District of Columbia, allowing local crimes and even local indictments to be processed by the Federal Court, appears to have contributed to later confusion by several components of the system in the handling of this case.  See, e.g., 11 D.C. Code 502 and Rule 6 of the D.C. Rules of Criminal Procedure.  The Federal District Court for the District of Columbia has jurisdiction to dispose of all Federal and District of Columbia charges brought to it by the Office of the United States Attorney when all the U.S. Code and District of Columbia Code charges are properly joined for trial 23 D.C. Code  311(b).  Only when all the charges cannot be joined for trial, must the D.C. Code offenses be referred by the U.S. District Court to the D.C. Superior Court for disposition 11 D.C. Code 502, and  United States v. Kember, 648 F.2d 1354, 1358-1359 (D.C. Cir. 1980).

After committing two similar armed carjackings in the District of Columbia on December 12, 1995 (of  Kristina Keyes using a butcher knife) and on December 16, 1995 (of Bettina Pruckmayr resulting in her murder, using a butcher knife ), Leo Gonzales Wright was arrested by D.C. Metropolitan Police Officers after a high speed chase on December 25, 1995.  Seven days earlier, on December 18, the United States Attorney's Office had sought and obtained a D.C. Superior Court arrest warrant for him from Superior Court Judge Judith Bartnoff for the crime of Felony Murder While Armed, a first degree murder charge that was punishable by a "life without parole" sentence, in violation of 22 D.C. Code 2401 & 3202.  The MPD 163 form reflects that Wright was booked on that charge, Felony Murder while Armed, pursuant to the arrest warrant (No. 1601-95) and on an outstanding Parole Violator warrant.  On December 19, the United States Attorney's Office returned to Superior Court Judge Bartnoff and she authorized two search warrants which the D.C. Metropolitan Police Department executed at locations where Wright was known to reside.

After his arrest on Christmas day, Wright had an initial hearing the next day in Superior Court before Commissioner Morton Berg of the Criminal Division of the Superior Court of the District of Columbia.  At the hearing on December 26, Commissioner Berg issued a "Commitment Pending Disposition" under the authority of the Chief Judge of the Superior

The Leo Gonzales Wright Case Since December 1995

Court committing Wright to the custody of the "Superintendent, District of Columbia Jail." Wright was charged with "Felony Murder While Armed" in Superior Court Case No. F10757-95. An attorney from the local Public Defender's Office was appointed to defend him, and Wright was ordered held on "NO BOND."

Thereafter, on January 2, 1996, the United States Attorney's Office obtained a Superior Court Grand Jury Section Directive ordering Wright to appear in a lineup at the Metropolitan Police Department which, after several delays, occurred on January 18. In the interim, several other Superior Court Grand Jury Subpoenas in this case, No. F10757-95, were obtained by the United States Attorney's Office. Finally, a Superior Court Subpoena was issued on January 18 for a D.C. medical examiner to be present at a Probable Cause hearing in case F10757-95 in the Superior Court Criminal Division Felony Branch that was held on January 19, 1999, before D.C. Superior Court Judge Susan Winfield. After that hearing, Superior Court Judge Winfield found that there was probable cause to charge Wright and to continue holding him without bond. (See, page 113 of that hearing transcript.) In order to assist their investigation of the case, the Assistant United States Attorney at the hearing then asked Judge Winfield for and was granted three separate Superior Court Criminal Division Felony Branch orders compelling Wright to provide the prosecution with: (1) blood, saliva and hair samples; (2) handwriting exemplars; and (3) additional photographs and videotaped samples.

## 2.  Confusion Over Wright's Parole Violator Status

A December 1995 D. C. Parole Violator Warrant was issued for Wright but never executed. Three days prior to Wright's arrest on December 25, 1996, the D.C. Board of Parole on December 22, 1995, issued a Parole Violator Warrant for Wright. The Board of Parole's separate STATEMENT OF ALLEGED PAROLE VIOLATIONS issued the same day listed six grounds for their warrant. The grounds included the fact that Wright was wanted by the F.B.I. and Metropolitan Police Department for a robbery and murder that occurred on December 16, 1995 [the Pruckmayr murder]; for allegedly possessing a knife at that time; for failing to meet with his parole officer on October 4, 1995; for testing positive for cocaine and opiates on August 7, 1995; and for selling cocaine and being charged with possession with intent to distribute the cocaine on June 28, 1995, in D.C. Superior Court Case No. F-5176-95.

The Parole Violator Warrant stated on its face that if another criminal warrant was issued or if the parolee was in custody, then the Parole Violator Warrant should not be executed. Accordingly, although the Parole Violator Warrant was listed as one possible reason for Wright's arrest on MPD's December 25, 1995 PD163 arrest report, the Parole Violator Warrant was not executed but instead filed as a detainer. The warrant stated on its face that Wright had last been reinstated to parole on July 28, 1995 from the D.C. Jail. This is more fully described in the Inspector General's January 25, 1999 Report at pp.32-34. The warrant listed the "SUBJECT'S LOCATION" as "At large", but a copy of the warrant in

The Leo Gonzales Wright Case Since December 1995

DOC's  file was later amended by hand to note that he was confined at "CDF," (i.e., the Central Detention Facility or D.C. Jail).

## 3. Confusion Over Wright's Detention Status After Arrest

Wright's pretrial detention status after arrest as a local, not Federal, prisoner until both of his two pending Superior Court felony cases were closed contributed to confusion in the subsequent handling of his case.

From the time of Wright's arrest in December 1995 until after all D.C. Code charges were adjudicated or dismissed in late September 1996, Wright was properly held in detention at the D.C. Jail as a local, not a Federal, prisoner because his earlier local drug and felony murder and armed cases still were  pending.  He was arrested, charged and detained on a first degree murder D.C. Code violation pursuant to official Superior Court orders, giving the local authorities primary jurisdiction.  Because it is correct and routine practice both in  the  District  and  throughout  the  country  that  the  jurisdiction  having  initial  custody maintains its "primary jurisdiction" until all of its charges are resolved, Wright remained a local prisoner for several weeks after his sentence was imposed in Federal Court. Unfortunately, Wright's status as a legitimate local D.C. pretrial detainee played a role in compounding the confused processing of his case by authorities after his sentencing.

Soon after Wright's arrest, D.C. Jail intake forms were completed on December 27, 1995, showing that he was taken before a D.C. Jail Orientation Officer. The forms reflect that he identified two separatees and was initially placed in protective custody because of the "nature of the crime and media attention."  This latter notation was not permanently highlighted and not taken into consideration in his later handling by case management and prison administration staff.

An undated D.C. Jail Face Sheet Number 1 (see Appendix 7a) in Wright's file, a critical document in the handling of a prisoner by authorities, correctly reflects all of the above data and notes the lodging of the December 22, 1995  Parole Warrant as a detainer (although the date  is incorrectly recorded as "12/22/96").  This Face Sheet Number 1 also documents Wright's status as a certified narcotics user, as a frequent user of alcohol, and under "Prisoner Type," that he was detained as a D.C. prisoner -- not as a Federal prisoner.  Although this Face Sheet Number 1 was amended some time later to show that on  September  9,  1996    Wright  received  a  life  sentence  for  "Motor  Vehicle  Theft Carjacking" in "Case No. 96-66," Wright's listed status as a D.C. prisoner -- and not a Federal prisoner -- remained unchanged and the "96-66" federal case number did not, by itself, specifically indicate or denote that the substance of his pending Superior Court cases had been disposed of in Federal Court.

