Page 1 (top)

# LegalTimes
LAW AND LOBBYING IN THE NATION'S CAPITAL

JUNE 5, 2006

ALM

**Held Over:** A second lawsuit has been filed against the District claiming that inmates are still being kept in jail after their sentences have been served. **Page 8**

## Decoding the Libby Defense

WILLIAM JEFFRESS, SCOOTER LIBBY, AND THEODORE WELLS

## Asbestos Work Could Cause Third-Degree Burn

Gilbert Heintz Fights Order To Pay Back $9.7 Million

BY ALEXIA GARAMFALVI

The sleek design and glistening motorcycles in the lobby of Gilbert Heintz & Randolph's Washington, D.C., office are a testament to the insurance-recovery firm's successes representing clients in asbestos bankruptcies and other matters. The office certainly doesn't give the impression that the firm itself could be teetering toward the edge of bankruptcy.

But that's the situation Gilbert Heintz could be in if it is forced to immediately make good on an order from a New Jersey court to return approximately $9.7 million in legal fees it earned representing New Jersey flooring manufacturer Congoleum Corp. in asbestos bankruptcy proceedings, says the firm's lawyer fighting the order.

"Common sense would tell you that

1449-502451

0056- 001

By SARAH KELLEY

I. Lewis "Scooter" Libby Jr. never meant to lie to the FBI or to a federal grand jury. Instead, his lawyers blame "confusion" or a "faulty memory" for his failure to disclose conversations he had with reporters about CIA operative Valerie Plame.

In other words, he simply forgot.

Given the hectic nature of his job as Vice President Dick Cheney's chief of staff, Libby's lawyers say, it's understandable that their client might have failed to remember "snippets of conversation" he felt were unimportant.

See LIBBY, PAGE 12

Scooter Libby's lawyers are leaving clues to their strategy for his upcoming perjury trial.

GHR can't save, said Alan Kraus, a partner at Latham & Watkins' Newark, NJ, office, at a May 15 hearing held in the U.S. District Court for the District of New Jersey on the firm's motion to stay the disgorgement order pending its appeal. Kraus said the firm had $2.3 million in liquid assets as of the end of March and argued that if Congoleum were to execute on the judgment immediately, it could drive Gilbert Heintz out of business—"potentially into bankruptcy." And that would mean Congoleum would get none or nearly none of the $9.7 million back, he added.

But that's exactly what Congoleum has done. The company asked the court last week to enter the order, which would allow it to execute the judgment, register it with the District of Columbia, and begin collecting the money. Judge Kathryn Ferguson of the U.S. Bankruptcy Court for the District of New Jersey will hold a hearing on Congoleum's request this month. If she grants the

See GILBERT, PAGE 19

*A Special Report, Page 20*

**Gilbert Associates**

## Help Wanted

Social conservatives seek a new vanguard.

BY JOE CREA AND ANDY METZGER

This week brings to Capitol Hill a bunch of familiar conservative standards that play like a greatest-hits package from a venerable rock band: A constitutional amendment to ban same-sex marriage. Another amendment to outlaw flag burning. Tax cuts pitched as a family value.

But if the songs remain the same, the front man has gone missing.

For social conservatives, getting their issues a public airing has been a cakewalk since President George W. Bush took office in 2001, but legislative victories have been few and far between. Now with the social-conservative champion, former House Majority Leader Tom

See SOCIAL, PAGE 14



TOM DELAY

DIEGO M. RADZINSCHI

## Open Mouth, Go to Jail

The convictions of Enron executives Kenneth Lay (right) and Jeffrey Skilling show the dangers of defendants testifying in their own defense, warns Joseph Aronica. Other CEOs ought to pay attention. Points of View, **Page 66**

$8.00   38>
6  59250  97340  6

## Legal Times

# COURTWATCH

PAGE 8 — JUNE 5, 2006

**Hush Up:** Kenneth Lay testified in his own defense, and look what happened to him, warns Joseph Aronica. Points of View, **Page 66**



# Jail Faces More Claims of Illegal Detentions

### Second suit against D.C. corrections officials says inmates are still being imprisoned past their release dates.

**BY BETHANY BROIDA**

After serving four months in jail for possession of marijuana and carrying a pistol without a license, Ricardo Luzano thought he was going home on May 3. That didn't happen. Instead, he spent nine more days in the District of Columbia's Central Detention Facility waiting for corrections officials to release him.

Now Luzano is one of several former inmates suing the D.C. government, claiming they were held in the jail past their release date despite the fact that they did not have any open cases or warrants against them. Some of the inmates say they were subjected to illegal strip-searches after the court ordered their release.

Lawyers for the former inmates say at least 100 people have been "over-detained" by the D.C. Department of Corrections since September 2005, with



**IN THROUGH THE OUT DOOR:** Former inmates of D.C.'s Central Detention Facility claim they were kept imprisoned after serving their sentences.

DIEGO M. RADZINSCHI

1449-502453

0056- 003

# Page 8 (bottom)

weeks past their release date. And on May 24, they filed an amended complaint in the U.S. District Court for the District of Columbia seeking class certification, which they say could add thousands more plaintiffs.