Wright's DOC file next reflects that on January 4, 1996, at his D.C. Jail initial housing review, he was correctly described as "involved in the murder of the lawyer at the ATM

machine."  Wright waived protective custody because he "did not fear for his safety" and he was authorized for release to general population at the D.C. Jail.

On March 7, 1996, a six-count indictment, No. 96-66, was filed in Federal District Court against Wright, after all the Superior Court pretrial proceedings noted above were conducted.  The first count of the Federal indictment charged Wright with the same Pruckmayr carjacking resulting in death, but now under 18 U.S.C. 2119(3), a federal crime punishable by the death penalty.  The second count of the Federal indictment continued to charge the original D.C. Code violation but in the form of a charge of First Degree Premeditated Murder While Armed.  The next two counts charged two more alternate theories of the same murder under the identical D.C. Code sections, but as First Degree Felony Murder While Armed (as occurring in the course of two additional felonies, i.e., armed robbery and then armed kidnaping).  The final two counts charged Wright with the armed robbery and armed kidnaping of Ms. Pruckmayr on the same occasion.

After the return of the indictment in Federal Court, U.S. Magistrate Judge Patrick J. Attridge issued a federal bench warrant for Wright's arrest, because Wright was not yet in Federal custody for this crime.  On March 13, 1996, the U.S. Marshals Service obtained Wright  from the D.C. Jail, where he was being held in local custody, and brought him to the Federal Court.  Both the docket sheet in No. 96-66 and the return on the March 7 Federal warrant reflect that Wright was "arrested" that day, March 13, on the federal bench warrant.  He was arraigned, assigned new counsel, pled "not guilty" to all six counts, and ordered to be held without bond on the Federal charges.  He was thereafter ordered committed pending trial  and a temporary one page Federal commitment document (known to DOC's record office as a "Blue Sheet") issued.

This March 13, 1996 Federal Court commitment or Blue Sheet, transported to DOC with the prisoner, listed the only offense(s) charged as "first degree premeditated murder while armed."  Next to the entry for a Criminal Code violation, it had several typed strikeovers and then showed sections 2401 and 3202, both D.C. Code violations (see Appendix 7b).  The commitment form, which is formally entitled "Commitment to Bureau of Prisons", is addressed by the Clerk of the District Court on behalf of the District Court to the "Attorney General of the U.S. and Director, Bureau of Prisons" and states:

> "The Court has ordered that the above named defendant be committed to the Bureau of Prisons; therefore receive into your custody the body of said defendant and safely keep [him or her] in your custody until further order, and this shall be your sufficient warrant."

Despite the Blue Sheet's boilerplate language,  it was and is regular practice for the USMS for the Federal Court in the District of Columbia to obey this order -- instructing the Director of the Bureau of Prisons to commit this prisoner to the custody of the Bureau of Prisons -- by returning the prisoner back to the temporary daily custody of the D.C. Jail.

The Leo Gonzales Wright Case Since December 1995

The "Blue Sheet" does not result in physical custody by the Bureau of Prisons regardless of whether the Blue Sheet is issued in a dual code case or a purely Federal case, or whether the prisoner was solely in Federal custody or temporarily borrowed from a local custodian.

In Wright's cases, the "Blue Sheet" was lodged as a detainer with DOC by the USMS, because they were not the initial arresting authority but had removed Wright for his Federal Court appearance from D.C. Jail authorities. Thus, Wright was returned to the custodial authorities from whom he had been borrowed. DOC, not the USMS, continued to pay for each ensuing day of Wright's stay at the D.C. Jail because of Wright's earlier and still outstanding Superior Court commitment for a D.C. Code "Felony Murder While Armed" in the pending Superior Court case No. F10757-95. Similar District Court Blue Sheets were issued and lodged as updated Federal detainers with DOC on each subsequent occasion when Wright was taken to and returned from Federal Court -- April 19, 1996, June 21, 1996, July 18, 1996, and September 9, 1996. Since Superior Court case No. F10757-95 was pending until September 20, 1996, DOC continued to pay for every day of Wright's pretrial incarceration at the D.C. Jail, without the reimbursement that is statutorily due for pretrial detainees held there as Federal prisoners under 24 D.C. Code 421 and 446.

Even after Wright's Federal Court arraignment on March 13, 1996, D.C. Superior Court Grand Jury subpoenas were issued in connection with his carjacking behavior, albeit of Ms. Keyes on December 12, 1995. Thus, even after his Federal indictment, the prosecutor, as he was entitled to do, continued to proceed against Leo Gonzales Wright for his carjacking course of conduct utilizing both the Federal and local D.C. court mechanisms.

In summary, during the entire period of Wright's detention prior to the final disposition of all the charges on September 9, 1996, the USMS and DOC correctly treated Wright as a Superior Court prisoner.

Wright's continuing status as a Superior Court prisoner until well after his Federal sentencing on September 9, 1996 played a role in the handling of him later. It is less likely that Wright would have been "administratively lost" in the correctional system, if he had become solely a Federal detainee after sentencing and the USMS was responsible for paying his daily custody charges to DOC. The costs charged to the USMS for daily local incarceration during any delay and critical need for bed space to accommodate other Federal detainees in the D.C. Jail would have motivated the USMS to focus on moving Wright and the necessary paperwork to BOP, as soon after sentencing as possible.

## 4. Wright's Plea in Federal Court to All Related U.S. and D.C. Code Charges

In anticipation of Wright's appearance and plea on September 9, 1996, the prosecutor filed several submissions with the Federal District Court on September 5 and 6, 1996, including a letter signed by the prosecutors and Wright that constituted a proposed sentence

The Leo Gonzales Wright Case Since December 1995

bargain. One of the terms of that letter bargain (at Para.1, p.2) was that the "multiple [four] homicide-related counts in the indictment all merge for purposes of sentencing" since they "simply reflect different legal theories under which Mr. Wright may be charged for … one homicide." Other agreed upon terms were that:

> under 18 U.S.C. 3013(a)(2)(A), a fifty dollar assessment was required to be imposed on the only federal charge, Count One (Para. 3, p.2);

> the "Armed Carjacking charge in the Kristina Keyes case carries … a maximum sentence of not more than 45 years" (Para. 4, p.2);

> "the appropriate sentence in this matter is life in federal prison without the possibility of parole" (Para. 4, p.2 & para. 7, p.3); and

> "Leo Gonzales Wright specifically agreed that he will not seek early release from prison at any time during the tenure of his sentence" pursuant to the compassionate release provisions of 18 U.S.C. 3582(c).

A document filed by the prosecutor the next day for the Court reproduced the text of 18 U.S.C. 3582(c) and attached both an excerpt from the Prosecutor's Guide to the Bureau of Prisons interpreting that statute and notes of two telephone conversations with BOP representatives about the statute.

On September 9, 1996, there was a lengthy sentencing hearing and Wright waived indictment and a jury trial in the Keyes carjacking and a Presentence Investigation Report in both cases. Thereafter, his plea to the six count indictment for the Pruckmayr carjacking/murder case and a separate one count information for the Keyes carjacking case were accepted. By virtue of the acceptance of that plea agreement by all parties and the Court, Wright agreed in writing and orally in open court (Tr. 53) to have the U.S. District Court dispose of the seven related charges arising out of his two similar December 1995 carjackings.