The suit, which was filed in February, came just one month after a federal judge approved the settlement of a similar class action. In that case, the D.C. government agreed to pay $12 million and promised to implement reforms that would make sure inmates were released on time.

U.S. District Judge Royce Lamberth hailed the settlement as an "exceptional" result: The government planned to use $3 million of the settlement money to build a state-of-the-art inmate-processing center that would eliminate the detention problem. In the interim, the government pledged, inmates would be discharged within 24 hours of their release date.

But positive results proved fleeting.

"*We thought they had gotten the over-detention issues under control*," says William Claiborne III, a solo practitioner who represents plaintiffs in both the current and the previous suits. He says the new era of reform was short-lived, and then in December "the system just collapsed."

In the current suit, which is also before Lamberth, Claiborne and his co-counsel, Barrett Litt of Litt, Estuar, Harrison, Miller & Kitson in Los Angeles and solo practitioner Ralph Robinson, have asked for an independent monitor to supervise the department's inmate-management system to ensure all inmates are released on or before their release date.

"Although the District had agreed to stop these practices, and indeed had done so in the context of the settlement, . . . the final order did not require that the practices stop," the attorneys say in the suit. "These practices have recently been revived, making it clear that a court order is necessary to ensure the rights of the class members."

Brenda Baldwin-White, general counsel for the Corrections Department, did not return calls for comment. Traci Hughes, a spokesperson for the D.C. Attorney General's Office, declined comment. The government has not yet filed a response in the new suit. They have until June 7 to do so.

## Settling Up

In 2002, Marcus Bynum and four other plaintiffs sued the District of Columbia, claiming the District routinely over-detained anywhere from 5 to 20 percent of inmates on any given day. The detentions, they claimed, stemmed from systemic problems with record keeping and a deliberate indifference by top corrections officials.

At the time, the types of claims in *Bynum v. District of Columbia* had never been litigated in the District, and in the settlement agreement even Lamberth acknowledged that during the course of the litigation "the outcome of this case was unclear and subject to serious risk of lack of success."

But the $12 million settlement was reached in August 2005. The District agreed to pay about $4 million to the lawyers and about $5 million to be split among the class members. The remaining $3 million would revert back to the government to build the new processing facility. In addition, the government agreed to provide an annual accounting of how many inmates were over-detained or strip-searched after they were ordered released and why.

The class of more than 4,000 individuals included anyone who was not released by midnight on their release date and was incarcerated between May 16, 2002, and Aug. 31, 2005. Everyone who was determined eligible will receive at least $50 from the settlement, and the named plaintiffs will split $200,000.

## Continuing Problems

Less than a month after the *Bynum* settlement was approved, Carl Barnes appeared in D.C. Superior Court on Feb. 15 for a bail violation and charges of unlawful entry and assault. Judge Patricia Wynn sentenced him to 90 days in jail but ordered his release for time served—he had been locked up since his arrest. But instead of being released, he says he was returned to the jail, where he was strip-searched and re-booked. He stayed there until Feb. 23, when he was finally freed.

Barnes' story is strikingly similar to the 20 affidavits from other former inmates that attorneys submitted with the complaint. Anthony Harris, who was convicted of violating bail and unlawful entry, says he should have been released the same day he appeared before Judge Ann O'Reagan Keary on Jan. 6 because he had already served his 30-day sentence. Instead, he spent 22 extra days in jail before he was released with the help of his attorney. Percival Pendergrass claims he was held for 20 days beyond his 45-day sentence on an assault charge and was released only after a corrections officer intervened. According to the affidavits, the former inmates were held for one day to three weeks past their release dates.

If *Barnes v. District of Columbia* is certified as a class action, it will cover any former inmate who was over-detained and subjected to a strip-search since the cutoff for the *Bynum* settlement on Aug. 31, 2005. According to the suit, the class could have thousands of members.

After the proposed settlement agreement in the *Bynum* case last August, Claiborne says, a process was put in place that avoided sending inmates back to the jail prior to their release. He says the city set up a processing center on the grounds of the former D.C. General Hospital to allow inmates to be released without having to go back through the corrections system. But in some of the affidavits, inmates complain that they were held at the center for hours waiting for their paperwork, only to be returned to the jail later on when the forms did not materialize.

Claiborne says it appeared the new system was working. But shortly after the *Bynum* settlement was announced in January, Claiborne says, he began receiving calls from people who wanted to participate in the original class action but their alleged over-detention happened after the settlement's cutoff. That is when he learned people were still being illegally held.

He says he doesn't know exactly why things began to deteriorate. But in the suit, the plaintiffs offer several reasons, many of them similar to allegations in the *Bynum* case: *problems with the Corrections Department's computerized inmate-accounting system, indifference on the part of corrections officials, and the resignation of competent managers in the records office, which handles the paperwork for releases.*

In his FY 2007 budget request, Devon Brown, who became director of the Corrections Department in January, asked for $525,000 to hire 11 additional staff members for the records department to help off-set the heavy workload.

But Claiborne says that without the court's intervention, he doesn't believe the corrections agency will fix the detainment issues, adding, "We would not have gone forward if we thought the problem was being solved."

*Bethany Broida can be contacted at bbroida@alm.com.*

1449-502454