## 5. Waiver of Presentence Investigation Report Contributed to Mishandling of Wright's Commitment

The District Court's sentence was rigidly prescribed as "life without parole" by this plea agreement and sentence bargain under Fed. R. Crim. P. 11(e)(1)(e) (Tr. 20), and partly on that account, all the parties waived the preparation of a Presentence Investigation Report by the U.S. Probation Service (Tr. 72, 82-84). Although in this instance a Presentence Investigation Report was not needed to assist the Court in sentencing, nevertheless as outlined in Chapters 1, 3, and 4, the Presentence Investigation Report provides a critical document for correctional administrators during the entire course of confinement of a prisoner. This report is recognized as their primary source of information for details about the offense behavior, the criminal history, and numerous other aspects of the prisoner's past life and social history. Instead, in this case, Wright's 20-year-old

The Leo Gonzales Wright Case Since December 1995

1976 Presentence Investigation Report was made available to the parties and the Court.

Ordinarily in such cases where a defendant is sentenced to a lengthy term of confinement, the Probation Service assists BOP by preparing a similar document, (i.e., an up to date Post-Sentence Report), containing all the same elements as a PSI. Unfortunately, in this case the Probation Service was not in court at sentencing nor informed of Wright's cases, so no Post-Sentence Report about Wright's 1995 personal situation or crimes was initiated by them. As it turned out, a Post-Sentence Report was not requested until February 1999 after the mishandling of Wright's cases were discovered.

## 6. The U.S. and D.C. Code Sentences Imposed

The plea agreement called for a sentence of life without parole on the sole Federal count that was charged, Count 1 of CR96-66, the carjacking resulting in death of Ms. Pruckmayr, pursuant to 18 U.S.C. 2119. This spared Wright from facing the Federal death penalty under that statute, and from facing any additional proceedings in his other pending local D.C. felony case, No. F-5176-95, charging possession with intent to distribute cocaine earlier in 1995 (Tr. 5, 7, 20, 25) . That latter crime was not related to the carjacking and therefore could not have been jointly indicted or tried with those crimes in Federal Court.

The remaining six counts that were charged were brought as D.C. Code violations, and the understanding of the parties was that all the alternate theories of Ms. Pruckmayr's murder (Counts 1-4 of CR96-66) would merge for sentencing purposes (Tr. 13). At the sentencing hearing, consecutive sentences were imposed on these four merged counts (Tr. 88). Merging four consecutive sentences was problematic, was not reflected in the judgment and commitment order on these counts, and as noted below, resulted in an appeal by Wright (see Appendices 7c. & 7d).

The remaining three non-homicide D.C. Code felonies, i.e., the armed robbery and armed kidnaping of Ms. Pruckmayr (Counts 5 and 6 of CR96-66) and the armed carjacking of Ms. Keyes (CR96-297), resulted in two additional consecutive D.C. sentences for Wright of 15 years to life on each CR96-66 offense, and a consecutive 15 to 45 year D.C. Code sentence on the CR96-297 offense [the latter of which was incorrectly recorded in the District Court Clerk's file, on the Docket Sheet and in the J&C in CR96-297 as a 15 to life D.C. Code sentence] (Tr. 88-89).

## 7. The Federal Court's Restrictions on Wright's Possible Future Release

In the course of presenting the plea agreement to the Court, the Court was advised that since Wright has serious medical problems (Tr.21-22), at some point he could potentially be a candidate for a compassionate release from his Federal sentence due to a life threatening medical condition, pursuant to a motion by the Director of the Bureau of

Prisons filed in the sentencing court under 18 U.S.C. 3582(c)(1)(A)(i). In response to the Court's concern about a compassionate release, the prosecutor stated that such a release could potentially occur solely at the initiative of the Director of the Bureau of Prisons, even if the inmate did not initiate the request. But see, 28 C.F.R. 571.64 (Director of the Bureau of Prisons has no authority to initiate a request under 18 U.S.C. 3582(c)(1)(A) on behalf of D.C. Code offenders). This was the same subject about which the Court received a special pleading from the prosecutor on September 6, 1996, noted above.

Since the parties agreed and the Court twice stated that they all expected Wright to spend the rest of his life in prison under the lengthy "sentence bargain" memorialized in a letter signed by all the parties (Tr. 32, 82, 87, 89), the Court then asked Government counsel if any such a motion for release [if ever initiated by the BOP Director] would have to be made to it, the sentencing court (Tr. 23). Government counsel stated that it would be but nonetheless advised the Court that the sentencing order could specifically "direct the Bureau of Prisons to direct any motions by the Director to this Court." (Tr. 24). After making sure that Wright understood the Court's intent, the Court adopted that suggestion (Tr. 24-25) and reiterated at the conclusion of the proceeding:

> "It's my intent, sir, that you never be released into society again. You will die in jail. This Court will do everything within its power to ensure that you are housed in a facility that will ensure that you will never walk the streets of this country or any other place again. This Court has retained jurisdiction over this case. Any requests by the Bureau of Prisons to have you released will be entertained by me, by no one else, and I can assure you, sir, that I will not be favorably disposed to release you from jail for any reason." (Tr. 87).

In conformance with these statements, the formal Judgment and Commitment order in each case provided, "Any Motion for release of Defendant must be filed with this Court."

## 8. Clear Intent of the Court Not Adequately Memorialized

The clear judicial intent as to the recommended place of imprisonment of Wright was undermined by the use of routine language in the J&C and by the apparent failure to deliver a J&C to DOC for 19 months.

In the course of the sentencing hearing, the parties and the Court all agreed that Wright would receive a sentence of "life in Federal prison" (Tr. 18, 21) and would "never be released from a Federal institution" (Tr. 16). Unfortunately, this expectation about incarceration in a Federal rather than a District facility was incorrectly assumed to ordinarily follow even though Wright was a dual code offender. Therefore, the recommendation was not explicitly incorporated into either of the official judgment and commitment orders, as recommended in the relevant statutes, regulations and BOP Judicial and Prosecutor's Guides described above in Chapter 1. When this specific recommendation was finally communicated to BOP in 1999 and the supporting paperwork transmitted, BOP honored the Court's wishes when it designated the inmate.

The Leo Gonzales Wright Case Since December 1995

Nonetheless, the Court's J&C in both cases, 96-66 and 96-297, did not raise any evident flag by making a special recommendation, but rather only used the standard language that is required by both 18 U.S.C. 3621(a) [for the federal offense] and 24 D.C. Code 425 [for the D.C. Code offenses]. This is the same boilerplate language used in judgment and commitment orders in the 50,000 other cases referred to BOP custody that year. The judgments ordered the defendant "committed to the custody of the United States Bureau of Prisons."[1]

The prosecutor told the Review Team that he had never moved to officially terminate the original D.C. Superior Court Felony Murder While Armed case against Wright but that it was terminated after nine months by operation of law, i.e. pursuant to Superior Court Criminal Rule 48(c). In fact, on September 20, 1996, a Superior Court order was issued informing the Superintendent of the D.C. Jail to release Wright on the initial local felony murder charge upon which Wright had been remanded to the local system on December 26, 1995, i.e. No. F10757-95. Pursuant to that order, Wright was ordered released "In this case only." He continued to be held locally, however, on his other outstanding D.C. Code drug felony which charged Wright with Possession With Intent to Distribute Cocaine in Case No. F5176-95. Although this charge was to be dismissed as part of his plea bargain, action to dismiss it was not taken at that time. Subsequently on September 26, 1996, a Superior Court order was issued informing the Superintendent of the D.C. Jail that Wright was released "In this case [F5176-95] only."

By the time that the September 26, 1996 order was received, the local D.C. Department of Corrections officials already possessed two new temporary Federal court "Blue Sheet" commitment orders dated September 9, 1996, resulting from the Federal Court plea and sentencing (see Appendices 7e. & 7f). Each of these new one page orders for temporary custody stated that the defendant had been convicted and sentenced to the same sentence, i.e. "life", committed to the Bureau of Prisons, and should be "receive[d] into your custody" and kept safely "until further order." In the ordinary course, these two updated temporary Federal commitment orders in Wright's case should have been filed as detainers upon receipt, and resulted in notification to the USMS once all the local holds on Wright were removed. The record available reflects several possible reasons why that notification by DOC to the USMS did not occur shortly after September 26, 1996 when the second of Wright's two local felony cases was finally closed. First, there was still an earlier pending local (D.C. Parole Violator Warrant) filed as a detainer against Wright that indicated that Wright still owed more than 41 years of jail time on his earlier D.C. sentence. For its part, the USMS had no way of knowing that this warrant was not being executed.

---

[1] As explained in Chapter 1, BOP routinely exercises its authority to place offenders committed to its custody into non-Federal facilities, be they operated by state, local, private or District authorities. In addition to those in DOC custody, there are over 16,000 Federal prisoners detained each day in non-Federal facilities.

The Leo Gonzales Wright Case Since December 1995

Second, it is memorialized in several DOC documents that DOC incorrectly understood that although Wright was sentenced on the Federal case, he was convicted but still awaiting final imposition of sentence on his D.C. charges from Superior Court.  As we detail below, Wright's attorney successfully challenged the D.C. Code sentences as they were imposed in the Federal J&C.  That appeal resulted in all parties agreeing to a modification of the sentences on the D.C. Code murder charges in Wright's Federal J&C.  In hindsight, it now appears likely that the pendency of this sentencing appeal on Wright's D.C. Code murder charges was misunderstood by DOC officials who did not possess, and therefore could not cross-check this information with, an official J&C.  The DOC's records notation on June 10, 1996, was: "Inmate received a life [S]entence for Armed Carjacking (Federal) and is convicted but unsentenced for Felony Murder w/Armed (Superior Court)." As detailed above, Wright's Felony Murder while Armed convictions under the D.C. Code did in fact originate from  the Superior Court.  Unfortunately, other important details that might have been deduced from the Federal Court "Blue Sheets" filed with DOC were apparently omitted, such as that the D.C. Code charges were ultimately reduced to convictions in Federal Court (because this was a dual code case) and that Wright's sentence, though concededly defective by all parties and at that time awaiting formal correction, nonetheless had been imposed.

Third, the Review Team could find no evidence that either the official Federal Court J&C or the two Federal Court orders amending it were ever transmitted to or received by DOC.  The two temporary Blue Sheet commitment orders that were transmitted to and received by DOC were flawed, which may have contributed to DOC's incomplete understanding of Wright's status.

The two interim September 9, 1996 commitment Blue Sheet documents completed at sentencing and delivered to the USMS and DOC portray Wright as sentenced under a D.C. Code violation and a Federal violation.  Neither gives a clear indication that he should be specially handled only in a Federal facility, nor do they explicitly authorize the custodian to transfer the prisoner out of DOC.  One of these two interim Blue Sheet commitment orders, in Criminal No.96-297, described the offense of conviction as armed carjacking under 22 D.C. Code 2903(b).  This might have produced confusion as it described a different offense than the Felony Murder While Armed offense for which the Wright had been held without bond in local case No. F10757-95, which then remained outstanding as a Superior court matter (until September 20), and as to which Wright had already earned nearly ten months of pretrial jail credit.  As with both the official J&C in Case 96-297 noted above and with the sentencing entry on the Federal Court docket sheet, the life sentence indicated on this Federal Court D.C. Code Blue Sheet commitment order was technically erroneous and should have been recorded as 15 to 45 years.[2]   Instead, the Blue Sheet

---

[2]Treatment of a 45 year D.C. Code sentence is similar to treatment of a D.C. life sentence except that educational good time earned by an inmate can be subtracted from the minimum term of the 45 year sentence.  As a practical matter, given all of Wright's consecutive sentences and barring certain extraordinary and improbable events (such as pardons and commutations), it is unlikely that Wright will ever start serving his 45 year consecutive sentence imposed in CR96-297.

The Leo Gonzales Wright Case Since December 1995

in Case No. 96-297 states only that a "life" sentence was imposed for 22 D.C. Code 2903(b), ARMED CARJACKING. The consecutive nature of this sentence to any other sentence being served is not mentioned, nor is it identified as the same or a different carjacking from Superior Court Case No. F-10757-95.

The other Blue Sheet commitment document, in Case 96-66, stated that it was also for carjacking but under "18 U.S.C. 2119, CARJACKING." Murder, "life without parole",or imprisonment in a federal facility is not mentioned.

In addition to the minimal and ambiguous documentary record noted above, the Federal Court docket sheet in the dual code Wright case, No. 96-66, reflects, erroneously at p.1, that a disposition of "LIFE without the benefit of parole" was imposed on all six counts of Indictment No. 96-66. Such a sentence was never uttered by any party, nor could it ever be authorized on Counts 5 and 6.[3]

Finally, on September 9, the Sentencing Court ordered Wright released to the custody of a MPD Detective for "routine processing", i.e., booking, fingerprinting, and photographing in this case upon "a representation by the United States that the defendant has never been the subject of routine processing in this case." The Court's order shows that it was ordered in Case No. 96-66 (the Pruckmayr carjacking murder) and it appears on the docket sheet in that case, although the Review Team was informed that the prosecutor believed that this order related solely to Case No. 96-297 (the Kristina Keyes case).

This last order, on a U.S. Attorney provided form, combined with the prior orders, illustrate how unusual a dual code case can get. Wright was in fact booked and then specifically ordered fingerprinted and photographed at the U.S. Attorney's request by a D.C. Superior Court judge. Yet nine months later, all that processing was requested again from this Federal sentencing judge, as "never" having been done before, because Wright was only just now approaching (i.e., after the last local felony charge was dismissed almost three weeks later) the threshold of entering Federal custody, assuming that all the other court records were in good order and his custodian was so informed.

---

[3]That same docket sheet in No. 96-66 also incorrectly states that in document numbered 42 on 7/23/99, Judge Sullivan ordered "as to LEO GONZALES WRIGHT: That defendant be placed in a halfway house." That Court order referenced another defendant in an unrelated case, Nicholas Bush, and is mistakenly summarized as applicable to Wright on the 96-66 docket sheet.

The Leo Gonzales Wright Case Since December 1995

## 9.  Wright's Appeal to Correct Erroneous J&Cs Clarified Commitment Status

After the judgment was issued,  Wright's attorney  filed a notice dated September 18, 1996 that he was appealing from the sentence imposed in Case No. 96-66.  The case was transmitted to the U.S.Court of Appeals on September 26,1996.  Four days later, the District Court issued its first Amended Judgment and Commitment which vacated the $50 Federal assessments that it had imposed (contrary to both law and the plea agreement) on the local D.C. Counts contained in Counts 2 through 6.

On January 30, 1997, Wright's counsel wrote the sentencing court, with the agreement of the government, and requested, instead of proceeding with Wright's pending appeal, No. 96-3112, that the first four counts of the judgment and commitment order in CR96-66 be amended by the District Court to reflect the plea agreement and the merger of those four murder counts ordered during the plea proceeding, because the sentences on those counts had been imposed consecutively by the Court.  After the District Court forwarded this letter and its own cover letter to the Court of Appeals, the case was remanded back to the District Court on February 21, 1997.  Thereafter, on March 20, 1997, the District Court entered a second order amending the original J&C in CR96-66 which ordered that the sentences on the four merged counts, the Federal carjacking count (Counts 1) and the three D.C. first degree murder counts (Counts 2 through 4), "are to run concurrently"[4] (see Appendix 7g).

## 10.  J&Cs Not Delivered to DOC For 19 Months

Even though the J&Cs were received from the Clerk's Office and signed for by the USMS on September 13, 1996, there is no evidence that either of these J&Cs were forwarded to or received by DOC from the USMS before March 1998.  DOC repeatedly sought the J&Cs from the District Court Clerk's Office (on April 15, 1998 and April 24, 1998) and finally obtained copies of the two J&Cs by April 27,1999.  Unfortunately, it appears that even at that time, only the uncorrected September 9, 1996 versions of the two J&Cs, were received by DOC from the Federal District Court Clerk's Office.  Indeed, the USMS only delivered those erroneous versions of the J&Cs to the BOP in early 1999 when this case was brought to their attention and which formed the basis of their originally inaccurate sentence computation.

In addition to the two corrections to the J&Cs mentioned above, to date the J&C in No. 96-

---

[4]Though of little practical significance in the context of the sentences imposed on Wright, this latter sentence correction jointly agreed to by the parties is of questionable sufficiency as to Counts 2-4. See, Byrd v. United States, App. D. C., 510 A.2d 1035 (1986) (for a single murder, concurrent sentences may not be imposed for alternate theories of murder); Catlett v. United States, App. D.C., 545 A.2d 1202 (1988), cert. denied, 488 U.S. 1017 (1989)(same); Mitchell v. United States, App. D.C., 629 A2d 10 (1993), cert. denied, 510 U.S. 1138 (1994)(same).  But as to Count 1, compare, United States v. Rivera-Gomez, 67 F.3d 993, 1000 (1st Cir. 1995) (murder is not a lesser included offense of carjacking resulting in death under 18 U.S.C. 2119, so that charge need not have been ordered merged).

66 has not been amended to reflect the specific recommendation of the District Court for incarceration in a BOP run facility, and the J&C in No. 96-297 has not been corrected to reflect that the Court's oral sentence was to the statutory maximum of 45 years, not to life imprisonment.

Again, the errors in and problems with the normally routine handling of the judgement and commitment documents appear to result in large part from the unique situations presented by dual code cases, particularly to Federal Court staff not familiar with D.C. practice. This lack of familiarity may have contributed to the faulty processing of this case.

## B. **DOC's Post-September 9, 1996 Treatment of Wright**

## 1. Wright's Next Ten Months in DOC Custody

DOC records reflect that Wright remained at the Central Detention Facility and compiled an extensive medical record until he was transported on June 10, 1997 to the Occoquan Facility at Lorton. On numerous occasions while at the D.C. Jail, he either failed to show up for a scheduled medical appointment or refused the treatment offered.

A June 10, 1997 commitment to the special Adjustment Unit at Occoquan describes Wright as having been received that day from "Intake D.C. Jail." Both the June 10 Adjustment Unit memo and another June 11, 1997 Occoquan memo state that Wright's institutional jacket reflected that Wright had received a life sentence for a charge of "Armed Carjacking (Federal)", and was convicted but not yet sentenced for a charge of "Felony Murder while Armed (Superior Court)." Due to his life sentence and the presence of one of Wright's separatees at Occoquan, these Occoquan officials recommended transfer to the Maximum Facility. In the interim, Wright was held in the special Adjustment Unit at Occoquan. The current DOC Chief of Case Management confirmed for the Review Team that these Occoquan documents reflect that Wright was being treated as a partly unsentenced prisoner since prior to June 10, 1997, Wright's housing status never progressed beyond the D.C. Jail Intake Unit. Even after that date (apparently due to a lack of space at the D.C. Jail), Wright was transferred to similar intake overflow space at Occoquan. On Wright's June 10, 1997, protective custody waiver form, his Occoquan case manager wrote: "Need review of record." This form notes that it was to be distributed to the Control Center, the Institutional Major, and the Case Manager's Folder. Unfortunately, that prophetic notation -- that a review of Wright's record was needed at that time -- was apparently never carried out.

The transportation records reflect that on July 10, 1997, Wright was moved to the Maximum Facility at Lorton. Shortly thereafter, on July 15, 1997, Wright signed forms attesting that he had completed the orientation process at the Maximum Facility and had

The Leo Gonzales Wright Case Since December 1995

been informed, inter alia, of his program prescription, special transfer requirements and reclassification date. His DOC case manager was the witness to Wright's completed form by which he waived placement in protective custody. The same case manager participated on July 15, 1997, as a member of the three person initial Housing Review Board which gave Wright an in-person hearing.

The July 15 record of Wright's Housing Review Board reflected that he was received from Occoquan on July 10 (and then placed in protective custody at the Maximum Facility "per sentence of Life Without Parole") and that there were two named inmates from whom he needed to be separated at Occoquan and another at the Jail. As to his legal status, Wright was identified as a sentenced adult felon whose sentence was "LIFE WITHOUT PAROLE" for Motor Vehicle Theft Conspiracy and "HWOB(96-66)", i.e., held without bond in case number 96-66. His PED (Parole Eligibility Date) was listed as "LIFE"; his STD (Short Term Date to complete his sentence) was listed as "LIFE" and no custody classification or Bond status was listed, but instead a line was drawn through those spaces on the form. His escape history was described as "NO" and for "Detainer(s)" the entry correctly read "D.C. Parole warrant dated 12-22-95 Not executed." The Board recommended Cellblock 2 or 4 and another review in 30 days. The form was signed on July 15, 1997, by three Housing Board Members and a DOC Administrator.

The processing noted above reflects the inadequate flow of information to the effected DOC officials, i.e., no judgment and commitment orders, no presentence investigation report, no initial classification study, and no DOC Face Sheet No.2. Moreover, even when the missing information was identified, the serious deficiencies of the case management and internal controls systems then in use at DOC did not automatically intervene to remedy those critical deficiencies, or precipitate the needed "review of [Wright's] record."

## 2. Wright's Brief Escorted Funeral Home Trip

On July 31, 1997, Wright's DOC caseworker prepared a one page summary of his status in connection with a proposed escorted trip to view the remains of his deceased mother. The caseworker also attached a one page DOC Custody Review form which she scored that same day. Neither form was correctly completed.

The summary of Wright's status listed his offenses as Armed Robbery, Murder II, and Armed Carjacking as the "Life Without parole Offense(s)" he had committed. It then listed his PED as "HWOB (96) Life", his MRD (mandatory release date) as "3/27/2016" and his FTD (full term date) as "7/28/2036." When the Review Team later showed Wright's former caseworker that these latter dates were the same as those on Wright's old outdated Face Sheet No. 2 for his 1976 murder II conviction, she could not specifically recall if that is where she got this information but agreed that it was the likely source. She could not recall or explain why her form did not reflect the contents of the July 15, 1997 Housing Board Initial Hearing in which she participated that listed LIFE for all Wright's release dates. She also could not recall or explain why she omitted Wright's 1996 First Degree

The Leo Gonzales Wright Case Since December 1995

Murder conviction of "Felony Murder While Armed," previously described in the June 11 Occoquan memorandum (see Appendix 7h).

Wright's caseworker attached a Custody Review form to the Escorted Trip summary that she completed the same day, July 31, 1997. She told the Review Team that such a form could not be completed without a Judgment and Commitment order and a completed DOC Face Sheet No. 2 in order to be sure that the initial offense was correct. Nonetheless she proceeded without those documents in 1997 and scored Wright for a "High" offense at 3 points, and with the maximum time to release. This was also consistent with Wright's Face Sheet No. 2 for his 1976 offense (see Appendix 7i). Wright should have received, but did not receive, 4 points for a "Highest" offense and another 4 points for having a current felony detainer, which was identified on the July 15 Housing Record that the same caseworker signed. While correct scores would not have increased the severity of Wright's overall custody level from Medium, it would have alerted those reviewing the form to his "highest severity" offenses.[5]

Wright's caseworker, who stated that she had responsibility for about 100 inmates in the Maximum Facility at that time, also stated that if she discovered that a Face Sheet No.2 and a Judgment and Commitment order were not in a case file, it was her job to request them. She cannot recall if she did so or explain why there is no record of any such attempt by her to do so in Wright's file.

The Escorted Trip form also recommended that Wright needed full restraints, that the appropriateness of the trip had been confirmed with the Funeral Home Director, and that Wright depart the prison at 6:30 a.m., presumably before normal business hours. Wright's caseworker recommended the trip, as did the Chief Case Manager and the Major for Operations (who at that time was also the Acting Deputy Warden for Operations). All three of these individuals had acted upon Wright's initial housing review two weeks earlier which reflected that he was sent to the Maximum Facility from Occoquan specifically because of his lengthy "life without parole" sentence. Moreover, neither the paperwork nor any of these officials advised the Warden that a June 11, 1997 Occoquan R&D memo in Wright's file noted that Wright had recently been convicted of Felony Murder while Armed (Murder I), regardless of whether they were misled by the file and believed that Wright was not yet sentenced and still being held without bond (HWOB) for that crime.

---

[5]If, as we noted above in Chapter 3, DOC had utilized an updated and less dysfunctional inmate security classification instrument, Wright would likely have had a higher security status. For example, under a proper application of BOP's classification instrument, Wright would have been classified as a high security inmate. Indeed, when Wright was rescored on November 12, 1998 by Virginia Department of Corrections officials on Virginia's classification instrument for possible incarceration in a Virginia institution, he was rated as close custody, or high-medium.

The Leo Gonzales Wright Case Since December 1995

Wright's former caseworker told the Review Team that only this one page Escorted Trip form and her Custody Review form dated July 31, 1997 were ordinarily provided to the Warden for approval. The then Warden, who had entered on duty at the Maximum Facility only days before this request was presented to him, also could not recall any details of this particular trip. He indicated that he did not recall ever getting more than a brief summary package for escorted trip requests, or contacting anyone above him in the chain of command for advice before approving these requests.

On July 31, 1997, the Warden at the Maximum Facility approved and signed Wright's unanimous Escorted Trip recommendation, and forwarded it to the Transportation Unit Administrator for execution. On the same day, the Warden at Occoquan approved an almost identical request by another medium security inmate convicted of felony murder and sentenced to life imprisonment, Edward Williams, to view the remains of Leo Gonzales Wright's mother because she had also been his legal guardian (see Appendix 7j). Unbeknownst to either warden, that request was also sent to the Transportation Unit Administrator and both fully shackled inmates would ultimately be transported together to the funeral home by two armed officers, as permitted by the exception contained in Section VII.C.4 of the DOC Escorted Trip policy then in force. For security reasons, the actual transport arrangements were purposely decided at the eleventh hour by the Transportation Unit and were not circumstances over which either warden would be provided advance knowledge, or had any authority.

The exception written into DOC 's transportation policy and utilized here -- that provided for less than two correctional officers to escort each heavily sentenced, albeit shackled, inmate -- permits a potentially dangerous and poor practice. The Review Team assumes that the exception was intended to be applied to less dangerous medium custody inmates, not, as here, two inmates convicted of murder and serving life sentences. To address this problem, DOC forms provided to the wardens who are responsible for approving these trips should be recrafted to solicit the warden's input, if not to allow an outright veto, over the prospect of any such joint escorted trip.

As it turned out, Wright's escorted trip resulted in a brief 5 minute funeral home visit on August 1, 1997, at a time when the D.C. Warrant Squad had been previously alerted and, as a precautionary measure, had posted additional law enforcement officers at the funeral home. The brief funeral visit was concluded without incident nearly two hours before the regular family visit was scheduled to begin.[6]

---

[6]Our review of Wright's file showed that he was authorized by other DOC officials for brief escorted trips to see his mother who was in critical condition in a hospital  intensive care unit in 1991, and to see the remains of his deceased brother at a funeral home in 1981, both of which occurred when he had more contemporaneous records of  disciplinary violations. Both of those visits were apparently concluded without incident.

The Leo Gonzales Wright Case Since December 1995

The DOC records of Wright's next six periodic Housing Board reviews at the Maximum Facility conducted between mid April 1998 through January 1999 reflect that Wright remained free of disciplinary infractions the entire time he was at the Maximum Facility.

At about the same time as Wright's April 1998 Housing Board review, the Legal Instruments Examiner at the Maximum Facility wrote the Federal District Court Clerk's Office on April 15, 1998, for a copy of Wright's J&Cs.  The letter noted that the Commitment Orders on file at the Maximum Facility's Records Office at that time reflected:

> "1) Criminal No. 96-297 - OFFENSE.  Armed Carjacking - CODE VIOLATION.  22 D .C. Code 2903 (b)
>
> 2) Criminal No. 96-66 - OFFENSE. First Degree Premeditated Murder while Armed ( Counts 1 thru 6)  - CODE VIOLATION.  22 D.C. Code 2401 & 3202 and/or 18 USC 2119"

Shortly thereafter, Wright's original September 1996 J&Cs were received, without either of the Court's orders amending those J&Cs.  The first Face Sheet No. 2 was prepared concerning Wright's 1996 convictions on April 27, 1998 and initialed by the Legal Instruments Examiner in DOC's Record Office. The typed information on it only calculated Wright's six D.C. Code sentences imposed on September 9, 1996.  A "corrected Face Sheet No. 2" dated July 21, 1998 was subsequently prepared and initialed by the same Legal Instruments Examiner and included the U.S. Code sentence for violating 18 U.S.C. 2119 (see Appendix 7k).  As it turns out, neither Face Sheet No. 2 was correct because the Court's March 20, 1997 order amending the judgment was neither incorporated into the original J&Cs nor provided by the Federal District Court Clerk's Office to DOC.

## 3.  Wright's Referral and Transfer to the Federal Bureau of Prisons

Two days after issuance of the D.C. OIG's January 25, 1999 report, the Pruckmayrs called the Federal prosecutor and asked why Wright was still at Lorton.

The prosecutor told the Review Team that in the 28 months since Wright's Federal sentencing, he had not checked on and was unaware of Wright's status or handling.  Such checking is not expected and there is no regular procedure to do so, although it does occur in some high profile cases similar to this one, as it ultimately did here.

After confirming that Wright was still in local custody, the prosecutor spoke and then wrote to a BOP official, enclosing various documents including the original plea agreement that the prosecutor believed required Wright to be incarcerated in a Federal prison.  The BOP official assured the prosecutor that all that was needed was a proper request from the USMS and then BOP would accept the inmate.  Consequently, the prosecutor wrote the District Court U.S. Marshals Office, on February 2, 1999.

Two days later, BOP received the USMS Form 129 but no accompanying Pre or Post-

The Leo Gonzales Wright Case Since December 1995

Sentence Report in connection with this offense.  Since that is a critical document in BOP's initial classification process, on February 5, 1999 BOP officials orally contacted USPO officials in D.C. requesting a Presentence Investigation Report.  This was followed up with a written request from BOP that they needed  a "Pre/Post Sentencing Report" which was faxed to the Probation Office on February 16, 1999.  The BOP form listed Wright's name, date of birth, the name of the Federal sentencing judge, and the Federal Court docket of the relevant case.  The form also states: "If no PSI is available, or your district is not responsible, please notify this office as soon as possible."   The receiving USPO clerk responded, apparently by phone, that they had no Probation Office record of Leo Gonzales Wright.  No record of this oral response was located, and an identical request was faxed to the Probation Office by the BOP on March 26, 1999, with the same result (see, e.g., Appendix 7l).  Apparently due to the large volume of PSI requests processed by the USPO, the problem identified in these repetitive requests did not get resolved until after receipt of a third, April 7, 1999, faxed request from BOP.  Upon receiving that request and an accompanying Federal Court J&C for Wright from the BOP, the USPO acknowledged that they needed to do a Post-Sentence Report for this two year old case and immediately commenced a Post-Sentence investigation.  Meanwhile, on
April 22, 1999, the prosecutor informed the Court by letter about Wright's custody situation and that BOP was still awaiting a Pre [or Post-] Sentence Report which by that time, the Probation Office reported, was being prepared.

On April 30, 1999, BOP received the Post-Sentence Report (which report the USPO has a standing agreement to furnish to BOP within 60 days of a request).  On May 6, 1999, BOP notified the USMS that Wright had been designated for Leavenworth, Kansas.

The USMS file reflects that at that time, Wright's medical status delayed his transportation to the BOP.  In order to obtain a current medical clearance form (i.e., USMS-553) required prior to transportation by the USMS, Wright had been referred to a DOC medical unit for a chest x-ray.  It was reported to the Review Team that according to Wright, he had not been informed why he was referred for the medical test and when it did not occur relatively promptly (i.e., after more than an hour), he decided not to wait any longer and the test was not performed.  As a result, Wright had no medical clearance when he was moved from the Maximum Facility to the D.C. Jail on May 10, 1999 for transport by the USMS.  Consequently, the USMS refused to accept him for transportation by the Justice Prisoner Alien Transportation System (JPATS) since it was scheduled to bring him into relatively close contact with many other staff and inmates.  He was returned by the USMS to the D.C. Jail that day, and the next day was back at the Maximum Facility.  Wright was removed a second time by the USMS from  DOC on May 18,1999.  When that specially arranged plane trip also had to be canceled (because the pilot became ill), Wright was housed by the USMS at the Prince William County, Virginia jail.  He was delivered by road transport to the USP Lewisburg, Pennsylvania on May 20, 1999 in a holdover status as reflected on the return on the J&C in CR96-66 which was filed with the Court by the

The Leo Gonzales Wright Case Since December 1995

USMS.[7]   He remained in holdover status until his June 2, 1999 arrival at USP Leavenworth, Kansas.   After his arrival at USP Leavenworth, the Bureau of Prisons prepared a sentence computation for Leo Gonzales Wright (see Appendix 7m).

## C. Findings and Recommendations

### Findings

**F-28**   After his sentencing in September 1996, Leo Gonzales Wright was not properly classified and processed as a dual code prisoner.  Though securely confined, he was left in bureaucratic limbo and as a result, "administratively lost" within the criminal justice system for more than two years.  The commitment process involving several components of the Federal government and DOC broke down badly, as the entire system failed due to the convergence of multiple problems.  Were it not for the litigation by the Pruckmayr family and subsequent D.C. OIG Report highlighting his status, this situation may well have continued.  Some of the major contributing factors included:

- Interagency confusion and poor design of the process by BOP, USMS, USPO, and DOC in the proper handling of dual Federal/D.C. Code cases.
- Poor communication by these agencies to the Federal judges and prosecutors regarding the 1994 change in practice which by then presumptively placed these dual code cases into DOC rather than in the federal prisons.  This communications failure impacted on the use by the sentencing court of routine commitment language in the Judgement and Commitment Order (J&C), rather than a specific, targeted recommendation for federal placement.
- Inaccuracies in the sentencing language in the J&C and the apparent non-delivery of the J&C by the Marshal to DOC for 19 months after sentencing.
- The lack of preparation of either a crucial Pre- or Post-Sentence Report for use by correctional authorities and the fact that no federal probation officer was in the courtroom at sentencing.
- No one in the courtroom who heard the Judge's verbal order followed up to see how or if Wright was committed to a federal prison.  There is normally no follow up expectations or procedures for  Assistant

---

[7]During the entire period from sentencing until May 20, 1999, the blank lines on the USMS "RETURN" on the second page of the J&Cs filed with the Federal District Court in Wright's cases openly reflected that the USMS had never delivered Wright to a Federal facility.  Just as soon as Wright was so delivered pursuant to the J&Cs, the USMS executed the return on the J&C showing to whom, where, and when Wright was delivered by the USMS, and filed it in the Court's public case record, as is their regular practice in every case.  (see Appendix 7c.)

U.S. Attorneys. Occasionally, follow up communication with the BOP does occur, especially in high profile cases, as it ultimately did here.

**F-29**  The DOC case management staff for at least 19 months repeatedly failed to perform a full and accurate initial classification assessment as required by policy and good practice. As a result, they did not discover the lack of all the key classification documents, a Judgement and Commitment order, a Pre- or Post-Sentence Report, a current sentence computation or a current Face Sheet. Partly because of the inadequate flow of complete documents to DOC, Wright was mistakenly treated for over a year after sentencing in 1996 as not finally sentenced, but rather as a prisoner still awaiting final sentencing on some charges. Even when the lack of necessary documentation was discovered in mid-1997, DOC case management staff who took part in Wright's Initial Housing review at the Maximum Facility, took no action to correct those deficiencies. The DOC case management system should have had a way to alert correctional administrators and, in some fashion, to take into account the widespread notoriety of the case.

**F-30**  Some of these failures, as well as those mentioned below, result from the lack of management oversight or internal controls at the institutional or headquarters level of DOC's case management and inmate records operations.

**F-31**  The escorted funeral trip did not constitute a release from custody from either a legal or operational standpoint. It was within DOC's authority and policy and was handled, with one security exception initiated by the Transportation Administrator, within DOC's normal practice, however flawed that normal practice might be considered.

**F-32**  Approval of this community trip for a notorious murderer was unwise on the Warden's part, especially as he was in his first week in the agency, and he did not consult with his supervisor or director but only with subordinate staff. He also did not review the full case file, but only a very brief summary form with a few attached pages, although that apparently was the common practice in the agency until recently.

**F-33**  The one page Escorted Trip Summary provided to the Warden, as well as most of the information conveyed to the Warden by the case manager and other subordinate administrators, was materially inaccurate, failing to convey all the available information about the current convictions, sentences, notoriety or judicial concern, and focusing instead on 20-year old data from the 1976 case. The case management staff performed poor work both during the intake screening process on Wright at the Maximum Facility, and soon after in reviewing the file and summarizing the case for the Warden as he made his decision on the escorted trip.

**F-34**  Although additional armed security officers were present at the funeral home to assist escorting officers and to protect the public, it was poor practice and severely stretched the limits of agency policy for only two officers to be sent to escort Wright and another prisoner also serving a life sentence for murder together in a vehicle from Lorton to the funeral viewing in the District. Apparently, neither warden was

The Leo Gonzales Wright Case Since December 1995

aware of the other inmate's potential participation when he approved the trip for his own inmate.

**F-35**   Once it was brought to their attention in January 1999 that Leo Gonzales Wright was being inappropriately held at Lorton, the federal apparatus did not move expeditiously in affecting his transfer from Lorton to federal custody, which occurred in May 1999.

## Recommendation

**R-24**   A formal internal administrative review should be commenced regarding the actions, omissions, and competency of Wright's caseworker and casework supervisor while he was at the Maximum Facility at Lorton.

Additional recommendations which support the findings of this chapter can be found in Part C of the Executive Summary. They include: R-1, R-2, R-3, R-6, R-7, R-9, R-10, R-11, R-12, R-13, R-14, R-15, R-16, R-18, R-19, R-21, and R-22.

# LEO GONZALES WRIGHT CHRONOLOGY

| | |
|---|---|
| May 16, 1957 | Born |
| January /February 1976 | Commits two armed robberies and shoots victims. One of the robberies results in the death of the victim. Arrested, released on bond, failed to appear and release revoked. |
| July/November 1976 | Pled guilty in D.C. Superior Court to armed robbery and second degree murder. Sentenced as an adult to 5 to 15 for armed robbery and 15 to 45 consecutively for second degree murder.  Charges dismissed on the other case. |
| November 25, 1989 | Inmate record reflects 38 disciplinary reports and transfers due to drug use, lack of program involvement, possession of shanks(weapons) and assaults on fellow inmates and staff. |
| March 1, 1990 | Wright placed in Central Facility's Unfoldment Substance Abuse Treatment Program (that could result in informal, rather than written, resolution of any additional disciplinary problems.) |
| March 19, 1991 | Transferred to Minimum Security Facility due to success in Unfoldment Substance Abuse Program. |
| February 1992 | Approved for and began Work Training Furlough Program at AMVETS Thrift Store. |
| May 4, 1992 | Due to continued success, Wright was recommended for parole through work release with special conditions of continued involvement in Unfoldment Program. |
| November 23, 1992 | First parole eligibility date for Wright.  In a September 28, 1992 parole report, the parole examiner recommended that early parole be denied. Parole was recommended by a Parole Board Member because Wright appeared not to have any disciplinary reports in over 4 years and maintained employment for 9 months.  Note:(His file contained detailed evidence of six disciplinary reports from May 1988 - November 1989). |
| February 23, 1993 | Wright was paroled through work release but with maximum supervision and continued participation in the Unfoldment Program as conditions of parole. By that time he was 35 years old and had spent nearly 17 years in prison. |
| December 1994 | After missing several monthly parole visits, Wright reported to his parole officer and was not required to report again until June 5, 1995. |
| May 24, 1995 | Wright was arrested in D.C. for automobile theft. Although the charge was dropped for lack of evidence, the police nor pretrial services notified the Parole Board. |
| June 5 & 7, 1995 | Wright appeared for Parole counseling and was referred for drug treatment but failed to keep the appointments. |
| June 28, 1995 | Wright was arrested in D.C. for Possession With Intent to Distribute Cocaine (PWID). The Parole Board was notified on July 3 but the parole violator warrant was not issued in time to delay release. The charges were dismissed on July 7. |
| July 7 & 10, 1995 | Parole Violation Warrant was issued and executed. After a Parole Revocation Hearing, Wright's parole was reinstated on July 31,1995. |
| August 2, 1995 | Wright was arraigned in D.C. Superior Court on the PWID charge, pled not guilty and was released by the court with a condition of drug testing twice weekly. His trial date was set for January 31, 1996. |
| August 7, 1995 | Wright had a positive drug test result. |
| September 20, 1995 | Parole Delinquent Notice sent to Wright's home requiring him to report to his parole officer on October 4, 1995. Wright failed to report to the officer on that date. |

Leo Gonzales Wright Chronology

| | |
|---|---|
| December 1995 | Wright uses a butcher knife to commit two separate carjackings on victims Kristina Keyes and Bettina Pruckmayr. Wright murders Pruckmayr. Arrest, search and Parole Violator warrants are issued for Wright. Nine days after the Pruckmayr murder, Wright is arrested after a high speed chase. |
| March 7, 1996 | Wright was named in a federal indictment on one count of carjacking resulting in a death and five other D.C. Code crimes, including first degree murder, armed robbery and armed kidnaping. |
| September 9, 1996 | Wright was sentenced in Federal Court in the Pruckmayr and Keyes cases. He received life without parole on the federal counts and on the other counts, consecutively, five D.C. sentences totaling 120 years to life for the Pruckmayr case; and 15 years to life under the D.C. code to run consecutively to any other sentence for the Keyes case. |
| September 13, 1996 | Two Federal Judgement and Commitment Orders were filed. |
| September 18-30, 1996 | Wright appealed the consecutive nature of the sentences on three of the five counts in the Pruckmayr case. Orders were issued terminating Wright's outstanding felony cases and the District Court issued its first order amending the Judgement and Commitment Order. |
| March 20, 1997 | District Court issued its second order amending the Judgement and Commitment Order by deleting the consecutive nature of counts 2-4. |
| June/July 1997 | Wright moved from the Jail to the Adjustment Unit at Occoquan Facility to Maximum Facility. |
| August 1997 | Wright was taken on an escorted trip to view the remains of his mother and spent 5 minutes at the funeral home. |
| April 1998 | DOC sent a written request to the District Court Clerk's Office for the official Judgement and Commitment orders in Wright's case. |
| July 8, 1998 | DOC released Wright's complete file to the D.C. Inspector General pursuant to a legal action filed by the parents of Bettina Pruckmayr. |
| July 21, 1998 | DOC receives the court orders amending Wright's J&C and a corrected Face Sheet # 2 for Wright was generated. |
| January 25, 1999 | The D.C. Inspector General filed his first report. |
| January 27 & February 2, 1999 | The prosecutor who handled the Wright cases wrote the BOP and the USMS to request an immediate federal designation for Wright. |
| February 1999 | BOP received USMS Form 129 but lacked a Presentence Investigation Report. Contacts were made to the USPO to obtain a Pre/Post Sentence Investigation Report. |
| April 1999 | After repeated inquiries from the BOP, the USPO determines that a presentence investigation was never done on Wright. The USPO immediately initiates a post-sentence investigation and completes it in about 3 weeks. |

Leo Gonzales Wright Chronology

| May 6, 1999 | BOP notified the USMS that Wright has been designated to USP Leavenworth, KS. |
| May 10, 1999 | Wright was readied for USMS transportation but the USMS airlift system refused to accept him because he did not have a current medical clearance. |
| May 20, 1999 | Wright was received at USP Lewisburg, PA in holdover status. |
| June 2, 1999 | Wright arrived at USP Leavenworth. |

**PLEASE NOTE: The Appendices section of the Report is not available as on-line document**.